**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| LEOPOLD RIOLA BARDAJI, Individually and on Behalf of All Others Similarly Situated, | Case No. _____ |
| Plaintiff, | **CLASS ACTION** |
| | **JURY TRIAL DEMANDED** |
| v. | |
| MATCH GROUP, INC., SHARMISTHA DUBEY, BERNARD KIM, and GARY SWIDLER, | |
| Defendants. | |

**CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS**

Plaintiff Leopold Riola Bardaji ("Plaintiff"), by and through his counsel, alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, including the investigation of Plaintiff's counsel, which included, among other things, a review of Defendants' (defined below) United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by Match Group, Inc. ("Match" or the "Company"), analyst reports and advisories about the Company, media reports concerning the Company, judicial filings and opinions, and other publicly available information. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I. **NATURE OF THE ACTION AND OVERVIEW**

1.  This is a federal securities class action on behalf of a class of all persons and entities who purchased or otherwise acquired Match common stock between November 3, 2021, through

January 31, 2023, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

2.      Match is a technology and social media company that operates one of the world's largest portfolios of online dating brands and apps.  Match's most notable dating apps include Tinder, Hinge, OkCupid, and PlentyOfFish.  Tinder, which generated more than half of Match's revenue during the Class Period, is Match's largest and most important brand.

3.      The Class Period begins on November 3, 2021, to coincide with Match's announcement of its third quarter 2021 financial results after the market closed on November 2, 2021.  In a letter to shareholders, Defendants touted Tinder's "radical product transformation," which included recently launched product initiatives such as a new "Explore" feature.  Defendants further stated that "[t]he interactive and social experiences within Explore are the harbinger for Tinder's long-term vision," and noted that Tinder was working on several other monetization opportunities, such as an in-app virtual currency.

4.      Throughout the Class Period, Defendants continued to represent that Tinder was effectively executing on several critical product initiatives that would drive growth for the Company in 2022 and beyond.  For example, as recently as May 2022, Defendants assured investors that Tinder was "on track" with these product initiatives and "on schedule with what [Tinder] planned to deliver in 2022."

5.      Investors began to learn the truth on August 2, 2022, when the Company announced financial results for the second quarter of 2022 and warned that it expected Tinder's growth to slow in the second half of 2022 as the result of poor product execution.  Specifically, Defendants admitted that "Tinder did not deliver on its product roadmap for the first half of the year," forcing

the Company to delay the launch of several initiatives and optimizations that it had previously expected to generate growth in 2022.

6.      On this news, the price of Match common stock declined $13.47 per share, or more than 17%, from a close of $76.71 per share on August 2, 2022, to close at $63.24 per share on August 3, 2022.

7.      Despite these revelations, Defendants continued to assure investors that the Company had revamped the Tinder team and that the new team was successfully executing on the initiatives.   For example, on November 1, 2022, Defendants assured investors that Tinder's "[p]roduct execution is already improving" and that "early results are showing promise."

8.      However, on January 31, 2023, the Company reported disappointing financial results for 2022, including total revenue that missed the Company's prior guidance.   Defendants largely attributed the shortfall to "weaker-than-expected product execution at Tinder, the effects of which became more pronounced as the year progressed."   During an earnings conference call the following day, Defendants further admitted that Tinder had "decelerated as the year went on."

9.      On this news, the price of Match common stock declined $2.71 per share, or 5%, from a close of $54.12 per share on January 31, 2023, to close at $51.41 per share on February 1, 2023.

10.     This Complaint alleges that, throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts, about the Company's business and operations.   Specifically, Defendants misrepresented and/or failed to disclose that: (1) the Company was not effectively executing on Tinder's new product initiatives; (2) as a result, the Company was not on track to deliver Tinder's planned product

initiatives in 2022; and (3) therefore, Defendants' statements about the Company's business, operations, and prospects lacked a reasonable basis.

11. As a result of Defendants' wrongful acts and omissions, and the significant decline in the market value of the Company's common stock when the truth was revealed, Plaintiff and other members of the Class (defined below) have suffered significant damages.

## II. JURISDICTION AND VENUE

12. Plaintiff's claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

13. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because Match is incorporated in this District.

15. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

16. Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Match common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

17. Defendant Match is a Delaware corporation with principal executive offices at 8750 North Central Expressway, Suite 1400, Dallas, Texas 75231.

18.     Defendant Sharmistha Dubey ("Dubey") was the Company's Chief Executive Officer from March 1, 2020, until May 31, 2022, and is a Company director.

