**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| LEOPOLD RIOLA BARDAJI, *Individually and on Behalf of All Others Similarly Situated,* | |
| Plaintiff, | C.A. No. 23-0245-MN |
| v. | **Class Action** |
| MATCH GROUP, INC., SHARMISTHA DUBEY, BERNARD KIM, and GARY SWIDLER, | **Jury Trial Demanded** |
| Defendants. | |

**AMENDED CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

1. Lead Plaintiff, Northern California Pipe Trades Trust Funds ("NCPTTF"), alleges the following based on the investigation conducted by its attorneys. This investigation included, but was not limited to, review and analysis of (i) Match Group, Inc.'s ("Match Group" or the "Company") public filings with the U.S. Securities and Exchange Commission ("SEC"), (ii) transcripts of Match Group's public conference calls, (iii) Match Group's press releases, (iv) independent media reports regarding Match Group, (v) securities analysts' reports and advisories about the Company, (vi) other public statements issued by the Company, (vii) media reports about the Company, and (viii) interviews of former Company employees ("FE"). Lead Plaintiff believes substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## INTRODUCTION

2. This is a securities class action alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5, 17 C.F.R. § 240.10b-5, as promulgated thereunder, against Defendants Match Group, former Chief Executive Officer Sharmistha Dubey, current Chief Executive Officer Bernard Kim, and current Chief Financial Officer Gary Swidler.

3. This action is brought on behalf of all investors who purchased Match Group common stock during the period November 3, 2021 through January 31, 2023 ("Class Period"). Lead Plaintiff alleges Defendants made false and misleading statements and failed to disclose material facts which caused Match Group's stock to trade at artificially inflated and artificially maintained prices. Lead Plaintiff and Class members purchased Match Group common stock at these inflated prices, and Lead Plaintiff and Class members suffered losses when the truth was revealed and Match Group's stock price plummeted.

4. Match Group owns and operates the largest global portfolio of online dating services including Tinder, Hinge, Match.com, Meetic, OkCupid, Pairs, PlentyOfFish, Azar, and

Hakuna. Of these, Tinder is Match Group's largest brand, which generated over half of Match Group's revenue during the Class Period. Tinder quickly rose to scale and popularity soon after its launch in 2012, but it has since faced increased competition in the dating app sector.

5. This action alleges Defendants made materially false and misleading statements and omissions about (1) the integration of Match Group's acquisition of a South Korean company called Hyperconnect into its existing group of online dating services, and (2) Tinder's new product offerings, which were supposedly going to stem the decline in Tinder user numbers, revenue, and profitability. As alleged herein, Defendants' public statements about these subjects contradict details of the inner workings at Match Group obtained in connection with Lead Plaintiff's investigation, including based on interviews of a former Chief Product Officer at Tinder (FE 1), a former Senior Manager of Corporate Strategy for Match Group (FE 2), a former Vice President of Communications at Tinder (FE 3), and a Former Senior Marketing Manager at Tinder (FE 4), all of whom held those positions prior to and during the Class Period.

6. Hyperconnect was a South Korean "social discovery and video technology" company that operated two flagship apps, Azar, a 1-on-1 live video and audio chat app, and Hakuna Live, a social live streaming app that enabled group video and audio broadcasts with various features including virtual gifting, AR powered avatars, profile enhancements, and community building.

7. In June 2021, Match Group acquired Hyperconnect for approximately $1.7 billion. Yet Match Group had years earlier contemplated acquiring Hyperconnect for under $1 billion, in 2018. At that time the acquisition was opposed by its controlling shareholder, IAC. IAC, an incredibly successful value investor, has generated over $110 billion for its shareholders since 2000 through a strategy of "anti-conglomeration," in which IAC has bought, developed, and often

spun off companies as diverse as Match Group, Expedia, LendingTree, and Vimeo.[1] When Match Group executives expressed an interest in acquiring Hyperconnect for $1 billion in 2018, IAC opposed it as a poor fit and too costly.

8. In any event, after IAC separated itself from Match Group on July 1, 2020,[2] Match Group was free to disregard IAC's insight, and instead moved forward with acquiring Hyperconnect—at a price of $1.7 billion—nearly double what IAC had thought too high.

9. Hyperconnect, at the time of the acquisition, was apparently on track to generate about $200 million in revenue for 2020; just two years prior (and pre-COVID) it had generated only $60-70 million annually. Match Group executives told investors that Hyperconnect's value to Match Group went far beyond those nascently growing revenues from Hyperconnect's two social/video chat apps Azar and Hakuna Live. Instead, Match Group executives justified the high price tag with the supposed benefits of incorporating into Match Group's portfolio of dating apps (including Tinder) Hyperconnect's pioneering capabilities in developing high quality livestreaming and in-app video technology, capable in-house team of 200 engineers, and top notch technology in artificial intelligence ("AI") and livestreaming.

10. In fact, before its acquisition of Hyperconnect, Match Group did little to no due diligence into how Hyperconnect's AI and livestream technologies could integrate with Match Group's portfolio of apps, including Tinder. Only after Match Group acquired Hyperconnect did

---

[1] Jim Osman, *IAC/InterActiveCorp Is A $12 Billion Company That Has Created $128 Billion Worth Of Value. Shareholders Can Expect A Lot More. Here's Why*, FORBES (Jan. 4, 2022, 6:00 a.m.), https://www.forbes.com/sites/jimosman/2022/01/04/iacinteractivecorp-is-a-12-billion-company-that-has-created-127-billion-worth-of-value-shareholders-can-expect-a-lot-more-heres-why/?sh=271e5c86fcff.

[2] *IAC and Match Group Complete Full Separation*, PR NEWSWIRE (July 1, 2020), https://www.prnewswire.com/news-releases/iac-and-match-group-complete-full-separation-301086627.html.

Match Group even begin to determine whether its apps could integrate Hyperconnect's technology. Plus, at the time of the acquisition, Hyperconnect already intended to develop unrelated mini games and metaverse technology for itself, so it was unable (or at least unwilling without clear instruction from Match Group management) to devote any time or resources to exploring or implementing the integration of its technologies with Match Group's apps. And each of Match Group's app companies, such as Tinder, Hinge, and OK Cupid, already had their product roadmaps in place for the year, so it was impossible for the apps to abruptly change direction to incorporate new technology within a matter of months. As described below, FE 1 stated there was no integration of Hyperconnect's technology into the other Match Group apps during 2021.

11. Thus, by the start of the Class Period, it was internally known that benefits from incorporating Hyperconnect's capabilities into Match Group's portfolio of dating apps (including Tinder) could not be obtained for some time, if at all. When the chief technology officers ("CTOs") at the various app companies—to whom Dubey had delegated the work of figuring out whether and how Hyperconnect's technologies could be integrated with the portfolio apps—met with Hyperconnect, their questions about integrating Hyperconnect's technologies went unanswered. Tinder's CTO had no idea or plan on how to integrate Hyperconnect into the Tinder app.

12. Moreover, Hyperconnect underperformed financially right after it was acquired. From at least Q3 2021 through Q2 2022, Match Group Board members discussed how Hyperconnect had been underperforming during each quarterly Board meeting.

13. Still, throughout the Class Period, Defendants falsely and misleadingly touted the Hyperconnect acquisition for the general evolution of Match Group's dating app brands. For example, Defendant Swidler misrepresented in February 2022 that "*we continue to make great, great progress working with Hyperconnect***.** We have a lot of confidence in the team and their

innovation. *Our teams are collaborating really well globally. We're learning from them. They're learning from us. So it's really going well from that standpoint. And we think they are very quick on product.* They're innovative**.** *They move fast.* So that's all great from our perspective." Defendant Swidler likewise misrepresented in March 2022 that the "[t]he integrations with our brands and their audio and video chat capabilities is . . . going extremely well."

14. On August 2, 2022, the truth about the Hyperconnect integration failure was partially revealed when Match Group disclosed a $217 million impairment charge relating to Hyperconnect as part of its second quarter 2022 earnings, which contributed to its poor second quarter 2022 performance and informed investors for the first time that the Hyperconnect acquisition was not performing well, contrary to Defendants' previous representations. An impairment—which is a defined accounting term[3]—exists when the carrying amount of an asset or group of assets exceeds its fair value. *See* ASC 360-10. An impairment to an indefinite-lived intangible asset,[4] like that related to Hyperconnect, is addressed by ASC 350, which mandates that intangible assets not subject to amortization "be tested for impairment annually and more frequently if events or changes in circumstances indicate that it is more likely than not that the asset is impaired." ASC 350-30-35-18.

> The quantitative impairment test for an indefinite-lived intangible asset shall consist of a comparison of the fair value of the asset with its carrying value. If the carrying amount of an intangible asset exceeds its fair value, an entity shall recognize an impairment loss in an amount equal to that excess. After an impairment loss is recognized, the adjusted carrying amount of the intangible asset shall be its new accounting basis.

---

[3] The Accounting Standards Codification ("ASC") serves as the single source of Generally Accepted Accounting Principles ("GAAP").

[4] Intangible Assets are "Assets (not including financial assets) that lack physical substance. (The term intangible assets is used to refer to intangible assets other than goodwill.)" ASC 350-20.

ASC 350-30-35-19. Factors Match Group "consider[s] in making this determination [of whether an intangible asset is impaired] include negative changes in industry and market conditions, financial performance, business prospects, and other relevant events and factors." *See* Match Group 2Q22 Form 10-Q, at 12. Match Group's "impairment of $217.4 million recognized in 2022 related to Hyperconnect intangible assets … stemmed from a decline in projections related to a lower outlook for the business…." *See* Match Group 2Q22 Form 10-Q, at 36.

15. Hyperconnect's poor performance was further revealed later the same day when Defendant stated on an earnings call that Match Group instructed Hyperconnect to scale back:

> Given uncertainty about the ultimate contours of the metaverse and what will or won't work, as well as the more challenging operating environment, *I've instructed the Hyperconnect team to iterate but not invest heavily in metaverse at this time.* We'll continue to evaluate this space carefully, and *we will consider moving forward at the appropriate time when we have more clarity on the overall opportunity* and feel we have a service that is well-positioned to succeed.

16. Match Group's earnings release on August 2, 2022 also partially revealed Tinder's poor performance Defendants concealed throughout the Class Period, as discussed below.

17. Tinder is an iconic dating app that popularized the phrase "Swipe Right." It was acquired by Match Group in July 2017. Tinder's platform has remained largely unchanged, prompting users to either "swipe right" to like another user's profile or "swipe left" to dislike another user's profile. Newer apps such as Bumble and Hinge have focused on personality-based matching with the goal of quality over quantity. Tinder is the largest app by revenue owned by Match Group, accounting for approximately half of Match Group's total revenue. In the face of increased competition and innovation from newer dating apps, Defendant Swidler made clear that "Tinder needs to face that that's the competitive reality that it's dealing with" and "need[s] to innovate."

18. Tinder operates as a separate company from Match Group and its other dating apps. Tinder's culture is resistant to change and resistant to input from Match Group and engineering input from the other app companies. This, of course, would prove to be a tremendous challenge in incorporating Hyperconnect's technology onto the Tinder platform, undercutting the justification for the acquisition.

19. In the years before the pandemic, Tinder's user base was declining. This was in part because Tinder was popular with Millennials, many of whom had found their partners and no longer needed a dating app, and also because Tinder had not innovated with any new product features to attract new users to the app and to entice existing users to stay on the app for a longer period. The longer a user is engaged with the app, the more revenue it generates for Tinder.

20. In 2021, Match Group revealed several new product features that Tinder was to roll out hoping to boost revenues for Tinder. In a letter to shareholders filed on Form 8-K with the SEC on November 2, 2021, Defendants Match Group, Dubey, and Swidler touted the product features called Explore—an interactive social discovery interface—and Tinder Coins—a virtual currency that users could earn when using the app and could be used to pay for things, such as product upgrades—as "the harbinger for Tinder's long-term vision."

21. But FE 2 explained that Explore was a "dud" soon after it was introduced. Indeed, by mid-2022 only 5% of users were engaging with Explore.

22. In May 2022 Match Group, Dubey, and Swidler told investors that Tinder Coins was "on track to launch globally" in the summer of 2022. But a research study on consumer sentiment about Tinder Coins conducted three months prior had shown that "user reaction was baffled to negative," meaning that Match Group was aware well before their public statements that Tinder Coins was not well received by its users and would not be successful.

23. Defendant Bernard Kim replaced Defendant Dubey as CEO of Match Group on May 31, 2022.

24. On August 2, 2022, the Company announced financial results for the second quarter of 2022. As discussed above, Defendant Kim revealed that Match Group was taking an impairment charge of $217.4 million associated with Hyperconnect, which contributed to a $10 million operating loss in the second quarter of 2022.

25. On the same date, Defendants Match Group, Kim, and Swidler announced in a letter to shareholders filed on Form 8-K with the SEC that they expected Tinder's growth to slow in the second half of 2022 because of "disappointing execution on several optimizations and new product initiatives," and that Tinder has "not been able to realize the monetization successes that we typically deliver." Defendant Kim admitted that "*Tinder did not deliver on its product roadmap for the first half of the year*," including Explore, and Defendants Kim and Swidler explained that the Company was delaying the launch of several initiatives and optimizations it had expected to generate growth in 2022, including Tinder Coins. Match Group also announced that the Tinder CEO would be replaced, but the role still has not been filled. Defendant Kim would fulfill the role in the interim while the Company continued to search for a successor.

26. In response to the revelations about Tinder, as well as Match Group's announcement of the $217 million Hyperconnect impairment charge, as discussed above, Match Group's common stock price fell by $13.47 per share on August 3, 2022, or 17.5%.

27. Defendants, however, continued to misrepresent Tinder's potential for short-term growth after promising that Tinder's new leadership team would make meaningful progress in the second half of 2022. Only one month later, in September 2022, Defendant Swidler falsely told investors that the Tinder was "*on a much better track now*" and the execution problems were

"*already underway of being cured*." Defendants Match Group, Kim, and Swidler further stated that "*performance this quarter looks good*" and Tinder's "*[p]roduct execution is already improving*."

28. Indeed, as late as December 8, 2022, Defendant Swidler told investors at a Barclay's investor conference that "I think [what] we need people to focus on, is really the change and improvement in Tinder product execution *that is underway and that will happen through the course of next year.*"

29. None of these statements were true. The truth was fully revealed on January 31, 2023, when Match Group reported disappointing financial results and its first ever quarterly decline for the fourth quarter of 2022. Defendant Swidler admitted that "*Tinder in particular, decelerated as the year went on*," and Defendant Kim admitted "our performance fell short of expectations," directly contradicting the statements made just four months earlier, in September 2022, and Swidler's statement in particular made on December 8, 2022 (near the very end of the quarter) that Tinder's product execution was already improving and underway of being cured. Defendants Match Group, Kim, and Swidler made clear that the shortfall was due to "weaker-than-expected product execution at Tinder, *the effects of which became more pronounced as the year progressed*." Rather than improving, the effects of Tinder's poor product execution were getting worse at the time Defendants were representing to investors that Tinder was making meaningful progress.

30. In response to this news, the price of Match Group common stock declined $2.71 per share, or 5%, from $54.12 per share at close on January 31, 2023 to close at $51.41 per share on February 1, 2023.

31. This action seeks to recover for the significant losses suffered by Lead Plaintiff and members of the Class due to Defendants' false or misleading statements and omissions during the Class Period, and the resulting precipitous decline in the price of Match Group common stock upon the revelation of the truth.

## JURISDICTION AND VENUE

32. This Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

33. This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1337.

34. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c), and (d) because Match Group is incorporated in this District.

35. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of national securities exchanges.

## PARTIES

36. Lead Plaintiff, Northern California Pipe Trades Trust Funds ("NCPTTF"), the trust funds for Plumbers & Steamfitters Local 342, with principal executive offices located at 935 Detroit Ave., Suite 242A, Concord, California 94518, purchased Match Group common stock during the Class Period on the Nasdaq Global Select Market and was damaged thereby. *See* ECF No. 12-2, Ex. B.