19.     Defendant Bernard Kim ("Kim") has served as the Company's Chief Executive Officer since May 31, 2022, and is a Company director.

20.     Defendant Gary Swidler ("Swidler") has served as the Company's President since January 26, 2023, and is, and at all relevant times was, the Company's Chief Financial Officer.

21.     Defendants Dubey, Kim, and Swidler are collectively referred to herein as the "Individual Defendants."

22.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Match's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market.  Each Individual Defendant was provided with copies of the Company's reports alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and/or were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.

23.     Match and the Individual Defendants are collectively referred to herein as "Defendants."

IV.     **SUBSTANTIVE ALLEGATIONS**

A.      **Background**

24.     Match is a technology and social media company that operates one of the world's largest portfolios of online dating brands and apps.  Match's brands include, among others, Tinder,

Match, Hinge, OkCupid, and PlentyOfFish.  Match common stock trades on the NASDAQ under the ticker symbol "MTCH."

25.     Match's largest brand is Tinder, which accounts for more than half of the Company's revenue.

26.     On June 22, 2021, Match announced that the Company planned to launch a number of new product features for Tinder, including the option for users to post videos to their profiles, a new "Hot Takes" chat experience, and an "Explore" feature within the Tinder app, which would provide users with a new way to discover potential matches who share similar interests.  In announcing these forthcoming features, Jim Lanzone (then Tinder's Chief Executive Officer) stated that the launch "lays down the building blocks" for "a deeper, multi-dimensional experience that expands the possibilities of Tinder as a platform."

27.     On August 3, 2021, in a letter to shareholders announcing the Company's financial results for the second quarter of 2021, Defendants stated that "[w]e are excited about the product roadmap and execution velocity at Tinder, as the brand expands from a like/match/message-only paradigm to a multi-dimensional experience which also allows for serendipitous connections across shared interests."  Defendants further touted the potential of Tinder's new features, representing that "[t]hese new features are driving enhanced engagement, higher match rates and are resonating especially well with women."

28.     Similarly, during an earnings conference call on August 4, 2021, Defendant Dubey stated that Tinder's product launch team "is executing really well, carefully testing the building blocks of this transformation road map," and that "[i]t's been super encouraging to see the promising engagement metrics with these new products."  Defendant Swidler further represented

that "Tinder's growth has accelerated, and the product is evolving in exciting ways that we expect will present real revenue opportunities for us over time."

**B.      Defendants' False and Misleading Statements**

29.      The Class Period begins on November 3, 2021, to coincide with Match's announcement of its third quarter 2021 financial results after the market closed on November 2, 2021.  In a letter to shareholders, Defendants touted Tinder's "radical product transformation" and assured investors that "[t]he first pieces of this transformation are already coming into view, starting with the [October 2021] launch of Explore™."  Defendants further stated that "[t]he interactive and social experiences within Explore are the harbinger for Tinder's long-term vision," and noted that other pillars of Tinder's monetization plan included forthcoming features "that are targeted in their value proposition to specific groups of people," as well as the introduction of virtual goods and an in-app virtual currency.  Defendants represented that initial tests of new targeted conversion features were "already underway," and that Tinder's virtual currency, called Tinder Coins, would "be essential for the virtual goods and trading ecosystem planned for 2022 and beyond."

30.      During an earnings conference call on November 3, 2021, Defendants continued to assure investors that Tinder's new features would drive growth for the Company.  For example, Defendant Dubey stated that "the Explore experiences should increase engagement and reactivation" and that "this, in turn, ought to provide more revenue optimization opportunities over time, both in terms of conversion, as well as [revenue per payer] growth."

31.      More specifically, Defendants assured investors that Tinder would undergo substantial, revenue-driving changes in 2022.  Specifically, when an analyst asked Defendants about the circumstances under which the Company's growth could be "above kind of the initial guide of around 20% year-over-year growth," Defendant Swidler stated that "***we have some really***

***bold and big initiatives planned for Tinder next year, especially around virtual goods and some***

***other areas as well***," which "could drive 2022 top line [growth] higher than what we've discussed

so far."[1]  Additionally, Defendant Dubey explained:

> So the virtual currency or the coins is something we think of as an infrastructure thing that's going to be necessary eventually for virtual goods.  And that particular component is currently testing, and ***we should have it sorted out in the next few months***.