37. Defendant Match Group is a Delaware corporation with principal executive offices located at 8750 North Central Expressway, Suite 1400, Dallas, Texas 75231. Match Group

common stock trades in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "MTCH." Match Group owns and operates the largest global portfolio of online dating services, including Tinder, Match.com, Meetic, OkCupid, Hinge, and Plenty of Fish.

38. Defendant Sharmistha Dubey was the Company's Chief Executive Officer ("CEO") from March 1, 2020 until May 31, 2022, and remains a Company director. Dubey is a control person of Match Group within the meaning of Section 20(a) of the Exchange Act. Dubey also currently serves as a director of Fortive Corporation (a technology conglomerate), Naspers (a multinational internet, technology, and multimedia holding company), and Prosus (a global investment group that is among the largest technology investors in the world). While serving as CEO of Match Group, Dubey oversaw its portfolio of brands, including Tinder. Dubey previously served as Match Group's President from 2018 to 2020, overseeing strategy, research, and development across the Match Group portfolio, including Tinder. She also served as the Chief Operating Officer of Tinder, where she led the team that launched Tinder Gold, one of its subscription products, which established Tinder as the highest-grossing non-gaming app globally. Dubey also previously served in various other roles across the Match Group portfolio, including as President of Match Group Americas, overseeing all product, engineering, and revenue functions at the portfolio's domestic brands, and Chief Product Officer of Match Group. She holds a B.S. degree in Engineering from the Indian Institute of Technology and a master's in engineering from The Ohio State University.

39. Defendant Bernard Kim has served as the Company's CEO since May 31, 2022, and is a Company director. Kim is also a control person of Match Group within the meaning of Section 20(a) of the Exchange Act. Kim also serves on the board of Five Below Inc., an American chain of specialty discount stores. Kim once served as President of Zynga, a mobile gaming and

interactive entertainment company, from June 2016 to May 2022. In that role, he built and led a global team that was responsible for Zynga's marketing, user acquisition, ad monetization, revenue, communications, consumer insights, data science, product management, business development, partnerships, M&A, and player network. Before joining Zynga, Kim was the Senior Vice President of Mobile Publishing at Electronic Arts Inc. for about 10 years. In that role, he oversaw Electronic Arts' mobile distribution, strategy, product management, analytics, network engagement, marketing, revenue demand planning, business development, third-party publishing, and mergers & acquisitions. He also led Electronic Arts' games division in Asia.

40. Defendant Gary Swidler has served as the Company's President since January 26, 2023, and has been, at all relevant times, the Company's Chief Financial Officer ("CFO"). Swidler joined Match Group as CFO in 2015. Swidler is also a control person of Match Group within the meaning of Section 20(a) of the Exchange Act. As CFO, Swidler oversees finance, accounting, tax, treasury, strategy, corporate development, and investor relations as well as corporate communications, ad sales, user privacy, safety, and data security. Before Match Group, Swidler held various roles at Bank of America for 18 years, including Managing Director and leading the Financial Institutions Investment Banking Group.

41. Defendants Dubey, Kim, and Swidler are also referred to as the "Individual Defendants." Match Group and the Individual Defendants are referred to collectively as "Defendants."

42. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Match Group, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers, and

investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading before its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions with the Company and access to material nonpublic information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## BACKGROUND

### I. Background on Match Group and Tinder

43. Match Group is a technology and social media company that operates one of the world's largest portfolios of online dating brands and apps. The Match.com platform was launched in 1995 and helped create the online dating category with the ability to search profiles and receive algorithmic recommendations. Match.com was acquired by media and internet company IAC Inc. in 1999. Match Group was officially formed in 2009, and IAC drove its acquisition of a sizable stake in the dating app industry. Match Group's most notable dating apps include Tinder, Hinge, Match, Meetic, OkCupid, Pairs, PlentyOfFish, Azar, and Hakuna. Match Group was spun off as a separate public company in July 2020.

44. Tinder, which generated more than half of Match Group's revenue during the Class Period, is Match Group's largest and most important brand. Tinder grew from around zero revenue in 2014 to an estimated $1.4 billion in 2020.

45. Tinder was launched in 2012 and rose to scale and popularity faster than any other service in the online dating category, growing to over 10.8 million payers as of the fourth quarter of 2022. The Tinder app offers a platform where users can search and match with potential

romantic partners based on their preferences and location. The well-known swiping mechanism is a quick way for users to sort through potential matches by swiping right or left, while the chat function enables users that match with each other to communicate. The customer segments Tinder targets are mainly singles aged 18-35, focusing on modern daters who value convenience and are more likely to use mobile devices for their social interactions and dating life.

46. Tinder employs a freemium model, through which users are allowed to enjoy many of the core features of Tinder for free, including limited use of the Swipe Right® feature (used to approve profiles to match with other users) and unlimited communication with other users. To use premium features, such as unlimited use of the Swipe Right feature, the ability to change one's location, more profile controls, and an ad-free experience, a Tinder user must subscribe to one of several subscription offerings: Tinder Plus®, Tinder Gold®, or Tinder Platinum®. Tinder users and subscribers may also pay for certain premium features, such as Super Likes and Boosts (to increase profile visibility), on a pay-per-use basis. Tinder Explore was later marketed as another feature available for users to interact with others in ways that are non-traditional to Tinder.

47. Tinder's revenue model capitalizes on its large user base and their desire for an enhanced online dating experience. While Tinder generates revenue predominately through its freemium app model and in-app purchases, it also makes money through advertising partnerships, selling ad space to third-party brands and businesses that want to reach its user base.

## II. Match Group Acquires Hyperconnect but Lacks a Concrete Integration Plan

48. Beginning around 2018, Match Group executives, including Dubey, were interested in acquiring Hyperconnect, believing its technology in livestreaming and AI would be a value add if implemented across Match Group's dating apps, and to gain access to markets in Southeast Asia. But IAC—a value investor with a stellar track record of purchasing and developing companies, before spinning them off as far more valuable entities, *see supra* ¶6—was staunchly opposed to

any acquisition, as the then-proposed purchase price of slightly less than $1 billion (for a company generating $60-70 million in revenue at the time) seemed out of line. Dubey and Swidler were apparently unmoved by IAC's assessment and remained (according to FE 2) overly enthusiastic about Hyperconnect.

49. After IAC fully divested itself of Match Group on July 1, 2020, Match Group quickly moved forward with its desire to acquire Hyperconnect, flying Hyperconnect's CEO to Dallas to strike a deal. On February 9, 2021, Match Group announced a $1.725 billion deal to acquire Hyperconnect and held an investor call, during which Dubey touted the intangible benefits Hyperconnect would bring to Match Group's whole portfolio:

> We're buying a great team with a like-minded philosophy and view of the global opportunity and market evolution. They have a tremendous track record of innovation and commercial success with capabilities in video and AI that we can leverage across the combined portfolio. Their experience in virtual currency, a la carte and gifting as well as their broad footprint and base in India, which are areas we've been looking to expand in, makes this transaction a great strategic fit.

50. In a press release issued the same day, Match Group boasted that "Hyperconnect is profitable and generated more than $200 million (based on preliminary data) in revenue in 2020, a 50% increase from 2019." The press release quoted Defendant Dubey:

> "With more than 75% of usage and revenue coming from markets spread across Asia, their product suite and regional footprint squarely complements our own. We will leverage our deep bench of expertise to help accelerate Hyperconnect's already-impressive growth, look to deploy Hyperconnect's technologies across our existing portfolio, and continue to invest in their growth."

51. The transaction was completed in June 2021, using 50% cash and 50% Match Group stock. 5.9 million shares of Match Group common stock were issued to complete the transaction.

52. Match Group did very little due diligence into Hyperconnect before the acquisition and had no plan for whether or how Hyperconnect's technology would integrate into Match

Group's existing suite of apps. There was minimal discussion and interaction with the CTOs of the various Match Group apps on how the Hyperconnect technology would integrate into the apps before the acquisition.

53. The CTO of Hinge and Tinder, Tom Jacques, met with the Hyperconnect team and asked questions about how to integrate Hyperconnect's technology into their apps, but the CTOs never got answers to what Hyperconnect could do or implement with it. According to FE 1 (who is described below), there was no integration between Hyperconnect and Match or Tinder during 2021. FE 1 said that as of November 2021, the CTOs of the brands were still investigating ways Hyperconnect's technologies might be integrated, but it did not look like there was anything obvious that plugged into existing Match Group products. Instead, they knew they would have to come up with new ideas that used Hyperconnect's technology. FE 1 spoke to Defendant Dubey about Hyperconnect after the acquisition, and Dubey said Hyperconnect had AI and some other things that Match was interested in exploring, but she delegated it to the brands to figure out what to do from there.

54. According to FE 2 (who is described below), beginning from at least Q3 2021, there were discussions at quarterly Board meetings that Hyperconnect had been underperforming expectations. FE 2 said that Hyperconnect had "basically underperformed from the moment [Match Group] acquired it." Plus, FE 2 said that, post-acquisition, Match Group "was not rolling out Hyperconnect technology to the Match Group properties."

## III. Leading Up to the Class Period, Tinder Faced Increased Competition from Rival Dating Apps and Pressure to Engage with Younger Users

55. Tinder's initial popularity quickly attracted new competitors in the online dating market, which now contributes to market saturation and reduced brand loyalty. Leading up to the Class Period, Tinder began to face increased competition from rival dating apps, including

Bumble, Hinge, OkCupid, and Coffee Meets Bagel. These apps set out to distinguish themselves from Tinder and were designed to facilitate more meaningful connections by emphasizing personality-based matching and focusing on quality over quantity. Smaller competitors, such as Happn, Plenty of Fish, and The League, also competed for user attention, and Meta also recently entered the dating space with Facebook Dating, further increasing competition in the sector.

56. As a result, Tinder now operates in a highly competitive market, with many companies vying for user engagement and market share. Defendant Swidler recognized that "*Tinder needs to face that that's the competitive reality that it's dealing with*. And when you face a tougher competitive reality, that's the time where you need to step up your game. *You need to innovate, you need to execute better than you have historically when you had more of the world to yourself*." Yet, before Explore was launched in 2021, Tinder's interface remained largely unchanged since its inception in 2012, focusing on profile photos for which users can either swipe right or left on potential matches.

57. While Tinder has a large user base, it has also become synonymous with casual dating and "hookup culture," which can alienate potential users looking for more serious relationships. This perception is driven by Tinder's simple interface, which focuses almost entirely on photos and locations. Additionally, some users may be tempted to download competitor apps due to the limited number of times users can "swipe right" on Tinder for free without a premium subscription, which can also lead to a decrease in user satisfaction and retention.

58. Tinder's static focus on photos and locations continued to drive its "hookup" image as competitor apps introduced deeper and more immersive approaches. Newer apps such as Bumble, Hinge, Coffee Meets Bagel, Siren, and Her are not as heavily based on images and aim to give users the ability to show more of their interests, personality, and identity. Bumble

distinguishes itself by only allowing women to send the first message to their matches, and Siren, which was launched in 2015, abandons the swipe interface entirely to avoid objectifying participants.

59. Other more recently created apps, such as Snack, are increasingly capturing the attention of Gen Z, a large audience for dating apps that Tinder is also seeking to attract. Snack bills itself as "TikTok meets Tinder" and invites users to upload short videos for potential matches to scroll through. Other new apps include Lolly, which allows users to "match with people while exploring sweet video content[;]" S'more, which blurs profile photos until people start messaging; and Feels, which features a carousel of short-form videos on profiles, where users are invited to express themselves in more dimensions. Feels is specifically marketed as the "anti-dating app," for people who believe that "swiping is boring" and that platforms like Tinder are too superficial. Laurent de Tapol, Feels' cofounder, stated in June 2021 that the app had attracted 150,000 users since launching in April 2021.

## IV. Tinder Was Failing to Execute New Product Initiatives During the Class Period and Its Growth was Hampered by Structural Issues

60. By the start of the Class Period, Match Group recognized the need for Tinder to innovate, telling investors in November 2021 that Tinder was "*already in the midst of a radical product transformation*" starting with the launch of Explore in the third quarter of 2021. Tinder announced the rollout of Explore in a press release on September 8, 2021, advertising it as a "newly-created hub within the app that will host completely new, interactive ways to use Tinder." Explore was aimed at giving members "more control over who they meet by giving them the option to navigate through profiles arranged by interest, while also allowing them to access a growing list of exclusive social experiences, such as Hot Takes, Vibes and Swipe Night - with many more to follow."

61. Both Tinder and Match Group touted Explore as a fundamental shift for the app that would allow Tinder to remain competitive. Tinder further stated in September 2021 that Explore "*represents the biggest update to Tinder since the invention of the original Swipe feature*, and in early testing nearly 80% of eligible Tinder members have flocked to try it." In a letter to shareholders filed on Form 8-K with the SEC on November 2, 2021, Defendants Match Group, Dubey, and Swidler also represented that, "*[t]he interactive and social experiences within Explore are the harbinger for Tinder's long-term vision*[.]" Explore was a clear attempt to push Tinder away from its roots as a swipe-based dating app towards something closer to an interactive social network, similar to TikTok and Snapchat.

62. While Explore was supposed to function as an alternative discovery model for users who were tired of swiping to identify potential dating partners, its utility was limited because Tinder collects so few details from its new users, especially compared to the more detailed sign-up process from apps like Bumble and Hinge, which require users to respond to many questions and provide details about themselves and their interests. In reality, according to FE 2, Explore "did not have much impact on attracting new users" and at the time of its launch, Explore was "a dud." FE 2 said that "Match executives knew that Explore engagement was only 5%."

63. In addition to Explore, Defendants Match Group, Dubey, and Swidler also stated in the letter to shareholders filed on Form 8-K with the SEC on November 1, 2021 that other pillars of Tinder's monetization plan included forthcoming features "that are targeted in their value proposition to specific groups of people," as well as the introduction of virtual goods and an in-app virtual currency called Tinder Coins. In the same letter, Defendants Match Group, Dubey, and Swidler represented that initial tests of new targeted conversion features were "already underway,"

and that Tinder Coins would "be essential for the virtual goods and trading ecosystem planned for 2022 and beyond."

64. Tinder Coins was intended to allow Tinder to monetize non-subscribers by allowing them to make ad-hoc or one-time purchases. Ideally, it would have encouraged users to spend more time and money on the app. Users who stay active and up-to-date on the site could acquire the coins for free, and users would also be able to pay money for them, similar to in-app game purchases. The coins could then be used to buy Tinder perks like Super Likes or Boosts, which were advertised as leading to more matches by increasing profile visibility. In October 2021, Tinder announced that the rollout of Tinder Coins would begin later that month in Australia.

65. On November 2, 2021, in a letter to shareholders filed on Form 8-K with the SEC, Defendants Match Group, Dubey, and Swidler stated that "Coins will be essential for the virtual goods and trading ecosystem planned for 2022 and beyond." Then, on May 3, 2022, in another shareholder letter filed on Form 8-K, Defendants Match Group, Dubey, and Swidler represented that Tinder Coins was "on track to launch globally this summer." But according to FE 2, an internal research team had already completed its pre-launch research on user sentiment about Tinder Coins, and a "readout" of results was presented to the head of products for Tinder and the corporate strategy team in or around February 2022, which showed that "user reaction was baffled to negative." And this is why Tinder Coins was not launched as planned. Yet Defendant Kim waited until August 2022 to reveal that Tinder Coins was not "on track" and that the Company would need to take a step back and re-examine the initiative "[a]fter seeing mixed results." Defendant Kim also admitted that Tinder Coins was not launched in a logical way as, normally, a company would first create demand for virtual goods and collectibles before rolling out a currency.

66. At the same time, on August 14, 2022, Defendant Swidler revealed a general execution problem at Tinder:

> [Y]ou've got a lot of good ideas at Tinder, but actually getting them out into the product is really critical. And testing them appropriately, rolling them out, refining them if they need to be, I think that is where Tinder missed some of the mark, both on some smaller stuff, less sexy stuff optimizations, however you want to characterize them, which we do quarter in, quarter out. I think that they did not do as good a job with some of the optimizations. Some they tried didn't work. But it's just a question of taking shots on goal. And you've got to continue to take shots on goal, and I think that they didn't quite get that done well.