> Now virtual goods, the team is working on a very Tinder-specific version of virtual goods that will help users with both self-expression as well as the ability to stand out, particularly in a one-to-many surface area that Explore experiences will enable.  And so the way we envision virtual goods is it is something that users will be able to collect as well as give and gift to others.  And so there's a lot of—in addition to this virtual currency, which is going to be a big component of what enables virtual goods, we do have to get the categorization of the goods and the design of it right.  We have to create a value structure and a currency for these goods.  And most importantly, to build the right experience that allows users to showcase them on the app in the right way.

> And so ***all of that is the plan for 2022***, and the plan is we build all of this out, test it out, learn it, refine it, work out the kinks in a couple of markets.  And then if we get this right, I do think this could be a multiyear revenue vector for Tinder, which doesn't exist today.  And so a lot of work done, but we're very optimistic that this is going to be a really fun thing on Tinder.

32.     On February 1, 2022, the Company announced its financial results for the fourth

quarter of fiscal year 2021.  In a letter to shareholders, Defendants touted strong growth at Tinder,

which "generated nearly $1.7 billion in Direct Revenue in 2021, up 22% over 2020, with year-

over-year growth above 20% in each of the last three quarters of the year."  With respect to fiscal

year 2022, Defendants projected 15% to 20% year-over-year growth in total revenue, "led by high-

teens growth at Tinder."

---

[1]      Unless otherwise noted, all emphasis is added.

33.     The February 1, 2022 letter also represented that "***Tinder continues to make strong***

***progress on the product roadmap we laid out in detail in last quarter's shareholder letter***."  More

specifically, Defendants stated that "Tinder continues to roll out Tinder Coins," which "will help

power Tinder's virtual goods ecosystem that is being built in 2022."

34.     During an earnings conference call on February 2, 2022, Defendants continued to

assure investors that notable product updates would drive substantial growth for Tinder in 2022.

For example, Defendant Dubey stated:

> Now Tinder, beyond a 22% revenue growth, in 2021, Tinder
> released its biggest update since the invention of the Swipe feature,
> and this was the launch of Tinder Explore.  Explore provides Tinder
> with additional flexibility to expand use cases to more dimensions
> of discovery and social live experiences.  Explore enhances
> responsiveness, offers surface and opportunity for regionally
> tailored experiences; has exciting media, video dating hybrids such
> as Swipe Night, wedding dates, concert Festival Mode; and it's
> clearly had a productive start with almost 70% of users adopting this
> experience.
>
> ***The 2022 roadmap has many more enhancements planned, along***
> ***with new monetization opportunities later in the year.***

35.     Similarly, in response to an analyst's question about how product initiatives such

as Explore would "affect[] the arc of Tinder growth over the next few years," Dubey stated:

> So Tinder Explore, what it did, it allowed us to create, successfully,
> a new surface area and experience without hurting the very efficient
> Swipe machine.  And the goal now is to have new and personalized
> experiences that are fun, interactive, useful in helping spark
> connections.  And we've already got 70% of our users adopting the
> experience, and we're seeing high levels of engagement and likes,
> messages and conversations.  ***So looking ahead, our plan is to***
> ***continuously launch and feature a variety of novel and engaging***
> ***experiences here.***
>
> *                *                *
>
> So additionally, as you can imagine, this new surface area with these
> Explore tiles also provides us opportunities for integrations with

third parties to drive new experiences in the app and offline.  And it gives people a reason to keep coming back and check out these new experiences.

And then as this—the adoption and engagement on the surface area increases, it does provide new opportunities to us to merchandise revenue features, both existing and new revenue features.  So that's why we're so excited about this whole new surface area that we've created.

36.     Defendants continued to assure investors that Tinder's new features were driving substantial growth and that Tinder was poised to soon monetize its new product features.  For example, at the Morgan Stanley Technology, Media, and Telecom Conference on March 7, 2022, in response to an analyst's question about "the strategy and monetization opportunity around virtual currency" and the effect of the Explore tab, Defendant Swidler stated:

So the Explore tab, I think, is a gateway to doing lots of different things.  It's a gateway to enable people to filter and say, "Oh, I went into that room, and that's where the dog lovers were or that's where the people who went to Berkeley are, and that's kind of who I want to meet, and so that's where I'm going." So it's got a very sort of basic function in the Tinder ecosystem.

But it also opens us up to lots of different experiences, whether it's Swipe Night, which is an interactive experience that everyone kind of does at the same time and can bond over.  We're about to roll out Festival Mode, which we've been delaying because of COVID.  But basically, that's going to enable people to connect through Tinder and say, I'm going to the same South by Southwest or some other festival that's coming up, and we're doing that with Live Nation.  And so it's a good example of the use of Explore for things that are happening right now that people are going through.  They can share the experience in common.  They meet online but then meet off-line, so it's a good collision of the online and off-line worlds.  We're doing it with partners, with name brands that people have heard of.  *So there's lots of interesting things that we're going to be able to do with the Explore tab, and we're just in the very early innings*.