67. Tinder's ability to roll out the features Defendants were announcing publicly was stymied by leadership turnover, as well as the failure to retain marketing and engineering talent. On the engineering side, Match Group was a "mid-major" in terms of the size of its engineering bench, according to FE 2. It could not be compared to a company such as Meta, for example, which meant that changes to product plans were more disruptive at Match Group, and, by extension, Tinder. There were around 100 engineers at Tinder during the relevant time. As a result, cancelling products or even reviewing products and changing direction were a huge time cost. When new initiatives were introduced, it was a burden for the engineers, as it might require new education and research, such as learning a new programming language.

68. According to FE 2 there was a "cultural disconnect" between Tinder and all the other Match Group app brands, and Tinder was also resistant to using engineers from different brands for work on Tinder initiatives. Tinder wanted tight control over feature deployments and did not want other external teams working on its products. Tinder was proud of having invented the "swipe" and developed a culture of reflexive rejection of collaboration across Match Group brands.

69. Leading up to and during the Class Period, Tinder had significant turnover at the executive level in products and marketing, which resulted in near constant changes to Tinder's

product roadmap. In the past five years, Tinder has cycled through three different CEOs: Elie Seidman from January 2018 to August 2020, Jim Lanzone from August 2020 to September 2021, and Renate Nyborg from September 2021 to August 2022, appointed after Match Group announced its first ever quarterly decline. During the Class Period, Tinder operated without a dedicated CEO after Nyborg's departure in August 2022, with Defendant Kim fulfilling the role in the interim while the Company searched for a successor.

70. In the past five years, Tinder also had four different chief product officers and two different chief marketing officers, plus a period of around 18 months in which Tinder had no chief marketing officer. Turnover in the chief marketing officer role was intensified by Tinder's lower marketing spend, compared to competitors such as Bumble.

71. Match Group later recognized the need to invest more heavily in marketing to proactively define the Tinder brand, rather than allowing user perception to brand Tinder as a space for casual hookups. On January 31, 2023, Match Group announced in its letter to shareholders for the fourth quarter of 2022 that Tinder planned to launch its "first-ever global marketing campaign this quarter" and that Tinder's marketing spend would increase as a result. The letter added that there was "less of a need to market" because Tinder "grew rapidly through strong, organic word-of-mouth" from the start. But it recognized that, "over time, *this lack of marketing has contributed to a narrow brand perception* that does not celebrate the breadth of relationship possibilities Tinder creates every day." The letter also stated that the "fresh, multi-channel brand campaign" would afford Tinder the "opportunity to showcase the full range of what it offers and develop a more accurate brand story that resonates with its core audience. *We believe that investing to build and properly position Tinder's brand will, over time, help engage both new and previous users*, and cement its position as a premiere global dating app."

**FORMER TINDER AND MATCH GROUP EMPLOYEES**

72. **Former Employee 1 ("FE 1")** was the Chief Product Officer at Tinder from approximately July 2020 through November 2021. FE 1 reported directly to Tinder's CEO, Jim Lanzone. Each of the Tinder CEOs reported directly to Match Group's CEO. FE 1 worked alongside Tinder's CFO (Joseph Ciesla) and CTO (Thomas Jacques). FE 1 said that under Dubey's tenure as CEO of Match Group, Tinder released almost no new features during 2022, which was "ineffective" and had a "huge, huge impact" on Tinder. In 2021, Tinder had a number of "irons in the fire" to improve overall revenue because competition was heating up—particularly from Hinge and Bumble, who were starting to eat into market share, though not dramatically. FE 1 stated that it was normal for Tinder to be delivering many initiatives per year, and for a small portion to fall behind or be discontinued (*e.g.*, 80/100 delivered, 20/100 behind or discontinued), but that those numbers flipped in 2022: most initiatives fell behind or were discontinued, and only a few were delivered (and those that were delivered, were delivered late).

73. According to FE 1, "Roadmap" is a common term within the software development industry: it consists of a set of deliverables, setting out the different phases of a feature or an idea from prototype to market to release, and is broken down by team. Virtual currency, i.e. Tinder Coins, was supposed to go live in 3Q22. The intention was that Tinder users could use virtual currency to spend $1-2 to stand out from others in an "a la carte kind of way" if they could not afford a $15 per month subscription.

74. Tinder rolled out a "soft launch" in some smaller test territories beginning in August 2021, mainly in Asia, whose user base is used to microtransactions with virtual currency. According to FE 1, the early data in August 2021 basically told them that the feature was probably a "little too busy" for the UI (user interface). As a result, they lost some users; retention was slightly worse even though there was an improvement in monetization. They saw this "right from the get-

go." Users would install Tinder and be introduced to several features as they go through learning how to use the app. This additional feature was virtual currency microtransactions, but the data was showing that this might be "one feature too far" and caused users to stop using the app. Users would get confused or think it's too busy or too much work.

75. FE 1 said of Hyperconnect that it was acquired with some very loose concepts as to how it would benefit the portfolio business units, but there was no plan at all as to how Hyperconnect would plug into an existing product offering, be it Tinder or Hinge etc. It did not have a direct plug-in to existing products. There were only loose ideas about how Hyperconnect's AI could be a potentially interesting add on to the matching and compatibility experiences and that maybe using Hyperconnect's technology instead of that of third parties would save money; however, feasibility was unknown. There was very little due diligence into Hyperconnect. Diligence was mostly kept at the Match Group level. Match Group's tech team evaluated Hyperconnect ahead of time, but FE 1's understanding was that the evaluation was pretty brief and pretty light. There was some consultation with CTOs of the individual brands, but when the CTO of Hinge and Tinder met with the Hyperconnect team and asked them a bunch of questions, the CTOs never got answers to what Hyperconnect could do or how it could be integrated into Tinder or Hinge.

76. According to FE 1, once Match Group started working on Hyperconnect, they realized the Match Group brands already had a roadmap and next year's projects committed, and they could not just drop them; they were already moving on them. FE 1 learned this from Tinder CEO Lanzone and otherwise through knowledge-sharing across Match Group brands. By the time it got to the point of even investigating integration with Hyperconnect, Match Group leadership realized it was a lot more work and the benefit was pretty low. Dubey delegated to the brands to

figure out what to do with Hyperconnect's resources. There was no integration between Hyperconnect and Match Group or Tinder in 2021. The CTOs of the brands were still investigating ways Hyperconnect might be integrated, but it did not look like there was anything obvious that plugged into the roadmap they already had. Instead, the CTOs knew they would have to come up with new ideas that used Hyperconnect. In 2Q21, FE 1's conversations with Tinder CTO Tom Jacques about Hyperconnect were limited to brainstorming efforts about what could Tinder do with Hyperconnect.

77. FE 1 discussed the Hyperconnect acquisition with Dubey. Dubey said Hyperconnect has AI and some other things that we are interested in exploring, but she delegated it to the brands to figure out what to do from there.

78. **Former Employee 2 ("FE 2")** was the Senior Manager of Corporate Strategy for Match Group from May 2018 through October 2022. FE 2 reported to Caleb Liu, the Vice President of Corporate Strategy. Liu reported to Swidler, to Dubey, and then to Kim after he succeeded Dubey. FE 2 had direct communication and was in meetings with each of these individuals. FE 2's responsibilities included helping to communicate to Match Group's CEO and Board updated information on corporate strategy for all of the Match Group brands, assisting the corporate development team with mergers and acquisitions, and working on competitive intelligence. On a granular level, this meant they put together presentation decks for management and the Board of Directors, and they assembled investor relations materials. Less officially, they also spent time dealing with the management turnover at Tinder by getting new CEOs up to speed and helping them set the agenda in their tenure.

79. FE 2 said that the CEOs of each brand in the Match Group portfolio met weekly with the then-current Match Group CEO. These regular meetings started under Mandy Ginsberg

and continued under Dubey and Kim. Under Kim, FE 2 was instructed to compile download and revenue numbers (the number of downloads of a specific app as well as the revenues the app had generated) and the Match Group apps' market shares before each weekly meeting. This information went into a metrics packet distributed to the meeting's attendees. Under Dubey, meetings were more free form: each brand CEO presented information they wished to share, and then Dubey would ask questions. At these meetings, the focus on Tinder was almost always on growth, while with Hinge it was user retention. Along with the weekly meetings, FE 2 sent comparative intel reports once a month to every Match Group executive (including Dubey and Swidler, brand CEOs, and others) that ranked the top 20 dating apps in the U.S. and Western Europe by quarter-over-quarter and year-over-year change in downloads. FE 2 said that Dubey and Swidler knew about the drop in users at Tinder from these comparative intel reports.

80. FE 2 said that quarterly Board meetings took place in person in New York, Los Angeles, or Dallas, except during the pandemic, when Zoom was used. FE 2 did not attend Board meetings but was at all prep meetings (along with Dubey and Swidler), where the Board meeting topics were decided. These prep meetings occurred twice a week in the lead-up to the Board meetings. FE 2 took guidance from Dubey and Swidler about what to focus on in the slide presentations for the Board. To craft the Board decks, FE 2 worked with the rest of the Match Group strategy team, who told the brands how many slides to provide for their respective brand. At every meeting, there were presentations about three or four brands of focus, Tinder, international growth and expansion, and Hyperconnect—a subsidiary acquired in 2020 after years of interest from Dubey that had been blocked by IAC before its complete divestiture from Match Group. There was always a section with slides presenting financial information, including

revenues and user growth for each brand. Board meetings had a tightly controlled invite list controlled by Dubey and Swidler.

81. Tinder's Board decks were not backward-looking; they did not provide information to compare metrics over time, and they did not show user acquisition numbers. Instead, they were mostly about new products and designed to blow past potential opportunities for reflection to avoid alarming anyone. Dubey directed the strategy team to prepare the decks this way. To collect information for the Board decks, FE 2 accessed the data warehouse used by Match Group and performed various SQL[5] queries. For example, FE 2 would query the number of minutes users spent on an app per week. This analysis could be performed on two different apps to determine the effectiveness (or lack thereof) of a new feature. The Board would receive the headline number, *e.g.* "People who have Tinder Places spent an additional 10 minutes on Tinder." FE 2 said Dubey and Swidler felt the Board members understood business trends, but not product metrics, so Dubey and Swidler carefully controlled the information going to the Board and wanted to control the discussion about uncomfortable topics; they did not want the Board in the weeds on product decisions. For example, if there was a bad month for downloads of an app, the number of downloads might be shown quarter over quarter instead of month over month—whatever would raise the least amount of questions. The emphasis—which came from Ginsberg (Match Group CEO before Dubey), Dubey, and Swidler—was on presenting the next initiative to the Board, to distract the Board from the current situation with Tinder or why it was not performing well.

[5] SQL (often pronounced "sequel") stands for Structured Query Language, which is a domain-specific programming language designed for managing data held in a relational database management system. SQL allows a user to access many records with a single command and without the need to specify how to reach a record.

82. FE 2 explained that the way to look at user growth or lack thereof on a dating app is through the metaphor of a leaky bucket. To fill a leaky bucket with water, you need to fill it faster than it leaks water. The leaking occurs when users get bored with an app and move onto a competitor or meet someone romantically and stop using the app. There is also a lag time between when a user starts using a dating and begins paying for it via subscription. The lag time can be as long as a year. At Tinder, user acquisition growth started to slow in 2018 due to various factors, including competition from apps like Hinge and Bumble. Nonpaying users of Tinder would switch to Hinge or Bumble before signing up for a paid Tinder subscription. Tinder began to feel like a utility because it was not rolling out new features quickly enough. By 2020, there were problems on both ends of the Tinder bucket—fewer users were signing up, and more users were leaving. Starting in 2020, Tinder saw two years of sequential user decline with top-of-the-funnel slowdown.

83. In 2018 and 2019, Tinder's revenues had started to stagnate as new-user acquisition was declining. The virality of the brand was wearing off, but marketing was not deployed to counter the slow fade. In 2018, Match Group and Tinder executives, including Dubey and Elie Seidman (then Tinder CEO) began considering using livestreaming to increase user engagement with various Match Group brands, including Tinder. FE 2 said there was a strong belief in the accretive benefits of the feature. The idea was that Tinder users would broadcast their day using livestreaming, and Dubey was an enthusiastic proponent. The Board, Dubey, and other top executives discussed acquiring a livestreaming company whose technology could be integrated with Match Group's brands, but Match Group chose to develop the feature in-house at that point. The development of the livestreaming feature took approximately a year and a half. In 2019, it was tested on Plenty of Fish ("POF") and OKCupid ("OKC"), both smaller apps than Tinder. The strategy team projected that POF would see a $20 million revenue increase from implementing

livestreaming, and that Tinder's benefit would be proportional in size to POF (*i.e.*, proportionally larger). Tinder began testing livestreaming on its platform before Seidman's tenure as CEO ended. Seidman was replaced by Lanzone, a former CEO of CBS interactive, who was thought to be an effective leader to oversee the rollout of livestreaming and other new features on Tinder; Dubey, the strategy team, and the Board had adopted a broader thesis that Tinder could engage new users through media, streaming, and interactive video-game-type features, such as "Swipe Night."

84. But testing of livestreaming on the Tinder app in 2020 did not yield encouraging results, showing it damaged Tinder's brand and revenues. Subscribers who had been paying $20 per month for Tinder Gold access could instead use the livestreaming feature and drop their subscriptions. U.S. users found the livestreaming feature to be sleazy and low-rent, like OnlyFans, and there were moderation issues. Reviewing data in Match Group's data warehouse and SQL queries (through which one could assess whether livestreaming was causing users to spend more/less time on Tinder) showed that the livestreaming feature did not translate into more user time spent on Tinder. So livestreaming was pulled from the Tinder app.

85. FE 2 said Lanzone's leadership at Tinder faltered. He failed to secure promised celebrity endorsements for Tinder. Nor did he have a good grasp of the tech business and lacked the skills and experience to run a core business. Lanzone was replaced by Renate Nyborg, who was promoted from her previous role as the head of EMEA (Europe, Middle East, and Africa) at Tinder. Dubey tasked Nyborg with rolling out Tinder's product roadmap, which included several features that had been under development since Seidman's tenure, including Explore and a Platinum (even higher than gold) tier subscription level. Platinum was intended for "super power users" and priced at $80 to $100 per month. Dubey and Nyborg met weekly to discuss Nyborg's priorities, but Nyborg nonetheless had different priorities for Tinder, including making it friendlier

for women and better for mental health. Nyborg's priorities might have been useful to the brand, but they distracted from the ongoing initiatives, and the rollout of the product roadmap really lost momentum. This, combined with Nyborg's management style—refusing to relocate from Switzerland to Los Angeles, setting up 11 direct reports with no hierarchy (including Tinder's heads of marketing, product, and engineering), which caused interpersonal conflicts and a lack of internal alignment—resulted in a failure to launch products, including Explore and the Platinum subscription plan. After less than a year, Dubey and Swidler decided Nyborg needed to resign. What also harmed Tinder was the turnover at the executive level in products and marketing. The turnover in the chief product officer meant that product roadmap kept changing, and Tinder had two stints during FE 2's tenure at Match Group, totaling 18 months, in which Tinder had no chief marketing officer.

86. FE 2 said Tinder's ability to roll out planned new features and initiatives was also stymied by (along with repeated management turnover) the lack of priority on retaining marketing and engineering talent. Match Group is a "mid-major" in terms of the size of its engineering bench, which meant that changes to product plans were more disruptive at Match Group (and by extension, Tinder) than at, say, Meta. Tinder had about 100 engineers total, so cancelling products or reviewing products and changing direction was a burden for the engineers and a huge time cost. Exacerbating the problem was that Tinder resisted using engineers from other Match Group brands for Tinder initiatives, wanting to maintain control over everything for the brand. Tinder's ability to attract top talent was hampered by its refusal to pay competitively: it paid engineers 10% less than engineers at other tech companies in Los Angeles, where Tinder is headquartered. On the marketing side, Tinder had been coasting on its well-known viral brand for years and did not invest in marketing, meaning less spend on marketing and uncompetitive pay for marketing personnel.