I mean, I think the key thing was obviously building it, getting people to adopt it, go check it out.  *That's happened, and it's happened really well*.  Adoption, men, women, by geography has been really strong, and so now we can start to really build on it and

give people different experiences, give them more reasons to go there, more reasons to spend time on Tinder.  And then we can start to turn our attention to monetization down the road.

37.     On May 3, 2022, the Company announced its financial results for the first quarter of fiscal year 2022.  In a letter to shareholders, Defendants assured investors that the Company would deliver on its previously announced initiatives for Tinder, stating that "***[w]e're largely on track with the initiatives we laid out in our prior shareholders' letter and are especially excited about the future for Tinder Explore and virtual goods***."

38.     Defendants further represented:

> Tinder Coins, its in-app virtual currency, is on track to launch globally this summer.  Ultimately, we see major potential for Tinder Coins to support further customization of premium experiences for members, incentivize positive network behaviors, and be the financial backbone for the virtual goods and trading ecosystem which we expect to begin testing in the second half of 2022.  Tinder also continues to iterate and test a set of monetization features designed for female users, with a planned launch of a new female-focused package in the second half of 2022.

39.     Similarly, during an earnings conference call on May 4, 2022, Defendant Dubey stated that "by and large, ***we are on schedule with what we planned to deliver in 2022***."  Dubey further added that Tinder "***continues to make progress on its product road map, whether that is adding new experiences into Explore or innovating on new monetization features***."  Likewise, Defendant Swidler assured investors that "Tinder has a very healthy product road map for the rest of the year, with a lot of exciting initiatives planned in the back half," which "***will help offset some of the macro challenges***."

40.     Moreover, in response to an analyst's question about "what initiatives or product launches over the next six to nine months excite you the most to continue to capitalization on that [monetization] opportunity," Defendant Dubey pointed to "the virtual goods trading platform on

Tinder and this idea of collectibles" as initiatives that would help Tinder to increase its revenue per payer.

41.     Then, at an industry conference hosted by Cowen on June 1, 2022, in response to an analyst's question regarding "the pipeline for product at Tinder as we kind of get through the year," Defendant Swidler again stated that Tinder was developing an initiative around "women-oriented monetization features," and would be offering "a subscription package targeted at women sometime in the second half" of 2022.

42.     The above statements identified in ¶¶ 29-41 were materially false and misleading, and failed to disclose material adverse facts, about the Company's business and operations. Specifically, Defendants misrepresented and/or failed to disclose that: (1) the Company was not effectively executing on Tinder's new product initiatives; (2) as a result, the Company was not on track to deliver Tinder's planned product initiatives in 2022; and (3) therefore, Defendants' statements about the Company's business, operations, and prospects lacked a reasonable basis.

### C.     The Truth Begins to Emerge

43.     On August 2, 2022, the Company announced financial results for the second quarter of 2022, including Tinder direct revenue growth of 13% on a year-over-year basis.  The Company warned that it expected Tinder's growth to slow in the second half of 2022, projecting third quarter direct revenue growth in just the mid-single digits for Tinder.  In a letter to shareholders, Defendant Kim (the Company's new Chief Executive Officer) attributed this expected slowdown to poor execution, stating:

> Over these past few quarters, Tinder has continued to iterate on Explore™, including the launch of Music Mode™ and Blind Date, and we continue to believe there is much more opportunity for leveraging Explore.  However, over that same period, we have not been able to realize the monetization successes that we typically deliver.  ***Tinder's current revenue growth expectations for the second half of the year are below our original expectations as a***

*result of disappointing execution on several optimizations and new product initiatives.*  I believe Tinder's overall product execution and velocity can be improved and that we need to do more to excite our user base to drive top of funnel growth.

Today we're announcing the departure of Tinder CEO Renate Nyborg, and I have made some changes to the management team and structure that I am confident will help deliver Tinder's full potential.  While we search for a permanent Tinder CEO, I will oversee a newly formed team of executives who will manage day-to-day operations and will ensure the Tinder organization is well coordinated, ships great new features at increased velocity, and delivers on Tinder's promise.