The brand had a stable of college campus-based promoters, but when the campuses closed with the COVID pandemic, Tinder had no backup plan. But Tinder's new user acquisition rate was declining even in the two years before the pandemic. When Tinder then saw a jump in users in the first year of the pandemic, the Company failed to capitalize on it and maintain momentum.

87. Ultimately, said FE 2, the features that Tinder launched in the last few years—Explore, and Tinder Coin in particular, were not effective at generating revenue or user engagement. Explore, rolled out in 3Q21, was a dud and had little impact on attracting new users. Explore was supposed to be an alternative discovery model for users who were exhausted with swiping to identify potential dating partners by finding other people with similar interests. Monetization was not the primary goal for Explore; the intention was to help users get around the lack of information available between users. But nine months after rollout, engagement was only five percent, meaning only five percent of Tinder users were engaging with the feature: Explore was not popular. The problem was that Tinder only required basic information to join—an email address and a few other data points—so most users had no interests or other personal information to discover. By contrast, apps such as Bumble and Hinge require new users to respond to a detailed questionnaire about who they are and their interests. The failure of Explore was determined by mining the data warehouse for comparative metrics, such as average length of time users spent on the app before Explore was introduced versus after it was launched. Match Group's strategy team also looked at conversion—the number of users who converted to subscribers from using it for free. Kim knew that Explore user engagement was only five percent because he specifically had an information request email sent for Explore user engagement metrics to the Match Group analytics team after the information was not provided at a weekly meeting. FE 2 was on the distribution list for these information requests. FE 2 believes the low user engagement numbers

for Explore were common knowledge among all Match Group and Tinder executives by the summer of 2022 because FE 2 was asked by a hiring manager that summer to put together a case study around Tinder and Explore for a listed strategy position, and the hiring manager said the position needed to be filled because "Explore numbers are in the low single digits and we need to increase engagement."

88. Tinder Coins had been in development for a long time and was intended to attract younger users and users outside the United States. The idea was that Gen Z and Asia-Pacific ("APAC") users have comfort with and like to use virtual currency. And virtual currency is more profitable because the issuer can receive a cut of the transaction fee levied to buy the virtual coins. But developing Tinder Coin was too complex for the return on investment. It was basically creating a new form of payment. And in a potentially lucrative target market, like India, introducing virtual coins was particularly challenging because only 20 percent of Indians have credit cards. So trying to integrate a way for Indian users to buy virtual coins was very challenging and consumed an inordinate amount of time and bandwidth. By February 2022, the development of Tinder Coins was nearly complete. Members of FE 2's corporate strategy team at Match Group were tasked with gauging consumer sentiment about the feature before its release. A readout of the pre-launch research on user sentiment about Tinder Coins—which showed that user reaction was baffled to negative—was presented to the head of products for Tinder and the corporate strategy team in February 2022. So negative were the results that Tinder Coins was shelved. FE 2 heard nothing further about Tinder Coins for the remaining eight months he worked at Match Group.

89. FE 2 said that midway through Nyborg's tenure at Tinder (end of 2021), it became evident that Explore and Tinder Coins were not panning out. Tinder saw revenue declining even before Nyborg started, but it takes a while for that to impact the top line. There were some pricing

adjustments that masked declines so the Company could still say to the investor that Tinder is growing revenues. But the "underlying metrics" showed a "big red flag" that in 6-12 months, Tinder was going to see a hit to the top line and they needed to do something about user retention. Under Nyborg that was not being addressed.

90. As for Hyperconnect, FE 2 said they worked with Match Group's corporate development team before the acquisition, sat in on meetings, helped with product testing, and participated in due diligence. Dubey and Swidler spearheaded the acquisition and had been overly enthusiastic about Hyperconnect since at least 2018. They were excited about Hyperconnect's livestreaming technology and also believed Hyperconnect could help Match Group expand internationally because Hyperconnect's users were mainly in Turkey, the Middle East, and parts of east Asia. But Hyperconnect had just two small apps—Azar, which offers video chat, and Hakuna Live, which uses audio-only livestreaming—that were generating only $60 to $70 million per year in revenues in 2018. Match Group made a huge bet on a company with an unproven track record. Match Group had been looking at Hyperconnect when FE 2 was first hired and contemplating an offer price of under $1 billion. But IAC, who was a majority shareholder in Match Group, refused to approve the deal. IAC strongly opposed it because they thought Hyperconnect had an inflated value. Once IAC divested itself of Match Group and therefore lost its Board seats, Hyperconnect's CEO Sam Ahn was flown to Dallas and a deal was struck—at a top-of-the-market price. FE 2 said the Hyperconnect deal could never have been successful for Match Group. Both Azar and Hakuna Live target users in Turkey and the Mideast; both markets use currencies that are weaker than the U.S. dollar. Dubey had envisioned deploying Hyperconnect's app developers for Match Group brands, but the integration did not work; the talent turned out not to be so great.

91. FE 2, along with Jared Sine (Chief Business Affairs & Legal Officer/Chief Legal officer & Secretary/General Counsel & Secretary at Match Group), Lance Barton (Senior VP Corporate Development & Investor Relations at Match Group), Dubey, and Joey Levin (CEO of IAC) engaged in the due diligence for Hyperconnect, in 2018, 2019, and 2020 up until the transaction took place. FE 2 continued to work with Dubey and Swidler after the acquisition to put together pitch slides on Hyperconnect for the Board.

92. FE 2 said that Hyperconnect lacked strong strategic guidance, lacked a focused strategy, and had slower execution. It did not focus on infrastructural improvements they could roll out to Match Group. Instead, Hyperconnect was putting engineering effort into mini games, metaverse, and other apps that never panned out. These efforts pulled focus away from the core responsibilities at Match Group, which are finding people that are compatible, matching them up, and improving the technology to do that. Thus, Hyperconnect never did anything to shore up parts of its business that were declining or otherwise invest in growth areas because the company's focus was on these new projects. Dubey and Swidler did not stop Hyperconnect and Ahn from continuing with these projects even though they were not the right priorities for Match Group. Instead, they wanted to make sure that Ahn was happy so Match Group could retain talent. Ahn was given the freedom to run the place and placed his wife—who did not have the skill set to manage such a company—as COO of Hyperconnect. It was purely a nepotism hire.

93. FE 2 said that post-acquisition, Match Group was not rolling out Hyperconnect technology to the Match Group properties. The main vendors for Match Group video were still external. Plenty of Fish uses a Canadian company called Meet Group for its live streaming technology—a small competitor dating company. Tinder uses an outside company as well. Theoretically, all the brands should be using Hyperconnect video technology, but they are not.

94. FE 2 said the fact that Hyperconnect was not adding the expected value was a formal section at Board of Director meetings for four consecutive quarters, beginning with 3Q21. In general, Hyperconnect was discussed at half of the Board meetings during FE 2's four-and-a-half-year tenure. Match Group flew Ahn in to present to the Board for the July/mid-2022 Board meeting; it was his "make-or-break" moment because Hyperconnect had underperformed from the moment Match Group acquired it. During the meeting, it was decided that Ahn would replace his wife with an external hire as COO.

95. FE 2 said that Kim was brought in as CEO of Match Group to replace Dubey to control Hyperconnect because Dubey had been reluctant to do so. Dubey had championed Hyperconnect for so long (she comes from an engineering background), since the days of IAC's opposition, but her interventions were ineffectual. Hyperconnect had free rein under Dubey.

96. **Former Employee 3 ("FE 3")** was the Vice President for Communications at Tinder from October 2021 through August 2022. FE 3 reported to Jenny McCabe, the Chief Communications Officer at Tinder at the time. FE 3 said that in their time at Tinder, Tinder failed to deliver on a variety of planned launches. The big problem was that Tinder was a rudderless organization from a product perspective. The company lacked a consistent chief product officer, and changing leadership repeatedly changed direction. The result is that products were talked about publicly that should not have been discussed because they were not ready. FE 3 described Tinder during their tenure as having the poorest leadership they had experienced in their multiple-decade-long career.

97. **Former Employee 4 ("FE 4")** was a senior marketing manager at Tinder from September 2019 through July 2022. FE 4 reported to Amy Wiedemann, Senior Director of Integrated Marketing at Tinder, who reported to Nicole Parlapiano, Tinder's Vice President of

Marketing, North America. However, FE 4 received direction directly from both Wiedemann and Parlapiano. FE 4 said the churn in leadership at Tinder—three CEOs, three CMOs, and two CPOs during his employment—impacted business priorities and stunted team development. FE 4 said it was part of their job to know Tinder's product roadmap because they worked on product marketing. Product priorities were also constantly changing.

98. According to FE 4, a new Tinder product was often "announced before it was in the market." FE 4 said that "there was a disconnect": A new feature "was touted as a future product when it was [actually] still a prototype, before it [had been] rolled out to the public." FE 4 knew this, because they "knew what the comms strategy was for the [product] features." The strategy consisted of promoting a Tinder product still under development by the product team "to the consumer and the industry press."

99. FE 4 said that Tinder Coins was promoted to consumers and the business press despite still being in prototype. And by the time of FE 4's departure from Tinder in July 2022, Tinder Coins was still not a viable, usable product. As for Explore, FE 4 was deeply familiar with the feature because they were responsible for its marketing strategy, including position its launch in the U.S. in summer/fall of 2021. Explore ended up having a negligible effect on user engagement, which FE 4 knew from the product usage dashboard circulated by the Match Group data analytics team. FE 4 said that users did not engage daily with Explore.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS

### I. Materially False and Misleading Statements About Hyperconnect

#### A. February 2, 2022 Fourth Quarter 2021 Earnings Call

100. On February 2, 2022, during the 4Q21 earnings call, Swidler responded to an analyst question about, among other things, the status of "integrating Hyperconnect, the team, the company":

> First of all, *we continue to make great, great progress working with Hyperconnect***.** We have a lot of confidence in the team and their innovation. *Our teams are collaborating really well globally. We're learning from them. They're learning from us. So it's really going well from that standpoint. And we think they are very quick on product.* They're innovative**.** *They move fast.* So that's all great from our perspective.

101. The statements identified in italics above were materially false and misleading, omitted material information, and Swidler knew or recklessly disregarded the truth in making these statements. Match Group was not making "great, great progress working with Hyperconnect," and their teams were not "collaborating really well globally." As detailed by FE 1, Match Group had no plan for how Hyperconnect's technology would plug into any of its portfolio products. Match Group had done "very little due diligence" into whether and how Hyperconnect's technologies could integrate with Match Group's products. Per FE 2, Swidler and Dubey had enthusiastically spearheaded the acquisition of Hyperconnect since at least 2018. FE 1 said Match Group had only "loose" ideas about Hyperconnect's AI as a "potentially interesting" add on to the matching and compatibility experiences and that using Hyperconnect's video technology instead of third-party technology might save money; feasibility was unknown at the time of the acquisition. Diligence was mostly kept at the Match Group level.

102. It turned out that Hyperconnect's technologies did not have a direct plug-in to Match Group's existing products. But rather than task Hyperconnect with figuring out the

integration of its technologies with Match Group's portfolio of products, Dubey delegated to the brands to figure out what, if anything, to do with Hyperconnect's video, audio, and AI resources. FE 1 had a discussion with Tinder CTO Tom Jacques in 2Q21 about what Tinder could do with Hyperconnect. FE 1 also stated that when the CTOs of Tinder and Hinge met with the Hyperconnect team, the CTOs asked many questions about what Hyperconnect could do or implement for their applications but received no answers. Problematically (as stated by FE 1), Match Group leadership learned shortly after the Hyperconnect deal closed that Match Group's brands already had a roadmap and their next year's projects committed (none of which were integrations with Hyperconnect), and they could not disengage from their roadmaps to attempt to integrate Hyperconnect's technology onto their platforms. Making for a perfect storm, FE 2 explained that Hyperconnect "lacked strong strategic guidance" and did not focus on infrastructural improvements they could roll out to Match Group, instead continuing to develop mini games and metaverse programs (which went nowhere). So no team was actually working on integration: Match Group's teams were not collaborating at all, let alone "well." According to FE 1, Match Group leadership realized the integrations between Hyperconnect and Match Group's portfolio products required much more work than believed and would be of little benefit. Match Group did not roll out Hyperconnect's technology to the other brands post-acquisition, said FE 2. Indeed, said FE 1, there was no integration between Hyperconnect and Match Group or Tinder in 2021.

103. Moreover, as FE 2 explained, beginning with the third quarter of 2021 and continuing for four consecutive quarters, a formal section at Board of Director meetings was devoted to Hyperconnect's failure to add expected value.[6] So the disappointment of the

[6] FE 2 explained that Dubey and Swidler regularly attended Board meetings.

Hyperconnect acquisition had already been the focus of two quarterly Board meetings at the time of Swidler's statements. Just three months later, in May 2022, Match Group would announce that Kim would replace Dubey as Match Group CEO before the end of the month. According to FE 2, the Board brought Kim in to control Hyperconnect because Dubey had been reluctant to do so, notwithstanding Hyperconnect's consistent underperformance.

104. Finally, Match Group leadership did not "think [Hyperconnect] are very quick on product" or that "[t]hey move fast." According to FE 2—who was one of the handful of individuals (including Swidler) involved in due diligence of Hyperconnect from 2018 through the acquisition in June 2020—Match Group's due diligence into Hyperconnect revealed that Hyperconnect had "slower execution."

105. Also during the 4Q21 earnings call, Swidler answered another question about Hyperconnect and its outlook for 2022:

> Right now, where -- *our outlook is still for a relatively flat performance in Q1 and Q2 on the Hyperconnect side*. And we think as these initiatives and more to come start to bear fruit, we'll start to see a reacceleration of growth into Q3 and Q4 in the back half of the year. *And that, of course, doesn't include all the great stuff they're doing for us across the portfolio, which is meaningful as well.*

106. For the reasons stated in ¶¶101-103, the statements identified in italics above were materially false and misleading, omitted material information, and Swidler knew or recklessly disregarded the truth in making these statements. Swidler also misled investors by portraying Hyperconnect's performance as flat as when, in reality, Hyperconnect was underperforming which was being discussed at each Board meeting, beginning in Q32021, according to FE 2.

**B. March 7, 2022 Morgan Stanley Industry Conference**

107. On March 7, 2022, Swidler spoke at the Morgan Stanley Technology, Media, and Telecom Conference, touting the enormous success in integrating Hyperconnect with Match Group, as for both personnel and technology:

> And then some of the other things coming out of Hyperconnect are really exciting. *The integrations with our brands and their audio and video chat capabilities is a huge step forward. It's going extremely well. The teams are working really well together. You never know when you mix two companies like that how it's going to go, but Hyperconnect is really innovative, really responsive. We're working hand in glove.* It's resonating well with the users at our Match Group and Meetic brands, and we're expanding their efforts to the Plenty of Fish brand and the Pairs brand in Japan in the second quarter. *And so the integrations are going really well* with a lot more to go and a lot more to do. And obviously, at some point, Tinder could make sense, as you asked about, with Explore, and integrating some of their capabilities into Explore certainly seems like a very logical thing to do. So lots more to go on integrating Hyperconnect.

108. For the reasons stated in ¶¶101-104, the statements identified in italics above were materially false and misleading, omitted material information, and Defendants knew or recklessly disregarded the truth in making these statements. The integration was not "going extremely well" and the team at Hyperconnect was not working "hand in glove" with Match Group's other teams. Just two months later, Match Group would announce that Kim was replacing Dubey as CEO. Kim was brought in specifically to control Hyperconnect because of Hyperconnect's underperformance. According to FE 2, Hyperconnect's products were not integrated into Match Group's other products.