*       *       *

In the near-term, the Tinder product roadmap remains focused on some of the key initiatives we previously laid out including to better serve our female users.  To that end, we'll be rolling out a new subscription package based on curated recommendations that we believe will appeal particularly to women.  We also plan to introduce several features to get users' friends more involved, such as a new patented Swipe Party™ feature, increasing the utility of Tinder and expanding its [total addressable market].  Additionally, we intend to introduce a shorter-term subscription package, which we think will appeal to newer Tinder users and drive incremental revenue.

*After seeing mixed results from testing Tinder Coins, we've decided to take a step back and re-examine that initiative* so that it can more effectively contribute to Tinder's revenue.  We also intend to do more thinking about virtual goods to ensure that they can be a real driver for Tinder's next leg of growth and help us unlock the untapped power users on the platform. *I'm confident that in the second half of 2022 the re-prioritization of the product roadmap, the new team and the gaming experience Mark and I bring will enable Tinder to make meaningful product progress and position it to achieve growth rates in 2023 and beyond that are more consistent with our aspirations*.

44.     During an earnings conference call on August 3, 2022, in response to an analyst's question about "what went wrong at Tinder," Defendant Kim further revealed that the Company's prior assurances that its initiatives were on track as of May 2022 were false, stating:

> ***Tinder did not deliver on its product roadmap for the first half of the year***.  And execution on a number of initiatives have been delayed that we were counting on for growth in Q3 and Q4.  Typically, Tinder works on big initiatives on the first half of the year that materialize in Payer and revenue growth in the second half of the year.  But that didn't happen this time around.  So we don't expect the same revenue bump that we typically see.

> As an example, a lot of time was spent building Explore.  It's a strong gateway with high engagement, but we haven't succeeded yet on innovating the user experience and then also building monetization features to maximize its potential.  I do believe that there is a lot of market opportunity and great product ideas at Tinder, but it's all about execution.

45.     Defendant Swidler also stated that "***some of the Tinder product initiatives and optimizations that we've been counting on for revenue growth in the second half of 2022 are not delivering as we'd expected and we[']re delaying some launches***."  More specifically, Swidler explained that "there were a series of other less keynote kind of initiatives and optimizations that were expected in the first half of 2022 to help us deliver the second half revenue, and also more initiatives in the back half of the year to help deliver the second half revenue," which the Company had not delivered.

46.     On this news, the price of Match common stock declined $13.47 per share, or more than 17%, from a close of $76.71 per share on August 2, 2022, to close at $63.24 per share on August 3, 2022.

47.     Despite these revelations, throughout the remainder of 2022, Defendants assured investors that Tinder's revamped team was now effectively executing and was on track to deliver on what the Company had promised.

48.     For example, during an industry conference hosted by Evercore on September 7, 2022, in response to an analyst's question about whether there is "anything structurally wrong with Tinder or is it purely an execution issue at Tinder," Defendant Swidler represented that "it's largely

an execution problem in a more competitive environment," and assured investors that the new

Tinder team was "*on the right track*" and that "their performance this quarter looks good."

49.     The following week, at a Goldman Sachs technology conference on September 14,

2022, Swidler similarly stated that the new Tinder team was "working together well" and was "on

a good track," such that the Company was "*on a much better track now*."  Swidler further

represented that Tinder's execution problems were "already underway of being cured and will not

be a factor in 2023 by the time we're sitting here hopefully next year at this conference."

50.     On November 1, 2022, the Company announced its financial results for the third

quarter of 2022.  Again, Defendants assured investors that Tinder was beginning to successfully

execute on its initiatives, stating that Tinder's "*[p]roduct execution is already improving*, the team

is galvanized and excited about the opportunities ahead, and a handful of new features have begun

testing, with more to come in Q4 and 2023," and that "*early results are showing promise*."

51.     Similarly, during an earnings conference call on November 2, 2022, Defendant

Swidler represented that "momentum . . . is building as the Tinder team makes more progress and

influences new things."

52.     Likewise, during a Wells Fargo conference on November 30, 2022, Swidler

reiterated the importance of good product execution and assured investors that "*that is in the

process of happening and is on a good track*."

53.     The above statements identified in ¶¶ 48-52 were also materially false and

misleading, and failed to disclose material adverse facts, about the Company's business and

operations.   Specifically, Defendants misrepresented and/or failed to disclose that: (1) the

Company was not effectively executing on Tinder's new product initiatives; (2) as a result, the

Company was not on track to deliver Tinder's planned product initiatives in 2022; and (3)

therefore, Defendants' statements about the Company's business, operations, and prospects lacked a reasonable basis.