**C. June 1, 2022 Cowen Industry Conference**

109. On June 1, 2022, Swidler spoke at the Cowen Technology, Media, and Telecom Conference, and he again touted the integration of Hyperconnect into Match Group while responding to a question about "how the [Hyperconnect] business is doing" given that "one of the rationales for [the acquisition] was maybe porting some of their technology to the other brands":

> Yes. I think—look, *Hyperconnect, we think the team is* great, very innovative, *very fast-moving.* They try a lot of stuff. Some work, some doesn't, but they kind of keep iterating. They've got this very interesting metaverse work that's going on now. And so they're going to keep trying different things. That's kind of their DNA, and we want to encourage them to do that.
>
> *They've got great video technology, great audio chat and video chat technology, and we've been leveraging that.* We've got it now in the Match app, in the Meetic

> app, in the Pairs app. *And we're looking at it in other places as well across our portfolio. And the interaction between our apps and the Hyperconnect team to build video chat, to build audio chat has been really, really good.*
>
> The feedback has been great. It's been super productive, very quick-moving, responsive to changes and improvements. *And so the leveraging of their capabilities around video and audio has really gone well, and their kind of look into the future with different technologies like related to metaverse has also gone really well.*

110. For the reasons stated in ¶¶101-104, the statements identified in italics above were materially false and misleading, omitted material information, and Defendants knew or recklessly disregarded the truth in making these statements.

## II. Materially False and Misleading Statements About The Rollout of Tinder Product Initiatives

### A. November 2, 2021 Third Quarter 2021 Letter to Shareholders

111. On November 2, 2021, after the markets closed, Match Group filed a letter to shareholders on Form 8-K with the SEC, signed by Defendants Dubey and Swidler, regarding Match Group's financial results for the third quarter of 2021 ("3Q21"). In the letter, Defendants Match Group, Dubey, and Swidler stated:

> *Our flagship brand, Tinder, in its mission to keep the magic of human connections alive, is already in the midst of a radical product transformation.* Tinder's iconic Swipe® feature will remain a key part of the experience, but with its deep and engaged user base, there is so much more Tinder can provide. *The first pieces of this transformation are already coming into view, starting with the launch of Explore™.* In October, Tinder opened its virtual doors to Explore, a new space within the app that will host interactive ways to meet new people. Available worldwide and *already demonstrating increased activity and engagement among members*, Explore gives members more control over who they meet, letting them navigate through profiles arranged by interest and giving them access to a growing list of exclusive social experiences like Swipe Night®, Hot Takes™, and VIBES. *This dynamic space will continue to add new experiences, like Plus One that launched in October, ahead of what is expected to be the busiest wedding season in history.*

* * *

*The interactive and social experiences within Explore are the harbinger for Tinder's long-term vision.* Ultimately, Tinder plans for Explore to host exclusive shared and live experiences where members can interact and connect with each other. The experiences can be tailored for international markets to bring specific cultural moments to life on Tinder around the world. *These new and fun ways to meet and make more meaningful connections are expected to be important drivers for increasing engagement and reactivation, regularly giving people new reasons to return to the app.*

112. The November 2, 2021 letter to shareholders also stated:

Tinder's monetization plans include three key pillars.

Optimize Existing Experience: Much optimization remains possible at Tinder. *The increased engagement driven by experiences in Explore are expected to drive Swipes, Likes and other activity to boost revenue growth via existing features. These experiences are still nascent today, providing ample opportunity to further increase the value of long-standing features.*

Targeted Conversion Drivers: Tinder has an opportunity to build features that are targeted in their value proposition to specific groups of people. For example, female users on Tinder convert to payers at a meaningfully lower rate than at many of our other brands. Introducing targeted features that provide women more power over their Tinder experience will be valuable in closing these notable gaps in payer conversion. Initial tests of new features are already underway.

Virtual Goods: Going beyond the like/match/message paradigm with the upcoming shared experiences on Explore creates a new dynamic where Tinder members come together around common interests and interact with each other as a community in addition to the 1:1 dynamic. In this new community dynamic, we believe members will see even more value in tools that enable them to stand out in the ecosystem. Over the coming years, Tinder plans to add a number of opportunities for virtual goods that can be used for self-expression, trading and sharing, which we believe will drive meaningful incremental revenue opportunities. We expect initial versions of this will start testing in 2022.

The ease and efficiency of in-app virtual currency will underpin and maximize the opportunities for these new revenue features. *Virtual currency, called Tinder Coins, is currently being tested in several markets including a few markets in Europe. As we look ahead to 2022, users around the globe will be able to purchase Tinder's à la carte offerings, including Boost™ and SuperLike™, using Coins. Coins will allow for the unbundling of subscription packages in select markets and selling certain subscription features (such as See Who Likes You) on a pay-as-you-go basis in markets where members find this structure more appealing. Coins can also be used to incentivize certain behaviors to help members make more meaningful connections on Tinder, such as verifying their profile or adding video to their bio.*

*And, perhaps most importantly, Coins will be essential for the virtual goods and trading ecosystem planned for 2022 and beyond.*

113. The statements identified in italics in the two preceding paragraphs were materially false and misleading for failing to disclose: (1) that the Tinder team was not effectively executing on Tinder's new product initiatives; (2) Explore was not having a meaningful effect on user engagement after its rollout in October 2021; (3) initial testing of Tinder Coins in Asia in 2021 showed it was not well received by users and caused users to disengage with and (4) as a result, related statements about the Company's business, operations, and prospects lacked a reasonable basis. According to FE 2, Explore was a "dud" from the start and did not increase user engagement. FE 4 said Explore ended up having a negligible effect on user engagement, which FE 4 knew from the product usage dashboard circulated by the Match Group data analytics team. FE 4 said that users did not engage daily with Explore. In fact, FE 3 and FE 4 both stated that Tinder would pre-announce products while they were still prototypes with uncertain viability. FE 1 said the early data in August 2021 basically told them that Tinder Coins was probably a "little too busy" for the UI (user interface). As a result, they lost some users; retention was slightly worse even though there was an improvement in monetization. They saw this "right from the get-go." Users would install Tinder and be introduced to several features as they go through learning how to use the app. This additional feature was virtual currency microtransactions, but the data was showing that this might be "one feature too far" and caused users to stop using the app. Users would get confused or think it's too busy or too much work.

114. Dubey and Swidler also knew or recklessly disregarded information indicating that Tinder was not prepared to build targeted features, and that Tinder Coins could not launch in 2022. According to FE 4, Tinder Coins was one of the products that was actively promoted to consumers and the business press despite still being in prototype stage, but ultimately was not a viable or

usable product. In addition, FE 1 stated that it was normal for Tinder to be delivering many initiatives per year, and for some to fall behind or be discontinued, but that those numbers flipped in 2022. FE 1 explained that while Tinder had a number of "irons in the fire" in 2021, in 2022 most of those initiatives fell behind or were discontinued, and only a few were delivered (and those that were delivered, were delivered late).

**B. November 3, 2021 Third Quarter 2021 Earnings Call**

115. During an earnings conference call on November 3, 2021, Defendants continued to misrepresent to investors that Tinder's new features would drive growth for the Company.

116. In her prepared remarks, Defendant Dubey represented, "Explore, which is a new surface area within the Tinder app, rolled out globally a couple of weeks ago. It is a dynamic interface, which allows users to connect with others through new experiences beyond the swipe that used to be Tinder. *These experiences can be tailored by market, it keeps Tinder at the center of culture, gives users new reasons to keep coming back, increases engagement and activity*."

117. In response to an analyst's question about the expectations for Explore and whether it will "accelerate Tinder RPP [revenue per payer] in the next few quarters[,]" Defendant Dubey responded that,

> In terms of Explore, it is new. It's only been out for a couple of weeks, *but we have early evidence of this. And we expect the Explore experiences should increase engagement and reactivation. And this, in turn, ought to provide more revenue optimization opportunities over time, both in terms of conversion as well as RPP growth, meaning both conversion from new Payers but also à la carte revenue opportunities on -- through that interface.*

118. Dubey and Swidler assured investors that Tinder would undergo substantial, revenue-driving changes in 2022. When an analyst asked them about the circumstances under which the Company's growth could be "above kind of the initial guide of around 20% year-over-year growth," Defendant Swidler stated that "*we have some really bold and big initiatives planned*

*for Tinder next year, especially around virtual goods and some other areas as well*," which "could drive 2022 top line [growth] higher than what we've discussed so far." Swidler also stated that "our expectation is for Tinder to continue to perform very, very well." Additionally, Defendant Dubey explained,

> So *the virtual currency or the coins is something we think of as an infrastructure thing that's going to be necessary eventually for virtual goods. And that particular component is currently testing,* and we should have it sorted out in the next few months.
>
> Now virtual goods, the team is working on a very Tinder-specific version of virtual goods that will help users with both self-expression as well as the ability to stand out, particularly in a one[-]to-many surface area that Explore experiences will enable. *And so the way we envision virtual goods is it is something that users will be able to collect as well as give and gift to others. And so there's a lot of—in addition to this virtual currency, which is going to be a big component of what enables virtual goods,* we do have to get the categorization of the goods and the design of it right. We have to create a value structure and a currency for these goods. And most importantly, to build the right experience that allows users to showcase them on the app in the right way.
>
> And *so all of that is the plan for 2022*, and the plan is we build all of this out, test it out, learn it, refine it, work out the kinks in a couple of markets. And then if we get this right, I do think this could be a multiyear revenue vector for Tinder, which doesn't exist today. And so a lot of work done, but we're very optimistic that this is going to be a really fun thing on Tinder.

119. The statements identified in italics in ¶¶117-118 above were materially false and misleading for the reasons described in ¶¶113-114.

### C. February 1, 2022 Fourth Quarter 2021 Letter to Shareholders

120. On February 1, 2022, the Company announced its financial results for the fourth quarter of fiscal year 2021 ("4Q21"). On the same date, Match Group filed a letter to shareholders on Form 8-K with the SEC, signed by Defendants Dubey and Swidler. In the letter, Defendants Match Group, Dubey, and Swidler touted strong growth at Tinder, which "generated nearly $1.7 billion in Direct Revenue in 2021, up 22% over 2020, with year-over-year growth above 20% in each of the last three quarters of the year." *With respect to fiscal year 2022, Defendants Match.*

*Group, Dubey, and Swidler projected 15% to 20% year-over-year growth in total revenue, "led by high-teens growth at Tinder."*

121. The February 1, 2022 letter further stated,

> Tinder's new Explore® area seeks to address these challenges. Explore provides a space where Tinder members can discover people who are into the same things, as well as participate in experiences that help people get to know each other better once they meet. Music Mode™, which launched in late Q4, blends the well-known behavior of connecting over a shared interest in music and brings that to life in a rich and engaging way; *more than 50% of Tinder members have already tried it.* Hot Takes™ is a pre-match experience that replicates the flirty banter that often happens at a party. Members meeting in Hot Takes are engaging in conversations that are twice as long as those meeting outside it.
>
> * * *
>
> Explore also enables Tinder to localize product-market fit and surface more region-specific profile information, cultural events, and content. *To date, the level of adoption of Explore has exceeded our expectations, with approximately two-thirds of active users engaging with Explore.*




122. The letter also represented

> *Tinder continues to make strong progress on the product roadmap we laid out in detail in last quarter's shareholder letter. Tinder continues to roll out Tinder Coins, their in-app virtual currency, which is now in a dozen countries. Coins will help power Tinder's virtual goods ecosystem that is being built in 2022.* Tinder is also considering ways to leverage Hyperconnect's new immersive experiences and Explore provides the ideal surface area to experiment.

123. The statements identified in italics in ¶¶120-122 above were materially false and misleading, omitted material information, and Defendants knew or recklessly disregarded the truth

in making these statements for the reasons described in ¶¶113-114. It was misleading to claim that "Coins will help power Tinder's virtual goods ecosystem" because, FE 1 explained, it was obvious "right from the get-go" of the August 2021 "soft launch" in test territories that users did not like Tinder Coins, that the UI was a "little too busy" and that Tinder lost some users and retention was slightly worse. FE 2 stated that by around year-end 2021 to early 2022 it was obvious the product rollouts for Explore and Tinder Coins were not working to improve and attract users to the app. FE 4 said that Tinder Coins was promoted to consumers and the business press despite still being in prototype. And by the time of FE 4's departure from Tinder in July 2022, Tinder Coins was still not a viable, usable product. FE 4 also said that Explore ended up having a negligible effect on user engagement, which FE 4 knew from the product usage dashboard circulated by the Match Group data analytics team. FE 4 said that users did not engage daily with Explore. For the same reasons, it was misleading to project 15-20% percent year-over-year growth in total revenue for fiscal year 2022 "led by high-teens growth at Tinder" when those projections assumed impactful rollouts of Explore (already a "dud" shortly after launch in late 2021) and Tinder Coins (which was never a viable product and had already received negative test feedback in August 2021); Match Group, Dubey, and Swidler knew those assumptions were not attainable because Explore and Tinder Coins were not performing as had been hoped.

### D. February 2, 2022 Fourth Quarter 2021 Earnings Call

124. During an earnings conference call to discuss the Company's 4Q21 financial results on February 2, 2022, Defendants continued to assure investors that notable product updates would drive substantial growth for Tinder in 2022. For example, Defendant Dubey stated,

> Now Tinder, beyond a 22% revenue growth, in 2021, Tinder released its biggest update since the invention of the Swipe feature, and this was the launch of Tinder Explore. Explore provides Tinder with additional flexibility to expand use cases to more dimensions of discovery and social live experiences. Explore enhances responsiveness, offers surface and opportunity for regionally tailored experiences;

> has exciting media, video dating hybrids such as Swipe Night, wedding dates, concert Festival Mode; *and it's clearly had a productive start with almost 70% of users adopting this experience.*
>
> The 2022 roadmap has many more enhancements planned, along with new monetization opportunities later in the year.

125. Similarly, in response to an analyst's question about how product initiatives such as Explore would "affect[] the arc of Tinder growth over the next few years," Defendant Dubey stated,

> So Tinder Explore, what it did, it allowed us to create, successfully, a new surface area and experience without hurting the very efficient Swipe machine. And the goal now is to have new and personalized experiences that are fun, interactive, useful in helping spark connections. *And we've already got 70% of our users adopting the experience, and we're seeing high levels of engagement and likes, messages and conversations.* So looking ahead, our plan is to continuously launch and feature a variety of novel and engaging experiences here.
>
> * * *
>
> So additionally, as you can imagine, this new surface area with these Explore tiles also provides us opportunities for integrations with third parties to drive new experiences in the app and offline. And it gives people a reason to keep coming back and check out these new experiences.
>
> And then as this—the adoption and engagement on the surface area increases, it does provide new opportunities to us to merchandise revenue features, both existing and new revenue features. So that's why we're so excited about this whole new surface area that we've created.

126. In response to an analyst question about the expected contribution of Tinder Coins, Defendant Dubey stated:

> Maybe I'll start with the Tinder Coins, and then Gary can jump in. Shweta, the Tinder Coins is currently testing in 12 markets. *And the use cases are both for incentivizing certain core actions and also increasing access to existing revenue products. And we are seeing some increased engagement and retention from these incentives. And there's a bunch of testing going on, on various sort of monetization experiences.*
>
> *The plan is to accelerate the rollout in Q2 and be globally out by Q3. However, the biggest value of coins to us is its ability to power new economies such as the virtual goods.* And that is a whole new construct that we are hoping to be able to test in the

> back half of the year, and hence, we're not counting on any sort of meaningful contribution to 2022 revenue, it's more a 2023 and beyond revenue contribution.

127. The statements identified in italics in ¶¶124-126 above were materially false and misleading, omitted material information, and Defendants knew or recklessly disregarded the truth in making these statements for the reasons described in ¶¶113-114. It was misleading to state that "we've already got 70% of our users adopting [Explore], and we're seeing high levels of engagement and likes, messages and conversations" when, according to FE 2, Explore was a "dud" from the start and did not increase user engagement. Explore ended up having a negligible effect on user engagement, which FE 4 knew from the product usage dashboard circulated by the Match Group data analytics team. FE 4 said that users did not engage daily with Explore. It was further misleading to state that there was "some increased engagement and retention from these incentives" as FE 1 detailed that early data from August 2021 informed the product team that Tinder Coins was "one feature too far" and caused some users to stop using Tinder.