54.     Indeed, despite Defendants' repeated assurances that Tinder was now on the right track, and its results improving, the Company reported disappointing financial results for 2022 on January 31, 2023.  Specifically, the Company's total revenue grew only 7% on a year-over-year basis—well below its target of growth in the mid- to high-teens.  In a letter to shareholders that day, Defendants admitted that "a significant portion [of the shortfall] resulted from weaker-than-expected product execution at Tinder, *the effects of which became more pronounced as the year progressed*."

55.     During an earnings conference call on February 1, 2023, Swidler further explained that "our business overall and *Tinder in particular, decelerated as the year went on,* and product execution was not what we expect[ed] it to be, especially in the first half of the year."  Defendant Kim also admitted that "we head into 2023 with less momentum than what we would like."

56.     On this news, the price of Match common stock declined $2.71 per share, or 5%, from a close of $54.12 per share on January 31, 2023, to close at $51.41 per share on February 1, 2023.

## V.     PLAINTIFF'S CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Match common stock during the Class Period (the "Class").  Excluded from the Class are Defendants, their agents, directors and officers of Match, and their families and affiliates.

58.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

59.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.     Whether Defendants violated the Exchange Act;

b.     Whether Defendants omitted and/or misrepresented material facts;

c.     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d.     Whether Defendants knew or recklessly disregarded that their statements were false and/or misleading;

e.     Whether the price of Match common stock was artificially inflated; and

f.     The extent of damage sustained by members of the Class and the appropriate measure of damages.

60.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

61.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in securities class actions.  Plaintiff has no interests that conflict with those of the Class.

62.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

## VI.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

63.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

a.    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.    The omissions and misrepresentations were material;

c.    The Company's common stock traded in an efficient market;

d.    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e.    Plaintiff and the Class purchased Match common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

64.    At all relevant times, the market for the Company's common stock was efficient because: (1) as a regulated issuer, the Company filed periodic public reports with the SEC; and (2) the Company regularly communicated with public investors using established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## VII.   NO SAFE HARBOR

65.    Defendants' "Safe Harbor" warnings accompanying any forward-looking statements issued during the Class Period were ineffective to shield those statements from liability. Defendants are liable for any false and/or misleading forward-looking statements pleaded because,

at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that the forward-looking statement was false.  None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## VIII.   LOSS CAUSATION/ECONOMIC LOSS

66.     Defendants' wrongful conduct directly and proximately caused the economic loss suffered by Plaintiff and the Class.  The prices of Company common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, which began to be revealed on August 2, 2022, and January 31, 2023, causing investors' losses.  As a result of their purchases of Match common stock during the Class Period, Plaintiff and the Class suffered economic loss, i.e., damages, under the federal securities laws.

## IX.   SCIENTER ALLEGATIONS

67.     During the Class Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of Company common stock during the Class Period.

## X.  CLAIMS AGAINST DEFENDANTS

### COUNT I

**Violations of Section 10(b) of the Exchange Act and
SEC Rule 10b-5 Promulgated Thereunder
Against All Defendants**

68.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

69.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and the Class; and (2) cause Plaintiff and the Class to purchase Company common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

70.     Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices thereof in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

71.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

### COUNT II

**Violations of Section 20(a) of the Exchange Act
Against the Individual Defendants**

72.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

73.     The Individual Defendants acted as controlling persons of Match within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of the Company, including the content and dissemination of the various false and/or misleading statements.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

74.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular accounting practices giving rise to the securities violations as alleged herein, and exercised the same.

75.     As described above, the Company and the Individual Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable under Section 20(a) of the Exchange Act.  As a direct and proximate result of this wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Company common stock during the Class Period.

XI.     **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

    a.        Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

    b.        Awarding compensatory damages and equitable relief in favor of Plaintiff and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

    c.        Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

    d.        Such other and further relief as the Court may deem just and proper.

## XII.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 6, 2023                    Respectfully submitted,

**DELEEUW LAW LLC**
*/s/ P. Bradford deLeeuw*
P. Bradford deLeeuw (DE Bar ID #3569)
1301 Walnut Green Road
Wilmington, DE 19807
Telephone: (302) 274-2180
Facsimile: (302) 351-6905
brad@deleeuwlaw.com

**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**
Naumon A. Amjed (DE Bar ID #4481)
Ryan T. Degnan
Karissa J. Sauder
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
namjed@ktmc.com
rdegnan@ktmc.com
ksauder@ktmc.com

***Counsel for Plaintiff Leopold Riola Bardaji***