**E. March 7, 2022 Morgan Stanley Industry Conference**

128. Defendants continued to assure investors that Tinder's new features were driving substantial growth and that Tinder was poised to soon monetize its new product features. For example, at the Morgan Stanley Technology, Media, and Telecom Conference on March 7, 2022, in response to an analyst's question about "the strategy and monetization opportunity around virtual currency" and the effect of the Explore tab, Defendant Swidler stated,

> So the Explore tab, I think, is a gateway to doing lots of different things. It's a gateway to enable people to filter and say, "Oh, I went into that room, and that's where the dog lovers were or that's where the people who went to Berkeley are, and that's kind of who I want to meet, and so that's where I'm going." So it's got a very sort of basic function in the Tinder ecosystem.
>
> But it also opens us up to lots of different experiences, whether it's Swipe Night, which is an interactive experience that everyone kind of does at the same time and can bond over. We're about to roll out Festival Mode, which we've been delaying because of COVID. But basically, that's going to enable people to connect through

> Tinder and say, I'm going to the same South by Southwest or some other festival that's coming up, and we're doing that with Live Nation. And so it's a good example of the use of Explore for things that are happening right now that people are going through. They can share the experience in common. They meet online but then meet off-line, so it's a good collision of the online and off-line worlds. We're doing it with partners, with name brands that people have heard of. So there's lots of interesting things that we're going to be able to do with the Explore tab, and we're just in the very early innings.
>
> I mean, I think the key thing was obviously building it, getting people to adopt it, go check it out. *That's happened, and it's happened really well. Adoption, men, women, by geography has been really strong,* and so now we can start to really build on it and give people different experiences, give them more reasons to go there, more reasons to spend time on Tinder. And then we can start to turn our attention to monetization down the road.
>
> And it opens up a lot of possibilities. *It opens up potential linkages with Hyperconnect and some of the video and other experiences and live streaming type experiences.* It opens up lots of different things we can do, so the menu is long. It's a question of prioritization and building those out. And then from the ones that people engage with, figuring out how to best monetize. So that's like a multiyear project to figure that out, but we have some great ideas and are excitedly kind of building away for all of that.

129. The statements identified in italics in ¶128 above were materially false and misleading, omitted material information, and Defendants knew or recklessly disregarded the truth in making these statements for the reasons described in ¶¶113-114. Swidler's statement that "it opens up potential linkages with Hyperconnect" was misleading as Tinder already had feedback that its users did not like or want to engage with a video or live streaming experience, per FE 1, so investors were misled not only as to potential additional products on Tinder but the viability of the Hyperconnect acquisition. Moreover, when asked on September 14, 2022 why Tinder's revenue growth was slowing in the second half of 2022, Swidler conceded that "a lack of successful product execution, especially in the first half of the year" meant that "product features [did not] come online and people [did not] take them up." So although "we didn't really feel it in Q1" and "[w]e didn't – felt a little bit in Q2," "[i]t's more apparent in Q3 and into Q4." In other words, Swidler admitted Match Group was not executing on its new products in 1Q22.

### F. May 3, 2022 First Quarter 2022 Letter to Shareholders

130. On May 3, 2022, the Company announced its financial results for the first quarter of fiscal year 2022. On the same date, Match Group filed a letter to shareholders on Form 8-K with the SEC, signed by Defendants Dubey and Swidler. In the letter, Defendants Match Group, Dubey, and Swidler assured investors that the Company would deliver on its previously announced initiatives for Tinder: "*We're largely on track with the initiatives we laid out in our prior shareholders' letter and are especially excited about the future for Tinder Explore and virtual goods.*"

131. Defendants Match Group, Dubey, and Swidler further represented:

> *Tinder continues to evolve and transform its product. Tinder Explore adoption levels continue to be high across active users.* Explore recently launched Festival Mode™ as one of many ways members can discover and interact with each other through shared interests and experiences. Launched in conjunction with Live Nation, this feature enables members to connect before or during 20 of the biggest festivals around the world.
>
> *Tinder Coins, its in-app virtual currency, is on track to launch globally this summer. Ultimately, we see major potential for Tinder Coins to support further customization of premium experiences for members, incentivize positive network behaviors, and be the financial backbone for the virtual goods and trading ecosystem which we expect to begin testing in the second half of 2022. Tinder also continues to iterate and test a set of monetization features designed for female users, with a planned launch of a new female-focused package in the second half of 2022.*

132. The statements identified in italics in ¶¶130-131 above were materially false and misleading, omitted material information, and Defendants knew or recklessly disregarded the truth in making these statements for the reasons described in ¶¶113-114, 129. In addition, according to FE 2, after the research team completed its pre-launch research on user sentiment about Tinder Coins, a "readout" was presented to the head of products for Tinder and the corporate strategy team in or around February 2022. The results of the research study on consumer sentiment about Tinder Coins showed that "user reaction was baffled to negative" which was the reason Tinder

Coins was "shelved." It was also misleading to claim they saw "major potential for Tinder Coins" when, in fact, the completed customer research showed the opposite.

### G. May 4, 2022 First Quarter 2022 Earnings Call

133. During an earnings conference call on May 4, 2022, Defendant Dubey stated that "by and large, *we are on schedule with what we planned to deliver in 2022*." Dubey further added, "The [Tinder] team *continues to make progress on its product road map, whether that is adding new experiences into Explore or innovating on new monetization features*."

134. The statements identified in italics above were materially false and misleading, omitted material information, and Defendants knew or recklessly disregarded the truth in making these statements for the reasons described in ¶¶113-114, 129, 132. Plus, less then 3 months later, Match Group would admit that Tinder did not make progress on its roadmap during the first half of 2022, that user engagement for Explore was low and that Tinder Coins would be abandoned.

### H. September 14, 2022 Goldman Sachs Industry Conference

135. After Swidler reassured investors that "we believe the company remains positioned to deliver accelerating revenue growth as we move through 2023, driven by improved product execution at Tinder" on September 3, 2022—notwithstanding that "Tinder did not deliver on its product roadmap for the first half of [2022]"—he spoke the next week, at the Goldman Sachs Communacopia + Technology Conference on September 14, 2022:

> So I think the changes he made were the absolute right ones. *I think we're on a much better track now*. The new team that [Kim's] implemented are people that we know, one of whom worked for me, one of whom worked in another part of Match Group and one of whom he knew well from his previous life. And so these are known quantities. *They're working together well. They're gelling well. They're on a good track*. They need some time to execute, but we're very optimistic that they will change the trajectory of that business.
>
> Tinder is the 800-pound gorilla in the space. I mean they've been at this a long time. They are the most iconic brand. They invented the Swipe. And so there's real opportunity there for executing properly. I think we were underexecuting. And I'm

> hoping that the team now is going to put that into the rearview mirror, and we're going to execute well, which is going to pay dividends for Tinder as well as for Match Group.

136. In response to a question about factors causing Tinder's revenue growth to slow, Defendant Swidler stated,

> So there's a bunch of different factors that go into it. I think the biggest driver is clearly a lack of successful product execution, especially in the first half of the year, which then sort of leads to more payers and improved ARPU in the second half of the year as those product features come online and people take them up. And so the fact that they underexecuted for a while, we're starting to feel it. We didn't really feel it in Q1. We didn't -- felt a little bit in Q2. It's more apparent in Q3 and into Q4.
>
> *And so like I said, I think making quick changes there, reversing course of that is underway, and I feel good about it kind of medium term, even though it's painful in the very short term.* And so most of it really is execution. And what that means is you've got a lot of good ideas at Tinder, but actually getting them out into the product is really critical. And testing them appropriately, rolling them out, refining them if they need to be, I think that is where Tinder missed some of the mark, both on some smaller stuff, less sexy stuff optimizations, however you want to characterize them, which we do quarter in, quarter out. I think that they did not do as good a job with some of the optimizations. Some they tried didn't work. But it's just a question of taking shots on goal. And you've got to continue to take shots on goal, and I think that they didn't quite get that done well.
>
> And then they have longer-term projects, bigger projects, more meaningful as well, and you got to continue to iterate on those and make progress. And so you've got to be able to do both the smaller, less sexy stuff and the bigger stuff simultaneously. And I don't think they were delivering appropriately on that.
>
> And so we've made changes. We've improved the team. *The early signs are that, like I said, the team is working well and starting to have some optimizations that are working well. We've been making some adjustments in Boost. We've been making some other optimizations that are showing good signs here in the third quarter.*
>
> And so those are early signs that things are working the way they're supposed to. *We have seen an improvement in the trajectory.*

137. Asked about what to look for in terms of innovation or optimization at Tinder, Swidler said,

> It's a relatively simple, straightforward road map for the next couple of quarters. We wanted to simplify it for the team. It's a new team. We want them to succeed with a limited number of things and remain focused and galvanized behind a small handful of things. *And so all indications are that's what's happening. Progress is being made, and we're on track for those quarters*.

138. In response to a question about his confidence that Match Group can accelerate revenue growth in 2023, Swidler reiterated that the factors underlying Tinder's poor execution are "already underway of being cured":

> And then you have the Tinder lack of execution and the fact that they just haven't innovated and brought product out the way we'd like to see them do. I'm hoping that, that gets cured. *It's already underway of being cured and will not be a factor in 2023* by the time we're sitting here hopefully next year at this conference.

139. The statements identified in italics in ¶¶135-138 above were materially false and misleading, omitted material information, and Defendants knew or recklessly disregarded the truth in making these statements for the reasons described in ¶¶113-114. Also, according to FEs 1, 2 and 4, the issues at Tinder were not purely based on execution and were in fact structural—Tinder was harmed by turnover at the executive level in products and marketing, and relatedly, lower marketing spend for Tinder during the relevant time, as well as turnover in a comparatively small engineering bench, which the Company did not address. There was also a "cultural disconnect" between Tinder and the other Match Group brands, such that Tinder was allowed to have no chief product officer for a long time and did not have to take direction from Match Group, which resulted in a lack of clear direction and frequent changes to the product roadmap. And most glaringly, Match Group subsequently admitted on January 31, 2023 that Tinder's revenue shortfall "resulted from weaker-than-expected product execution at Tinder, *the effects of which became more pronounced as the year progressed*;" Swidler similarly conceded that "our business overall and Tinder in particular, *decelerated as the year went on*." Poor execution at Tinder—to the extent it was responsible for Tinder's poor performance—was not being "cured" in September 2022.

**I. November 1, 2022 Third Quarter 2022 Letter to Shareholders**

140. On November 1, 2022, the Company announced its financial results for the third quarter of 2022 ("3Q22"). Again, Defendants assured investors in a letter to shareholders filed on Form 8-K with the SEC, signed by Defendants Kim and Swidler, that:

> We put in place a team at Tinder that has started to shape a clear strategy to carry the brand into the future and drive strong growth. *Product execution is already improving*, the team is galvanized and excited about the opportunities ahead, and a handful of new features have begun testing, with more to come in Q4 and 2023. *There is still a lot of work to be done, but early results are showing promise.*
>
> * * *
>
> In their first three months, the new Tinder leadership team has been working hard to set priorities and galvanize the broader team. *There is a palpable improvement in culture, prioritization, and product execution.* Importantly, there has been no notable attrition among the broader team since the management changes occurred. The employee base is engaged and excited about the roadmap for 2023.
>
> Moving forward, we expect an intense focus on enhancing the user experience and driving new user adoption at Tinder. The current product plan focuses on four key areas: women's experience, including through more curation to ensure high-quality matches; Gen Z targeted product initiatives; virtual goods and coins to better monetize power users; and targeted monetization efforts including an expanded advertising effort. Tinder also plans to continue its consistent cadence of optimizations. Tinder's marketing team is working closely with the product team to develop brand campaigns that will highlight innovative new features that resonate with key audiences. We expect to be able to share more specifics on product and marketing plans on our Q4 call, following completion of our annual planning process.
>
> The Tinder CEO search is continuing. We have met with a diverse slate of candidates and we're optimistic that we can identify an experienced leader with a number of key qualifications including consumer digital expertise and an ability to work well with the current Tinder team. In the meantime, the business's plans are moving forward with the experienced team we have in place. *We're confident that execution and performance will continue to improve.*
>
> * * *
>
> *Tinder has seen an improvement in product cadence under the direction of its new Chief Product Officer, who has helped the product team execute on the clear vision the leadership team has set forth.* In September, Tinder began testing new optimizations and initiatives, including new offerings in the Boost product line, and

> a weekly subscription package. *The improved product velocity and focus is a notable improvement compared to the first half of 2022.*

141. The statements identified in italics in ¶140 above were materially false and misleading, omitted material information, and Defendants knew or recklessly disregarded the truth in making these statements for the reasons described in ¶¶113-114, 139. It was misleading to state that there "is a palpable improvement in culture, prioritization, and product execution" and that the "improved product velocity and focus is a notable improvement compared to the first half of 2022" when Match Group admitted about three months later, on January 31, 2023, that the effects of poor product execution actually "became more pronounced as the year progressed" and Swidler also conceded that "our business overall and Tinder in particular, decelerated as the year went on." In addition, FE 1 stated that a larger number of new product initiatives than normal failed in 2022. It was further misleading to discuss Tinder's "current product plan" and state that "Tinder also plans to continue its consistent cadence of optimizations" when Tinder was not equipped to deliver on new product initiatives and that the effects of poor product execution were worsening at the time. FE 2 detailed structural issues creating a lack of alignment between the product and engineering teams, which contributed to Tinder's failure to launch products that the Company did not address.

### J. November 2, 2022 Third Quarter 2022 Earnings Call

142. In his opening remarks during the 3Q22 earnings call on November 2, 2022, Defendant Kim represented that, "After just a few months, the team at Tinder is gelling well together, and there has been a palpable change in the culture. We have made some big changes to improve organizational efficiencies and operations to get the team shipping product and accelerating growth." He continued,

> I am excited about how our 2023 roadmap is beginning to take shape, which centers in 4 key areas: providing our women users more tailored experiences; targeting Gen

> Z through various product initiatives; *evaluating virtual goods and coins to unlock untapped power users;* and finally, creating more targeted monetization opportunities, including an expanded focus on users who have not previously paid.

143. On the same call, Defendant Swidler said, "We expect the company as a whole to have accelerating year-over-year revenue growth as we move through 2023, *driven by improved product execution leading to improved revenue momentum at Tinder*." Defendant Swidler further stated that momentum "*is building as the Tinder team makes more progress* and influences new things."

144. The statements identified in italics in ¶¶142-143 above were materially false and misleading, omitted material information, and Defendants knew or recklessly disregarded the truth in making these statements for the reasons described in ¶¶113-114, 139.

**K. November 30, 2022 Wells Fargo Industry Conference**

145. During the Wells Fargo TMT Summit on November 30, 2022, Swidler assured investors that product execution was back on track:

> And I attribute that to just not great execution on the Tinder side, particularly in the product area.
>
> And so [Kim] brought in somebody he knew on the product side, from the gaming industry, the Chief Product Officer. We revamped the way Tinder is working. We brought in a COO, who used to work for me as the Head of Strategy at Match Group, who is now the COO of Tinder. *And we've just gotten them better organized, better galvanized, better prioritization of initiatives. People know what the plans are, what they need to be executing*. There was a period where we had deals kind of not sure what to do or doing some pet projects but not things that were kind of consistent with our strategy or would move the needle.
>
> *We've cleaned a lot of that up. It is starting to work a lot better there*. So we're very encouraged, and that's some of the optimism that you've read in the most recent letter. *And so the machine, I think, is heading in the right direction again.* And when I look at the road map for 2023, there's a lot of reasons to be optimistic because there's a lot of good stuff on there.

* * *

> So it was important to get the team working so it could do all those three things. *I think that is in the process of happening and is on a good track, and now it is just kind of hitting those goals and delivering the road map for them.*

146. The statements identified in italics in ¶145 above were materially false and misleading, omitted material information, and Defendants knew or recklessly disregarded the truth in making these statements for the reasons described in ¶¶113-114, 139.

**L. December 8, 2022 Barclays Industry Conference**

147. At the Barclays Global Technology, Media and Telecommunications Conference on December 8, 2022, in response to an analyst question about Tinder Coins or virtual currency, Defendant Swidler stated: "*Yes. It's on the road map for kind of middle to back half of next year. It was just delayed is the way that I would think about it. It was pushed from 2022 to 2023 to give it more time to be refined.* And that is one of a large number of initiatives, both revenue- and non-revenue-generating that Tinder has for next year."

148. Defendant Swidler continued, in response to an analyst question about Tinder's growth for the year,

> Yes. I mean, look, I think your assumption is right. The plan is to kind of get some modest growth in the first half of the year and improve that year-over-year in the second half of the year. And that's what the plan calls for to get to that 5% to 10% growth range.
>
> There's lots of puts and takes that go into the outlook. Obviously, Tinder executing on their product road map and delivering all these features, improving user acquisition and retention is all a critical part of the outlook. The better they execute, the more likely you are to be at the higher end. The less well they execute, the more likely you are to be towards the low end. So that's kind of one set of variables in the guidance related to Tinder execution.
>
> * * *
>
> But hard to say it's going to be better or worse than what we're currently anticipating. Nobody seems to have a very firm grasp, maybe your economist does, but overall, a very firm grasp on what's going to happen next year. So we laid out our assumptions and then what that led to in terms of the outlook of that 5% to 10%, and so far, *that looks on track***.**

149. Defendant Swidler also addressed strategy changes at Tinder for the second half of 2022, stating that "We've got this great new Chief Marketing Officer who moved over from OkCupid. And we think there's lots of things we can do at Tinder to get the brand story out there, which we think will help user acquisition significantly." Defendant Swidler further stated,

> I think the biggest thing is really kind of the improvement in Tinder execution. I think that the execution at Tinder was not where it needed to be in the first half of this year. We made some significant changes to the team as we realized kind of what was happening on the execution in the first half of the year. *They've done some really good things already to get the company better organized, better galvanized behind priorities, set strategic priorities.*
>
> I think they've accomplished a lot in a short period of time. This is something that will take some time to play through into full financial results, but we think it's headed in the right direction. And that's the most important thing that I think we need people to focus on, *is really the change and improvement in Tinder product execution that is underway and that will happen through the course of next year.*

150. The statements identified in italics in ¶¶147-149 above were materially false and misleading, omitted material information, and Defendants knew or recklessly disregarded the truth in making these statements for the reasons described in ¶¶113-114, 139.

**THE TRUTH BEGINS TO EMERGE**

151. On August 2, 2022 after the close of the markets at 4:18 p.m., Match Group filed its 2Q22 Letter to Shareholders on Form 8-K. The letter announced financial results for the second quarter of 2022, including an unexpected "[o]perating loss of $10 million driven by a $217 million impairment of intangibles relating to the Hyperconnect acquisition." The Company explained that the impairment "stemmed from a decline in projections related to a lower outlook for the business…." This lower outlook for the business was fully consistent with Hyperconnect's poor performance—including lack of integration with the rest of Match Group's portfolio—highlighted *supra*. Tellingly, Match Group identified other factors purportedly responsible for the "decline in

projections related to a lower outlook for the business"—foreign currency impacts and the use of increased discount rates—in a non-exhaustive list.

152. Match Group also reported Tinder direct revenue growth of 13% on a year-over-year basis (in line with earlier forecasting), but the Company warned that it expected Tinder's growth to slow in the second half of 2022, projecting third quarter direct revenue growth in just the mid-single digits for Tinder. In the letter, Kim attributed this expected slowdown to poor execution and accordingly revealed an overhaul of the Tinder leadership:

> Over these past few quarters, Tinder has continued to iterate on Explore™, including the launch of Music Mode™ and Blind Date, and we continue to believe there is much more opportunity for leveraging Explore. However, over that same period, we have not been able to realize the monetization successes that we typically deliver. Tinder's current revenue growth expectations for the second half of the year are below our original expectations as a result of disappointing execution on several optimizations and new product initiatives. I believe Tinder's overall product execution and velocity can be improved and that we need to do more to excite our user base to drive top of funnel growth.
>
> Today we're announcing the departure of Tinder CEO Renate Nyborg, and I have made some changes to the management team and structure that I am confident will help deliver Tinder's full potential. While we search for a permanent Tinder CEO, I will oversee a newly formed team of executives who will manage dayto-day operations and will ensure the Tinder organization is well coordinated, ships great new features at increased velocity, and delivers on Tinder's promise.

153. On August 3, 2022, Kim again discussed during the 3Q22 earnings call that he had replaced the Tinder leadership team because Tinder had not delivered on its product roadmap for the first half of 2022:

> With the current Tinder CEO stepping down, I've put a new leadership team in place who will report directly to me, while I lead the recruiting efforts for a new CEO. This team has a great working dynamic that's already apparent and brings proven expertise to Tinder's next phase of growth. They're passionate, strategic leaders who are also able to get into the trenches, experiment, lead by example and get things done. I'm confident that this new team will work well together to build product and enhancements and innovation.
>
> But I do want to acknowledge that there have been some misfires and turnover on the team that have led to delays in product and execution in the first half of the year.

> I believe that our new team can right that ship, but it will take some time to execute and build momentum.
>
> * * *
>
> From my experience, product innovation always drives user adoption and engagement. We have great products. But I want to speed up product delivery, bring new dynamic features to life and set big audacious goals. At Tinder, we need some time to regain product momentum. I'm committed to product innovation that will give our users more reasons to come back more often and for new singles to sign up and start dating.

154. And in response to an analyst's question about "what went wrong at Tinder," Defendant Kim admitted that:

> Tinder did not deliver on its product roadmap for the first half of the year. And execution on a number of initiatives have been delayed that we were counting on for growth in Q3 and Q4. Typically, Tinder works on big initiatives on the first half of the year that materialize in Payer and revenue growth in the second half of the year. But that didn't happen this time around. So we don't expect the same revenue bump that we typically see.
>
> As an example, a lot of time was spent building Explore. It's a strong gateway with high engagement, but we haven't succeeded yet on innovating the user experience and then also building monetization features to maximize its potential. I do believe that there is a lot of market opportunity and great product ideas at Tinder, but it's all about execution.

155. Defendant Swidler also stated that "some of the Tinder product initiatives and optimizations that we've been counting on for revenue growth in the second half of 2022 are not delivering as we'd expected and we[']re delaying some launches." Swidler explained,

> But there were a series of other less keynote kind of initiatives and optimizations that were expected in the first half of 2022 to help us deliver the second half revenue, and also more initiatives in the back half of the year to help deliver the second half revenue. And it's on that series of initiatives, kind of less sexy, less notable initiatives, but still very important initiatives, that really has not taken place. And it explains why changes in the team at Tinder have been made to try to make sure that we deliver more fully on the initiatives and optimizations that we have in our plans. And so it's that kind of shortfall and delay that's really causing the issue.

156. On this news, the price of Match Group common stock declined $13.47 per share, or more than 17%, from a close of $76.71 per share on August 2, 2022, to close at $63.24 per share on August 3, 2022.

157. As described *supra*, however, after these partial revelations, Defendants nonetheless continued throughout the rest of 2022 to falsely and misleadingly assure investors that Tinder's revamped team was now effectively executing and was on track to deliver on what the Company had promised. *See* ¶¶135-150.

158. On January 31, 2023, however, Match Group reported disappointing financial results for 2022, contradicting Defendants' repeated statements that Tinder was back on track and that its results had been improving. The Company's total revenue grew only 7% on a year-over-year basis—well below its target of growth in the mid- to high-teens. In a letter to shareholders released the same day, Defendants Match Group, Kim and Swidler admitted that "a significant portion [of the shortfall] resulted from weaker-than-expected product execution at Tinder, the effects of which became more pronounced as the year progressed." They also stated that Tinder is only "beginning to execute on its clearly defined product roadmap" and completely omitted Explore, which was featured heavily in prior shareholder letters during the Class Period, from its "2023 Roadmap" shown below:




159. Match Group, Kim, and Swidler also announced a renewed focus on "establishing Tinder's brand narrative" by launching its "first-ever global marketing campaign this quarter" to "help engage both new and previous users[.]" As a result, Tinder's marketing spend was expected to increase by approximately 2%.

160. During an earnings conference call on February 1, 2023, Swidler further explained that "our business overall and *Tinder in particular, decelerated as the year went on*, and product execution was not what we expect[ed] it to be, especially in the first half of the year." Defendant Kim also admitted that "we head into 2023 with less momentum than what we would like."

161. On this news, the price of Match Group common stock declined $2.71 per share, or 5%, from a close of $54.12 per share on January 31, 2023, to close at $51.41 per share on February 1, 2023.

## ADDITIONAL EVIDENCE OF DEFENDANTS' SCIENTER

162. At all relevant times, Defendants acted with scienter. Numerous facts detailed herein support that Defendants either had actual knowledge of the material facts they omitted to disclose, and which contradicted their false and misleading statements, or acted with reckless disregard for the truth or falsity of those statements and omissions. The allegations herein, considered holistically, support a strong inference of scienter. Match Group has the scienter of its management-level employees, including each of the Individual Defendants. The following subsections further bolster the indicia of scienter set out in the above allegations, and should not be construed to either summarize or replace the indicia of scienter alleged above.

### I. The Successful Integration and Financial Performance of Hyperconnect Was Critically Important to Match Group, and Defendants Put Their Knowledge of Hyperconnect's Integration and Performance at Issue

163. The integration of Hyperconnect was of vital importance to the Company, as the acquisition was Match Group's largest to date and was advertised as a means to transform its portfolio, including Tinder.

164. Defendants also repeatedly discussed Hyperconnect after the acquisition, with Dubey stating in August 2021 that Match Group would "roll out Hyperconnect's video, audio and AI technologies onto our platforms over the next several months[.]" It would likewise be unreasonable to believe that the Individual Defendants were unaware of the true state of the Hyperconnect integration while making those statements and responding to analyst questions. As detailed by FE 2, diligence for the Hyperconnect acquisition was mostly kept at the Match Group level, and Dubey was one of the handful of people personally involved in the process. FE 1 stated that Match Group leadership was aware that integrations between Hyperconnect and Match Group's portfolio products required much more work than previously believed and would be of little benefit to Match Group.

165. The accounts of the former employees discussed above show that Defendants were aware of or recklessly disregarded information that their statements about the Hyperconnect acquisition and integration were materially false and misleading, and omitted material information. For example, Dubey knew or recklessly disregarded information contradicting her statement on February 9, 2021 that Hyperconnect has "capabilities in video and AI that we can leverage across the combined portfolio[,]" as Match Group had not determined that Hyperconnect's technology could feasibly be integrated into Match Group's portfolio products and did not have a plan for leveraging capabilities. As discussed above, Defendants Dubey and Swidler were aware of the true status of the Hyperconnect integration.

166. Likewise, when Swidler stated that the team of Hyperconnect engineers was "really innovative" and "working hand in glove" with the Match Group team in March 2022, he was actually aware of the opposite. According to FE 2, the fact that Hyperconnect was not adding the expected value was a formal section at Match Group board meetings for four consecutive quarters, beginning with the third quarter of 2021. FE 2 detailed that Hyperconnect lacked strong strategic guidance, lacked a focused strategy, and had slower execution. Dubey and Swidler did not stop Hyperconnect from continuing with projects that were not advantageous to the Match portfolio, and post-acquisition, Match Group was not rolling out Hyperconnect technology to the Match Group properties.

167. As such, Defendants knew, or were reckless in not knowing, that their statements detailed herein were materially false and misleading, and omitted material information.

## II. Tinder Was Critically Important to Match Group and Defendants Put Their Knowledge of Tinder's Rollout of Explore and Tinder Coin at Issue

168. During the Class Period, Tinder was the Company's most important brand, representing over 50% of Match Group's revenue. As discussed above, Defendants repeatedly

described Tinder's new product initiatives, including Explore and Tinder Coins. For example, in November 2021, Defendants Match Group, Dubey, and Swidler advertised that, "increased engagement driven by experiences in Explore are expected to drive Swipes, Likes and other activity to boost revenue growth via existing features." They further stated that "Coins will be essential for the virtual goods and trading ecosystem planned for 2022 and beyond." Given the multitude of statements concerning progress with Tinder's product roadmap and expected benefits, it is unreasonable to believe that the Individual Defendants were unaware of the significance and status of the product initiatives for Match Group's largest source of revenue, which they were discussing publicly, including in response to analyst questions on conference calls to discuss the Company's quarterly earnings.

169. In addition to being commonly discussed by Defendants in Match Group's public filings and statements to investors, user engagement for Explore was monitored internally. According to FE 4, the Match Group data analytics team circulated a product usage dashboard, which showed that Explore ended up having a negligible impact on user engagement. FE 4 specified that users did not engage daily with Explore, and FE 2 stated that Match executives were aware that user engagement for Explore was only at 5% by mid-2022. FE 1 further detailed that early data from August 2021 informed the product team that Tinder Coins was "one feature too far" and caused some users to stop using Tinder. In addition, according to FE 2, after the research team completed its pre-launch research on user sentiment about Tinder Coins, a "readout" was presented to the head of products for Tinder and the corporate strategy team in or around February 2022. The results of the research study on consumer sentiment about Tinder Coins showed that "user reaction was baffled to negative" which was the reason Tinder Coins was "shelved."

170. As described in more detail herein, FEs 1, 2, 3, and 4 also described cultural and structural issues at Tinder that hampered progress, with FEs 3 and 4 further explaining that Tinder's products would often be pre-announced while they were still prototypes with uncertain viability. FE 2 also stated that the CEOs of each brand in the Match Group portfolio met weekly from at least May 2018 through October 2022, which included discussions of Tinder's growth.

171. The accounts of the former employees discussed above show that Defendants were aware of or recklessly disregarded information that their statements about Tinder's growth, performance, and product roadmap during the Class Period were materially false and misleading, and omitted material information. For example, Defendants Match Group, Dubey, and Swidler knew or recklessly disregarded information contradicting their statement that Tinder was "already in the midst of a radical product transformation" on November 2, 2021. As described by FE 4, Tinder Coins was still a prototype at that time, and Explore had a negligible impact on product engagement, which FE 4 knew from the product usage dashboard circulated by the Match Group data analytics team. The accounts of former employees similarly show that Dubey knew or recklessly disregarded information contradicting his statement on February 2, 2022, that, "we've already got 70% of our users adopting [Explore], and we're seeing high levels of engagement and likes, messages and conversations." As stated above, FE 2 revealed that Explore was a "dud" and FE 4 revealed that Explore had a negligible impact on user engagement. These and other statements also illustrate that Defendants were in fact apprised of internal user metrics for new product initiatives.

172. In addition, Match Group, Kim, and Swidler also knew or recklessly disregarded information contradicting their statement on November 1, 2022 that, "[t]here is a palpable improvement in culture, prioritization, and product execution." In reality, according to FEs 1, 2,

and 4, Tinder was being harmed by various structural factors, including by only employing a comparatively small team of engineers, turnover at the executive level in products and marketing, and a "cultural disconnect" resulting in a clear lack of direction and frequent changes to the product roadmap. As Swidler later admitted on February 1, 2023, "Tinder in particular, decelerated as the year went on, and product execution was not what we expect[ed] it to be" and Defendant Kim also admitted that "we head into 2023 with less momentum than what we would like." These revelations show that Defendants did not have a basis to represent that Tinder's product execution was improving in the second half of 2022.

## III. The Individual Defendants' Compensation Plans Provide Additional Motive to Mislead

173. As set forth herein, Defendants were motivated to engage in a fraudulent course of conduct due to increased competition in the dating app sector and pressure to innovate. During the Class Period, over 50% of Match Group's revenue was derived from Tinder, but as described by FE 2, Defendants Dubey and Swidler were aware that Tinder suffered two years of sequential user decline starting in 2020 with top-of-the-funnel slowdown. As a result, Defendants were motivated to maintain Tinder's position as a top dating app to preserve Match Group's main source of revenue.

174. Match Group's strategy to adapt and grow in response to these external pressures depended on the success of Tinder's "radical product transformation" and the alleged integration of Hyperconnect with its advanced capabilities and engineers that could be deployed across the Match Group portfolio. As a result, and because over 50% of Match Group's revenue was derived from Tinder during the Class Period, Match Group's ability to steer new innovations at Tinder (and to integrate Hyperconnect's technology in Match Group's portfolio, including Tinder) was especially important to Match Group's financial performance and success.

175. The approximately $1.73 billion acquisition of Hyperconnect was also Match Group's largest acquisition to date. It was justified to investors as a way to help Match Group evolve as a "social discovery" company to remain competitive against new innovative dating apps and social media competitors like Meta, as well as a source of vital engineering resources. As a result, the integration of Hyperconnect into the Match Group portfolio was also crucial to the Company's ability to both grow and maintain its position in a more competitive landscape.

176. The structure of the Individual Defendants' performance and stock-based compensation created a concrete and personal benefit to each of them, rewarding them for artificially inflating Match Group's stock price and providing an incentive to overstate Tinder's progress in executing its product roadmap and Match Group's ability to integrate Hyperconnect into its portfolio.

177. The Company's bonus program was explained as follows in Match Group's Definitive Proxy Statement filed with the SEC on April 29, 2022:

> Match Group's bonus program is designed to reward performance on an annual basis and annual bonuses are discretionary. Because of the variable nature of the bonus program, and because in any given year bonuses have the potential to make up a significant portion of an executive's total direct compensation, *the bonus program provides an important incentive tool to achieve Match Group's annual objectives. Match Group generally pays bonuses shortly after year-end following finalization of the financial results for the year in question.*
>
> The determination of bonus amounts is based on a non-formulaic assessment of factors that vary from year to year, including a discretionary assessment of Company and individual performance. In determining individual annual bonus amounts, the Committee considers a variety of factors regarding the Company's overall performance, such as growth in profitability or achievement of strategic objectives by the Company, an individual's performance and contribution to the Company, and general bonus expectations previously established between the Company and the executive. The Committee does not quantify the weight given to any specific element or otherwise follow a formulaic calculation; however, *Company performance tends to be the dominant driver of the ultimate bonus amount.*

178. During the Class Period, the Individual Defendants received millions of dollars in performance compensation, bonuses, and other remuneration for their role in the fraud, which far exceeded their annual salaries. In 2021, Dubey's total compensation as CEO of Match Group was $25,397,675, including $21,137,675 in stock awards. Also in 2021, Swidler's total compensation was $15,367,669, including $12,682,669 in stock awards. In February 2021, Dubey was granted 33,055 restricted stock units ("RSUs") and 99,166 performance-based restricted stock units ("PSUs"). Swidler was granted 19,833 RSUs and 59,500 PSUs. In 2021, Dubey realized a value of $19,184,782 on vesting of RSUs, and Swidler realized a value of $4,549,186 on vesting of RSUs.

179. For the year 2022 (beginning in May 2022), Kim's total compensation was $23,921,211, including $21,307,365 in stock awards. Dubey's total compensation for 2022 (until May 2022) was $23,016,375, including $18,771,038 in stock awards. Also in 2022, Swidler's total compensation was $23,677,633, including $20,992,633 in stock awards. In March 2022, Dubey and Swidler were granted RSUs and PSUs, the number of which was determined by dividing the values below by the 30-day volume-weighted average stock price ending on the date of Committee approval of the awards. Dubey was granted $7,500,000 in RSUs and $7,500,000 in PSUs (at target), and Swidler was granted $5,000,000 in RSUs and $5,000,000 in PSUs (at target).

180. As explained in Match Group's Definitive Proxy Statement filed with the SEC on May 1, 2023, the portion of PSUs that is earned and vests is based on Match Group's relative total stockholder return percentile rank among the Nasdaq-100 index composite companies.

181. As a result of their fraudulent conduct detailed above, Defendants collected performance-based compensation that well exceeded their annual salaries.

## LOSS CAUSATION/ECONOMIC LOSS

182. During the Class Period, as detailed here, Defendants engaged in a scheme to deceive investors and the market and a course of conduct that artificially inflated the price of Match Group stock and operated as a fraud or deceit on Class Period purchasers of Match Group stock by misrepresenting and omitting material information about the integration of Hyperconnect into Match Group and the performance and rollout of new features for Tinder. When Defendants' prior misrepresentations and omissions were disclosed to the market, beginning on August 2, 2022, Match Group's stock price fell as part of the artificial inflation came out of the price. The full artificial inflation did not come out of the stock price until February 1, 2023. As a result of their purchases of Match Group stock during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

183. Defendants' misleading statements and omissions of material facts, identified at ¶¶100-150, had the intended effect and caused Match Group stock to trade at artificially inflated prices during the Class Period.

184. Match Group's stock price suffered as a direct result of the disclosures made at 4:18 p.m., on August 2, 2020, as detailed in ¶¶151-152, which revealed (1) that Match Group had suffered an unexpected "[o]perating loss of $10 million driven by a $217 million impairment of intangibles relating to the Hyperconnect acquisition," which "stemmed from a decline in projections related to a lower outlook for the business…."; (2) that the Company expected just mid-single digit revenue growth for Tinder's in the second half of 2022 due to poor leadership and execution; and (3) that Tinder's leadership was being overhauled. On August 3, 2022, as detailed in ¶¶153-155, Kim revealed that he had replaced the Tinder leadership team because Tinder had not delivered on its product roadmap for the first half of 2022, and Swidler disclosed that "some of the Tinder product initiatives and optimizations that we've been counting on for revenue growth

in the second half of 2022 are not delivering as we'd expected and we[']re delaying some launches." In direct response, Match Group's stock price fell 17% from $76.71 per share at close on August 2, 2022 to close at $63.24 per share on August 3, 2022.

185. The second disclosure on February 1, 2023, as detailed in ¶¶158-161, directly caused Match Group's stock price to fall from $54.12 per share at close on January 31, 2023 to close at $51.41 on February 1, 2023—a drop of 5%. At 4:11 p.m. on January 31, 2023, Match Group disclosed, in its 4Q22 letter to shareholders, disappointing financial results for 2022, contradicting Defendants' repeated assurances that Tinder had been on the right track and that its results had been improving. The Company's total revenue grew only 7% on a year-over-year basis—well below its target of growth in the mid- to high-teens. Defendants admitted that "a significant portion [of the shortfall] resulted from weaker-than-expected product execution at Tinder, the effects of which became more pronounced as the year progressed." Defendants also conceded that Tinder is only "beginning to execute on its clearly defined product roadmap" and completely omitted Explore, which was featured heavily in prior shareholder letters during the Class Period. Defendants announced a renewed focus on "establishing Tinder's brand narrative" by launching its "first-ever global marketing campaign this quarter" to "help engage both new and previous users[.]" As a result, Tinder's marketing spend was expected to increase by approximately 2%. And during an earnings conference call on February 1, 2023, Swidler further revealed that "our business overall and Tinder in particular, decelerated as the year went on, and product execution was not what we expect[ed] it to be, especially in the first half of the year." Defendant Kim also admitted that "we head into 2023 with less momentum than what we would like."

186. The declines in Match Group's stock price on August 3, 2022 and February 1, 2023, resulted from the revelation to investors and the market of the truth about the nature and extent of and/or the materialization of risks concealed by Defendants' Class Period material misstatements and omissions.

187. The timing and magnitude of Match Group's stock price decline negates any inference that the losses suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific factors unrelated to Defendants' fraudulent conduct. On August 3, 2022, the NASDAQ was down only 0.2%. On February 1, 2023, the NASDAQ increased 1.7%.

188. The losses suffered by Lead Plaintiff and other members of the Class resulted from Defendants' fraudulent scheme to inflate Match Group's stock price and the subsequent, significant declines in the value of that stock when Defendants' prior misrepresentations and omissions were revealed.

**CLASS ACTION ALLEGATIONS**

189. Lead Plaintiff brings this action as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), on behalf of a class consisting of all purchasers of the common stock of Match Group during the Class Period ("Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

190. The members of the Class are so numerous that joinder of them is impracticable. Throughout the Class Period, Match Group traded on the NASDAQ exchange. While the exact number of Class members is not presently known to Lead Plaintiff, and can be ascertained only through discovery, Lead Plaintiff believes there are thousands of members in the proposed Class.

Record owners and other members of the Class can be ascertained through records maintained by Match Group and/or its transfer agent. Those record holders could be notified of the pendency of this action by mail.

191. Lead Plaintiff's claims are typical of the claims of the members of the Class, as all are similarly affected by Defendants' wrongful conduct in violation of federal law.

192. Lead Plaintiff will fairly and adequately protect the interests of the members of the class and has retained competent and experienced securities litigation counsel.

193. Common questions of law and fact exist as to all members of the Class and will predominate over any questions solely affecting individual members of the Class. Among the common questions of law and fact common to the Class:

(a) Whether the Exchange Act was violated by Defendants as alleged herein;

(b) Whether statements made by Defendants misrepresented and omitted material facts about Match Group's business, operations, and management; and

(c) To what extent the members of the Class have suffered damages, and the proper measure of those damages.

(d) A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. As the damages suffered by each individual Class member may be relatively small, the burden and expense of litigating individual cases would make it all but impossible for many members of the Class to redress wrongs done to them. There will not be any difficulty in managing this action as a class action.

**FRAUD ON THE MARKET**

194. Lead Plaintiff will rely on the presumption of reliance established by the fraud-on-the-market doctrine. Among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) These omissions and material misrepresentations were material;

(c) Match Group common stock traded in an efficient market throughout the Class Period;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Match Group common stock; and

(e) Lead Plaintiff and other members of the Class purchased Match Group common stock between the time Defendants misrepresented or failed to disclose material facts and the time the facts were disclosed, without knowledge of the misrepresented or omitted facts.

195. At all relevant times, the market for Match Group common stock was efficient, as:

196. Match Group filed periodic public reports with the SEC as a regulated issuer; and

197. Match Group regularly communicated with public investors via established communications mechanisms, including through the regular dissemination of press releases on major news wire services, communications through the financial press, securities analysts, the internet, and other similar reporting services.

## AFFILIATED UTE RELIANCE

198. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Match Group's acquisition of Hyperconnect and the performance and rollout of features at Tinder—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable

investor might have considered them important in making investment decisions. That requirement is satisfied here given the importance of the issues at hand.

**COUNT I**

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against all Defendants**

199. Lead Plaintiff incorporates ¶¶1-198 by reference.

200. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and concealed material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

201. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Match Group securities during the Class Period.

202. Along with the duties of full disclosure imposed on Defendants as a result of their affirmative false and misleading statements to the public, the Defendants had a duty to promptly disseminate truthful information about Match Group's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market prices of the Company's securities would be based on truthful, complete, and accurate information. SEC Regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

203. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the Class have suffered damages in connection with their purchases of Match Group common stock during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for Match Group securities and experienced losses when the artificial inflation was released from Match Group securities as a result of the revelations and prices decline detailed here. Plaintiffs and the Class would not have purchased Match Group securities at the prices they paid, or at all, if they had known that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

204. Because of the foregoing, Match Group, Dubey, Kim, and Swidler have each violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

**COUNT II**

**For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

205. Lead Plaintiff incorporates ¶¶1-198 by reference.

206. During her tenure as officer and director of Match Group, Dubey was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. Because of her position of control and authority as officer and director of Match Group, Dubey had the power and authority to cause Match Group to engage in the conduct complained of here. Dubey was able to, and did, control, directly and indirectly, the decision-making of Match Group, including the content and dissemination of Match Group's public statements and filings described herein, thereby causing the dissemination of the materially false and misleading statements and omissions as alleged herein.

207. In her capacity as Chief Executive Officer and director of Match Group, and as more fully described herein, Defendant Dubey participated in the misstatements and omissions set forth above. Indeed, Dubey had direct and supervisory involvement in the day-to-day operations

of the Company and had access to non-public information about Match Group's deceptive and risky business practices. Dubey had the ability to influence and direct and did so influence and direct the activities of Match Group in its violations of Section 10(b) of the Exchange Act and Rule 10b-5 as detailed in ¶¶199-204.

208. During his tenure as officer and director of Match Group, Kim was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. Because of his position of control and authority as officer and director of Match Group, Kim had the power and authority to cause Match Group to engage in the conduct complained of here. Kim was able to, and did, control, directly and indirectly, the decision-making of Match Group, including the content and dissemination of Match Group's public statements and filings described herein, thereby causing the dissemination of the materially false and misleading statements and omissions as alleged herein.

209. In his capacity as Chief Executive Officer and director of Match Group, and as addressed herein, Defendant Kim participated in the misstatements and omissions set forth above. Indeed, Kim had direct and supervisory involvement in the day-to-day operations of the Company and had access to non-public information about Match Group's deceptive and risky business practices. Kim had the ability to influence and direct and did so influence and direct the activities of Match Group in its violations of Section 10(b) of the Exchange Act and Rule 10b-5 as detailed in ¶¶199-204.

210. During his tenure as officer of Match Group, Swidler was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. Because of his position of control and authority as officer and director of Match Group, Swidler had the power and authority to cause Match Group to engage in the conduct complained of herein. Swidler was able to, and

did, control, directly and indirectly, the decision-making of Match Group, including the content and dissemination of Match Group's public statements and filings described herein, thereby causing the dissemination of the materially false and misleading statements and omissions as alleged herein.

211. In his capacity as Chief Financial Officer of Match Group, and as detailed herein, Defendant Swidler participated in the misstatements and omissions set forth above. Indeed, Swidler had direct and supervisory involvement in the day-to-day operations of the Company and had access to non-public information about Match Group's deceptive and risky business practices. Swidler had the ability to influence and direct and did so influence and direct the activities of Match Group its violations of Section 10(b) of the Exchange Act and Rule 10b-5 as detailed in ¶¶199-204.

212. As a result, Individual Defendants were control persons within the meaning of Section 20(a) of the Exchange Act. Because of their position, and as a result of its aforementioned conduct and culpable participation, Dubey, Kim, and Swidler are jointly and severally liable, pursuant to Section 20(a) of the Exchange Act, to Plaintiffs and the other members of the Class.

213. This claim is brought within the applicable statute of limitations.

214. By reason of the foregoing, Defendants Dubey, Kim, and Swidler violated §20(a) of the Exchange Act, 15 U.S.C. §78(a).

**PRAYER FOR RELIEF**

215. WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

(a) Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b) Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiff and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

216. Lead Plaintiff demands a trial by jury.

DATED: July 24, 2023

**BLOCK & LEVITON LLP**

*/s/ Kimberly A. Evans*
Kimberly A. Evans (#5888)
3801 Kennett Pike, Suite C-305
Wilmington, DE 19807
(302) 499-3600 phone
kim@blockleviton.com

*Counsel for Lead Plaintiff Northern California Pipe Trades Trust Funds and Lead Counsel for the Putative Class*

*Of Counsel:*

Jeffrey C. Block (*pro hac vice*)
Jacob A. Walker (*pro hac vice*)
Sarah E. Delaney (*pro hac vice*)
Michael D. Gaines (*pro hac vice forthcoming*)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
(617) 507-6020 fax
jeff@blockleviton.com
jake@blockleviton.com
sarah@blockleviton.com
michael@blockleviton.com

*Counsel for Lead Plaintiff Northern California Pipe Trades Trust Funds and Lead Counsel for the Putative Class*

Jesse L. Jensen (*pro hac vice forthcoming*)
Robert Kravertz (*pro hac vice forthcoming*)
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
1251 Avenue of the Americas
44th Floor
New York, NY 10020
(212) 554-1400 phone
(212) 554-1444 fax

jesse.jensen@blbglaw.com
robert.kravertz@blbglaw.com

*Additional Counsel for Lead Plaintiff Northern California Pipe Trades Trust Funds and the Putative Class*