# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

LEOPOLD RIOLA BARDAJI, Individually and on Behalf of All Others Similarly Situated

        Plaintiff,

   v.

MATCH GROUP, INC., SHARMISTHA DUBEY, BERNARD KIM, and GARY SWIDLER,

        Defendants.

Case No. 1:23-cv-0245-MN

## DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**TABLE OF CONTENTS**

**Page**

I.   PRELIMINARY STATEMENT ...................................................................................1

II.  NATURE AND STAGE OF THE PROCEEDINGS ............................................................2

III. SUMMARY OF ARGUMENT ...................................................................................3

IV.  FACTUAL BACKGROUND......................................................................................3

    A.   MGI Acquires Hyperconnect...................................................................3

    B.   Tinder Tests New Features—Coins and Explore.......................................5

V.   PLAINTIFF FAILS TO STATE A CLAIM UNDER THE EXCHANGE ACT ...............6

    A.   Plaintiff Fails to Plead a Material Misrepresentation ...............................7

        1.   There Were No Misrepresentations About Hyperconnect.........................7

        2.   There Were No Misrepresentations About Tinder Coins or Explore ........11

    B.   Plaintiff Fails to Plead a Strong Inference of Scienter............................14

        1.   Plaintiff Fails to Plead Conscious Misbehavior or Recklessness ..............14

        2.   Plaintiff Fails to Plead Motive and Opportunity.......................................18

        3.   Plaintiff's Scienter Theory Makes No Sense ............................................19

    C.   Plaintiff Fails to Plead Loss Causation ..................................................20

VI.  CONCLUSION......................................................................................................20

# TABLE OF AUTHORITIES

**Page**

## Cases

*In re Aetna, Inc. Sec. Litig.*,
  617 F.3d 272 (3d Cir. 2010)..............................................................................................9

*In re Amarin Corp. PLC Sec. Litig.*,
  2021 WL 1171669 (D.N.J. Mar. 29, 2021)..........................................................................4

*Bartesch v. Cook*,
  941 F. Supp. 2d 501 (D. Del. 2013).................................................................8, 12, 13, 18

*Bd. of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v.
  Mechel  OAO*,
  811 F. Supp. 2d 853 (S.D.N.Y. 2011), *aff'd*, 475 F. App'x 353 (2d Cir. 2012)......................15

*Cal. Pub. Emps. Ret. Sys. v. Chubb*,
  394 F.3d 126 (3d Cir. 2004)............................................................................................17

*Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*,
  543 F. App'x 72 (2d Cir. 2013) .......................................................................................20

*City of Warren Police & Fire Ret. Sys. V. Prudential Fin., Inc.*,
  70 F.4th 668 (3d Cir. 2023) .......................................................................................9, 12

*In re Diebold Nixdorf, Inc., Sec. Litig.*,
  2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ........................................................................10

*In re Digital Island Sec. Litig.*,
  357 F.3d 322 (3d Cir. 2004)............................................................................................14

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005)......................................................................................................20

*In re eSpeed, Inc. Sec. Litig.*,
  457 F. Supp. 2d 266 (S.D.N.Y. 2006)................................................................................13

*Fadia v. FireEye, Inc.*,
  2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) ........................................................................9

*Fan v. StoneMor Partners LP*,
  927 F.3d 710 (3d Cir. 2019)............................................................................................19

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
  336 F. Supp. 3d 196 (S.D.N.Y. 2018), *aff'd*, 779 F. App'x 69 (2d Cir. 2019)........................19

*In re Grand Canyon Educ., Inc. Sec. Litig.*,
  2021 WL 3491779 (D. Del. Aug. 9, 2021) ................................................................19

*GSC Partners CDO Fund v. Washington*,
  368 F.3d 228 (3d Cir. 2004).....................................................................................14

*In re Hertz Global Holdings Inc.*,
  905 F.3d 106 (3d Cir. 2018).....................................................................................17

*Institutional Invs. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009).................................................................................16, 18

*In re Intel Corp. Sec. Litig.*,
  2023 WL 2767779 (N.D. Cal. Mar. 31, 2023).........................................................12

*In re Intelligroup Sec. Litig.*,
  527 F. Supp. 2d 262 (D.N.J. 2007) ..........................................................................18

*Kairalla v. Advanced Med. Optics, Inc.*,
  2008 WL 2879087 (C.D. Cal. June 6, 2008) .............................................................8

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015)............8, 9, 17, 18

*Martin v. GNC Holdings, Inc.*,
  757 F. App'x 151 (3d Cir. 2018) .............................................................7, 14, 15, 16

*In re NAHC, Inc. Sec. Litig.*,
  306 F.3d 1314 (3d Cir. 2002).....................................................................................12

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
  720 F. Supp. 2d 517 (D.N.J. 2010) ......................................................................15, 18

*In re Newell Brands, Inc. Sec. Litig.*,
  837 F. App'x 869 (3d Cir. 2020) ................................................................................7

*Percoco v. Deckers Outdoor Corp.*,
  2013 WL 3584370 (D. Del. July 8, 2013) .................................................................15

*Rahman v. Kid Brands, Inc.*,
  736 F.3d 237 (3d Cir. 2013)..........................................................................7, 15, 18

*Roofer's Pension Fund v. Papa*,
  2018 WL 3601229 (D.N.J. July 27, 2018).................................................................16

*Sylebra Cap. Partners Master Fund Ltd v. Everbridge, Inc.*,
  2023 WL 3549506 (C.D. Cal. May 9, 2023) ..............................................................9

*Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*,
    176 F. Supp. 3d 387 (D. Del. 2016)......................................................................19

*Williams v. Globus Med., Inc.*,
    869 F.3d 235 (3d Cir. 2017).................................................................................7

*Wilson v. Bernstock*,
    195 F. Supp. 2d 619 (D.N.J. 2002) .......................................................................18

*Winer Family Trust v. Queen*,
    503 F.3d 319 (3rd Cir. 2007) ............................................................................4, 11

*In re Xinhua Fin. Media, Ltd. Sec. Litig.*,
    2009 WL 464934 (S.D.N.Y. Feb. 25, 2009)...........................................................10

## Statutes

15 U.S.C. § 78u-5(c)(1)(B)(i) ....................................................................................19

Fed. R. Civ. P. 9(b) .............................................................................................1, 3

Fed. R. Civ. P. (b)(6)...........................................................................................1, 3

Exchange Act Section 10(b) ..............................................................................2, 3, 6

Exchange Act Section 20(a)...............................................................................2, 3, 7

Defendants respectfully submit this Opening Brief in Support of Their Motion to Dismiss the Amended Class Action Complaint (the "Complaint") pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act ("PSLRA").

## I.      PRELIMINARY STATEMENT

From November 3, 2021 through January 31, 2023 (the "Class Period"), Match Group, Inc. ("MGI") filed six Form 10-Qs and 10-Ks with the SEC, which span hundreds of pages and contain extensive disclosures regarding MGI's business, including the risks associated with a newly acquired company, Hyperconnect, and feature development at its brands. Plaintiff claims that MGI's executives were too optimistic about (i) the ongoing integration of Hyperconnect and (ii) the potential success of new Tinder (an MGI brand) feature initiatives, but Plaintiff does not challenge a single statement in MGI's 10-Qs or 10-Ks. Instead, Plaintiff selectively quotes aspirational forward-looking statements of opinion from earnings calls and shareholder letters to create the false impression that MGI executives intentionally defrauded investors. The Complaint's striking omission of *any* of MGI's 10-Qs or 10-Ks reveals it for what it is: an attempt to turn the securities laws into an insurance policy for losses caused by risks known to the market.

The Complaint has three clear legal deficiencies.

*First*, Plaintiff fails to plead a single materially misleading statement. Plaintiff challenges statements such as "we think the team is . . . fast moving" and "we expect the Explore experiences should increase engagement and reactivation." ¶¶ 109, 117. But that is not the stuff of securities fraud. Rather, these statements are "corporate puffery" and forward-looking opinions that cannot support a securities-fraud claim. Even if they were otherwise actionable, Plaintiff does not adequately allege that any of the statements are misleading. Instead, the Complaint reels off a list of irrelevant allegations from purportedly confidential former employees, but none of those allegations address the challenged statements, much less render them misleading. Attempting to

1

overcome the exacting pleading standard by sheer volume, the bulk of the allegations are disconnected from the alleged fraud. Further, much of the purportedly "undisclosed" information *was* disclosed, including in SEC filings Plaintiff omitted from the Complaint or in portions of earnings calls Plaintiff selectively quoted.

*Second*, the Complaint does not meet the statutory requirement to plead a "strong inference" of scienter that is at least as compelling as any competing non-culpable inference. Plaintiff does not allege a single piece of evidence demonstrating Defendants were aware that any of the alleged misstatements were misleading. Nor does Plaintiff allege any cogent motive for the alleged fraud, such as large stock sales. To the contrary, Defendants *purchased* MGI stock during the Class Period—another fact omitted from the Complaint demonstrating that Plaintiff's theory makes no sense. And, far from seeking to mislead investors, Defendants both repeatedly warned investors that the results of the Hyperconnect integration and Tinder feature initiatives were uncertain, and repeatedly disclosed when results were less than expected. Indeed, on the very first day of the Class Period, Defendants disclosed that Hyperconnect's results were "below our expected range."

*Third*, Plaintiff fails to adequately plead loss causation. The Complaint alleges no connection between the alleged misstatements and any corresponding loss. Instead, Plaintiff relies on two purported "corrective disclosures" unrelated to the alleged misrepresentations.

For each of the foregoing reasons, the Complaint should be dismissed.

## II.    NATURE AND STAGE OF THE PROCEEDINGS

On July 24, 2023, Plaintiff filed the Complaint, alleging two claims: (i) that MGI and the individual Defendants—Sharmistha Dubey, Bernard Kim, and Gary Swidler—violated Section 10(b) of the Exchange Act and Rule 10b-5, and (ii) that the individual Defendants violated Section 20(a) of the Exchange Act. This is Defendants' opening brief in support of their motion to dismiss the Complaint.

2

### III.   SUMMARY OF ARGUMENT

1.      Plaintiff fails to adequately allege under Rules 12(b)(6) and 9(b) and the PSLRA at least three required elements of a Section 10(b) claim:  a material misrepresentation, scienter, and loss causation.  Therefore, the Court should dismiss Count I of the Complaint.

2.      Because Plaintiff fails to plead a predicate Section 10(b) claim, Plaintiff's Section 20(a) control person claim fails.  Therefore, the Court should dismiss Count II of the Complaint.

### IV.   FACTUAL BACKGROUND

MGI is an internet and technology holding company, which, through its portfolio companies, provides dating brands in the online dating category.  MGI's portfolio companies must continually adapt and innovate in response to the ever-changing dating landscape to stay competitive.  ¶¶ 173-74.[1]  As relevant here, between 2021 and 2022, MGI and its portfolio companies undertook new initiatives to better serve their users.

#### A.   MGI Acquires Hyperconnect

One of MGI's initiatives was the acquisition of Hyperconnect, which was announced in February 2021 and closed in June 2021.  ¶ 7.  Hyperconnect is a global video, artificial intelligence, and augmented reality company.  Ex. A at 2.  Defendants were optimistic about Hyperconnect and its potential integration into its portfolio of dating brands, but were careful not to commit to any timeline for integrating Hyperconnect's features.

When the transaction was announced, then-MGI CEO Sharmistha Dubey told investors that Hyperconnect "will make sense on *some* platforms" but that she couldn't "say exactly when, [with respect to] the timeline." *Id.* at 6.  After the acquisition closed, Defendants reiterated that it

---

[1]   References to "¶ __" are to the Complaint.  Emphasis is added and citations and quotations omitted unless otherwise noted.  Exhibits are to the Declaration of Lauren Neal in Support of Defendants' Motion to Dismiss filed simultaneously herewith.

would take time and effort to integrate Hyperconnect's capabilities. Throughout the Class Period, MGI's SEC filings included extensive risk disclosures warning that the integration might not be successful. *See infra* at 8.[2] MGI also disclosed when the acquisition encountered headwinds. On November 3, 2021, during MGI's first earnings call post-acquisition and the first day of the Class Period, Mr. Swidler disclosed that Hyperconnect experienced "softness" in its largest revenue generating app, "faced delays in rolling out certain product initiatives," and generated only $53 million in revenues, which he disclosed was "below our expected range." Ex. B at 2-4. He explained that "it's going to take some time" "to be able to return the business to growth." *Id.* at 8. On the same call, MGI even reduced Hyperconnect's expected revenue contribution for 2021 because of "weaker Q3 performance and lowered expectations for Q4." *Id.* at 4.

Defendants continued to express caution throughout the Class Period. On February 2, 2022, MGI disclosed "about $50 million" in Q4 2021 revenues from Hyperconnect—virtually the same as the Q3 results that were below expectations—and told investors the "outlook is still for a relatively flat performance in Q1 and Q2 on the Hyperconnect side." Ex. C at 4, 14; *see also* Ex. D at 6. During that call, Ms. Dubey and Mr. Swidler said in no uncertain terms that "much remains to be done at Hyperconnect," and that "there is more work to do." *Id.* at 3, 14. Mr. Swidler explained that the work left included integrating Hyperconnect technology "into our Pairs app and a part of it into our Plenty of Fish app *over the coming time*" as well as "looking at" whether there were "things to leverage from Hyperconnect into the Tinder Platform." *Id.* at 12.

On May 4, 2022, MGI reported that "Hyperconnect contributed just over $50 million of

---

[2] "The Third Circuit permits a district court to judicially notice SEC filings and public disclosures." *In re Amarin Corp. PLC Sec. Litig.*, 2021 WL 1171669, at *8 (D.N.J. Mar. 29, 2021) (citing cases). Courts may also consider documents that were integral to and/or explicitly relied upon in the complaint. *Winer Family Trust v. Queen*, 503 F.3d 319, 328 (3rd Cir. 2007).

total revenue" for Q1 2022, consistent with its February disclosure that it expected Q1 to be "relatively flat" compared to Q4 2021's "approximately $50 million." Ex. E at 5.

On August 2, 2022, MGI reduced guidance and disclosed a $217 million impairment charge relating to Hyperconnect as part of its second quarter earnings. Ex. F at 11. The impairment charge "stem[med] from a lower financial outlook for [Hyperconnect's] two apps including FX [foreign exchange] impacts in certain of Hyperconnect's key markets, as well as the use of higher discount rates in the DCF calculations given rising interest rates generally." Ex. G at 5.

### B.    Tinder Tests New Features—Coins and Explore

MGI also disclosed new initiatives at the Tinder brand. ¶ 111. One of these initiatives was Explore, a "newly-created hub within the app that will host completely new, interactive ways to use Tinder." ¶ 60. The other was the creation of an in-app virtual currency ("Coins") intended to allow non-subscribers to make purchases. ¶ 64. Though optimistic that these features would attract users and increase engagement, Defendants cautioned that the failure to "keep up with changes in technology and user preferences . . . could adversely affect our business." Ex. H at 18.

Defendants also disclosed the experimental and uncertain nature of both features. On November 3, 2021, Ms. Dubey shared that "[virtual currency] is currently testing, and [they] *should* have it *sorted out* in the *next few months*," ¶ 118 and that the plan for 2022 was to "build all of this out, *test it out, learn it, refine it, work out the kinks*," *id.* Similarly, when asked whether Explore would accelerate revenue, Ms. Dubey explained that Explore was "new," had "only been out for a couple of weeks," and that any "revenue optimization opportunities" would occur "over time." ¶ 117. On June 1, 2022, Mr. Swidler spoke to the status of the Explore initiative, noting that "we think there's interesting things we can do in Explore that we're *just starting to scratch the surface on*." Ex. I at 6. With respect to Coins, he stated "[w]e're still building that out. *It is really not a 2022 revenue item. It's really a 2023 and beyond item*." *Id.*

In MGI's August 2, 2022 shareholder letter, MGI stated that "Tinder's current revenue growth expectations for the second half of the year are below our original expectations as a result of disappointing execution on several optimizations and new product initiatives." Ex. F at 6. MGI disclosed it expected "muted top-line growth in the second half of 2022" as well as "essentially flat" Q3 Total Revenue outlook year over year. *Id.* at 12. During MGI's earnings call the next day, Mr. Swidler explained that Coins was not responsible for the reduced expectations as "[t]here wasn't much, if anything, baked into the second half outlook around coins and virtual goods." Ex. G at 10. He explained further that the cause was from a series of "kind of less sexy, less notable initiatives," not Coins or Explore. *Id.* He noted that based on "where we were in May, we still believe[d] that we were going to deliver those initiatives." *Id.*

Defendants expressed optimism in the second half of the year that Tinder's "[p]roduct execution is already improving," but cautioned that "it will take some time [for that improvement] to *play through into full financial results*[.]" ¶ 149. And Defendants were candid that the prior disappointing execution would continue to impact 2022 results. On November 1, 2022, in MGI's Q3 2022 Shareholder Letter, for example, Defendants projected that Tinder's direct revenue would be "relatively flat [year over year]" and between $780-$790 million for Q4 2022. Ex. J at 11.

On January 31, 2023, MGI reported Q4 revenues of $786 million and disclosed flat year-over-year direct revenues from Tinder, both in-line with the November guidance. Ex. K at 2. The next day, Mr. Swidler again acknowledged that Tinder's revenue growth "decelerated as the year went on," as a result of the previously-disclosed execution issues in the first half, but expressed optimism about "the strides the [Tinder] team has made over the last 6 months in improving on product execution" and the "strong product road map for 2023[.]" Ex. L at 8.

## V.    **<u>PLAINTIFF FAILS TO STATE A CLAIM UNDER THE EXCHANGE ACT</u>**

To state a claim under Section 10(b) of the Exchange Act, Plaintiff must allege (i) a

6

material misrepresentation or omission, (ii) reliance on such misrepresentation or omission, (iii) scienter, and (iv) loss causation. *Williams v. Globus Med., Inc.*, 869 F.3d 235, 240 (3d Cir. 2017). Because the claims are subject to the heightened pleading requirements of the PSLRA and Rule 9(b), the Complaint must plead with particularity why the statement is fraudulent. *See In re Newell Brands, Inc. Sec. Litig.*, 837 F. App'x 869, 874 (3d Cir. 2020). Plaintiff must also establish a "strong inference" that each defendant acted with intent to deceive. *Martin v. GNC Holdings, Inc.*, 757 F. App'x 151, 153 (3d Cir. 2018). Plaintiff fails to adequately allege at least three required elements: a material misrepresentation, scienter, and loss causation. And Plaintiff's failure to plead a primary violation under 10(b) requires dismissal of Plaintiff's Section 20(a) control person claims as well. *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 247 (3d Cir. 2013).

## A. Plaintiff Fails to Plead a Material Misrepresentation

### 1. There Were No Misrepresentations About Hyperconnect

Plaintiff alleges that certain statements between February and June 2022 about Hyperconnect were misleading because (i) according to FE 1—a former employee who departed in November 2021—MGI had done little due diligence prior to the acquisition and had "no plan for how Hyperconnect's technology would plug into any of its portfolio products"; (ii) according to FE 2—a former employee—Hyperconnect "lacked strong strategic guidance" and had "slower execution"; (iii) MGI was not utilizing Hyperconnect technology in every MGI property; and (iv) Hyperconnect underperformed initial expectations. ¶¶ 101-104. These allegations fail.

***Generic Positive Statements About Hyperconnect Were Not Misleading.*** Plaintiff alleges that omitted information regarding the integration challenges rendered generalized statements about Hyperconnect and its integration, such as "we continue to make great, great progress working with Hyperconnect" and "we think the team is . . . fast moving," materially misleading.

7

¶¶ 100, 109; *see also* ¶¶ 105, 107.[3]  Plaintiff is wrong.

*First*, Plaintiff's claim "predicated on the concealment of information" fails because "that information was, in fact, disclosed." *Bartesch v. Cook*, 941 F. Supp. 2d 501, 508 (D. Del. 2013). On the first day of the Class Period, MGI disclosed that Hyperconnect's revenue was "***below our expected range***." *Supra* at 4.  Similarly, MGI disclosed on February 2, 2022—the date of the first alleged misrepresentation about Hyperconnect—which brands had and had not integrated Hyperconnect technology and that MGI was "*looking at*" whether there were "things to leverage from Hyperconnect into the Tinder Platform." *Supra* at 4.[4]

*Second*, the allegedly omitted information does not contradict the affirmative statements. FE 1's allegation about minimal due diligence prior to the acquisition—which conflicts with FE 2's account (¶ 90)—does not render statements regarding Hyperconnect's performance *a year later* misleading.  Nor does FE 1's allegation that MGI had no plan for "how Hyperconnect's technology would plug into" MGI's brands, because the absence of a specific plan at the time of the acquisition has nothing to do with integration efforts months later.  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580-81 (S.D.N.Y. 2014) (allegations regarding issues in Spring of 2012 did not render statements months later misleading), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).  And FE 2's views regarding Hyperconnect's "slow execution" are not relevant because Defendants were not required "to frame their disclosures in such a pejorative manner." *Bartesch*, 941 F. Supp. 2d at 508.

*Third*, statements reflecting what Defendants "think" (*e.g.*, ¶¶ 100, 105, 109) are opinions,

---

[3]   To aid the Court, Defendants have prepared Appendix A, which identifies the alleged misstatements in the Complaint, and the arguments those statements correspond to herein.

[4] MGI's disclosure that Hyperconnect focused on augmented reality and the "metaverse," s*upra* at 3, dooms Plaintiff's allegation regarding such "non-disclosure," which also fails because the "statements create no affirmative impression, either way, regarding [Hyperconnect's focus]." *Kairalla v. Advanced Med. Optics, Inc.*, 2008 WL 2879087, at *4 (C.D. Cal. June 6, 2008).

which are not actionable here because Plaintiff alleges, at most, certain former employees held opinions that differed from Defendants', but "it is the facts known to, and the intent of, the maker of the statements which is ultimately relevant when the Court considers the falsity of statements of belief or opinion." *Lululemon*, 14 F. Supp. 3d at 580. And even if the opinions of these unnamed former employees were somehow relevant, they would constitute, at most, "fact[s] cutting the other way," which are insufficient to establish a false statement of opinion. *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 687 (3d Cir. 2023).

*Fourth*, statements regarding the progress of Hyperconnect's integration (*e.g.*, ¶¶ 100, 105, 107) "constitute forward-looking statements." *See Sylebra Cap. Partners Master Fund Ltd v. Everbridge, Inc.*, 2023 WL 3549506, at *7 (C.D. Cal. May 9, 2023). As forward-looking statements, they are not actionable because "they were accompanied by meaningful cautionary statements," *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 278–79 (3d Cir. 2010), regarding the integration such as MGI "may experience operational and financial risks…if [it were] unable to…successfully integrate the operations and accounting, financial controls, management information, technology, human resources, and other administrative systems, of the acquired business [including Hyperconnect]," and that MGI "may not be successful in addressing other challenges encountered in connection with our acquisitions and the anticipated benefits of one or more of our acquisitions may not be realized."[5] Ex. H at 22; Ex. M at 23.

*Finally*, "courts regularly deem" such statements "describ[ing] ongoing mergers as smooth, rapid, and successful," (*e.g.*, ¶¶ 100, 107, 109), non-actionable puffery. *Fadia v. FireEye, Inc.*,

---

[5] Cautionary statements disclosed in SEC filings may be incorporated by reference; they do not have to be in the same document as the forward-looking statements." *Aetna*, 617 F.3d at 282. The challenged forward-looking statements were identified as such and investors were referred to MGI's SEC filings containing cautionary language. Exs. B at 2; C at 2; E at 2; G at 2; K at 28; O at 26.

2016 WL 6679806, at *7 (N.D. Cal. Nov. 14, 2016) (citing cases); *see also In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *9 (S.D.N.Y. Mar. 30, 2021) (similar).  Similarly "soft adjectives" "used to describe the management team," (e.g., ¶¶ 100, 107, 109) are mere puffery.  *In re Xinhua Fin. Media, Ltd. Sec. Litig.*, 2009 WL 464934, at *8 (S.D.N.Y. Feb. 25, 2009).

  ***Statement Regarding Hyperconnect's Outlook Was Not Misleading.***  Plaintiff alleges that it was misleading to state that "our outlook is still for a relatively flat performance in Q1 and Q2 [2022] on the Hyperconnect side" because Hyperconnect's performance was not "flat," it was "underperforming."  ¶¶ 105-06.  But MGI did not claim Hyperconnect was "flat" relative to initial expectations.  To the contrary, MGI disclosed that Hyperconnect's Q3 2021 results were below expectations and that Q4 revenues were essentially the same as Q3 revenues.  *Supra* at 4.  Thus, "relatively flat" performance for Q1 2022 was, as disclosed, below initial expectations.  The statement is also not actionable because it is a forward-looking opinion, *supra* at 8-9, and correct: Hyperconnect's revenues in Q1 2022 were virtually the same as Q4 2021, *i.e.*, flat.  *Supra* at 4.

  ***Statements Regarding Integration Of Hyperconnect Technology Were Not Misleading***.  Plaintiff alleges that statements such as "[Hyperconnect has] great audio chat and video technology, and we've been leveraging that" were misleading.  ¶ 109; *see also* ¶ 107.  They were not.

  *First*, it is undisputed that MGI integrated Hyperconnect technology into its applications.  Indeed, Plaintiff explicitly *does not* challenge the statement "[w]e've got [Hyperconnect technology] now in the Match app, in the Meetic app, in the Pairs app."  ¶ 109.  While FE 2 purportedly claims that *two* applications had not incorporated Hyperconnect technology, those are the same two applications MGI itself disclosed were not yet leveraging Hyperconnect technology.  *Compare* ¶ 93 (alleging Hyperconnect was not integrated with Plenty of Fish or Tinder), *with supra* at 4 (disclosing Hyperconnect was not integrated with same applications).

*Second*, to the extent Plaintiff's theory is that the statements were false because of *other* general issues with Hyperconnect, Plaintiff's theory fails both because MGI did disclose other obstacles and risks related to Hyperconnect (*supra* at 4-5), and because the specific statements about integrating Hyperconnect technology triggered no duty to disclose unrelated issues. *Winer Fam. Tr. V. Queen*, 503 F.3d 319, 330 (3d Cir. 2007) ("[B]y revealing one fact about a product," a company is not obligated to "reveal all others that, too, would be interesting, market-wise.").

### 2.    There Were No Misrepresentations About Tinder Coins or Explore

Plaintiff claims that statements between November 2021 and May 2022 about Tinder Explore and Coins were misleading because (i) Tinder was allegedly "not effectively executing on Tinder's new product initiatives"; (ii) according to FE 2, Explore did not have "a meaningful effect on user engagement after its rollout in October 2021," insofar as nine months after rollout, "engagement" was allegedly 5 percent; (iii) according to FE 1, "smaller test territories" in August 2021 indicated that the Coins user interface at the time was a "little too busy"; and (iv) Coins was promoted despite being in the prototype stage.  ¶¶ 74, 99, 113.  These allegations fail.

*Statements Regarding The Plans And Expectations For The Tinder Initiatives Were Not Misleading*.  Plaintiff claims the allegedly omitted information rendered MGI's statements about its plans and expectations for Explore and Coins, such as its stated expectations that Explore was the "harbinger for Tinder's long-term vision," and that Explore features would "be important drivers for increasing engagement and reactivation," misleading.  ¶ 111; *see also* ¶¶ 112, 116, 117, 128.  Similarly, Plaintiff challenges MGI's statement that "we have some really bold and big initiatives planned for Tinder next year, especially around virtual goods and some other areas as well."  ¶ 118; *see also* ¶ 126.  And Plaintiff challenges MGI's statements regarding the extent of its "progress on its product road map," including that it was "largely on track."  ¶¶ 130, 133; *see also* ¶¶ 122, 131.  These statements are not false and misleading.

*First*, the alleged omissions are not inconsistent with MGI's statements. *Bartesch*, 941 F. Supp. 2d at 508. Allegations that Explore's engagement was low ***nine months*** after launch, *i.e.* in July 2022, do not demonstrate that any of the alleged misstatements—all of which were made between November 2021 and May 2022—were "misleading ***at the time [they were] made***." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002). The claims that Coins had received "negative" feedback in "smaller markets" and was marketed while it was a "prototype," are not inconsistent with MGI's disclosure that Coins was "currently testing," and that "the plan for 2022" was to "build all this out, test it out, learn it, [and] ***work out the kinks***." *Compare* ¶¶ 74, 99, *with* ¶ 118. And the fact that MGI ultimately disclosed, in August 2022, "disappointing execution on several optimizations and new product initiatives" does not demonstrate issues at the time of the alleged misstatements. Indeed, Mr. Swidler explained in August 2022 that "if you look back where we were in May, we still believe[d] that we were going to deliver those initiatives." Ex. G at 10.

*Second*, the alleged misstatements about the plans and expectations for the Tinder initiatives are opinions, and the allegedly omitted information, including early "negative" feedback, "would be, at most, only one of many factors" Defendants took into account. *City of Warren*, 70 F.4th at 687. Thus, Plaintiff identifies, at most, certain "fact[s] that cut the other way." *Id.*

*Third*, statements about feature development (¶¶ 111, 112, 117, 118, 126, 130, 131, 133) "are plainly forward-looking." *In re Intel Corp. Sec. Litig.*, 2023 WL 2767779, at *11 (N.D. Cal. Mar. 31, 2023). As such, they are not actionable because they were surrounded by cautionary language, including that "the size and level of engagement of our user base may decrease" if MGI fails to "compete effectively against [MGI's] current or future competitors and services that may emerge" and that the failure to "keep up with changes in technology and user preferences" "in a timely and cost-effective manner" "could adversely affect our business." Ex. H at 15.

*Finally*, statements expressing optimism about "bold and big" initiatives (*e.g.*, ¶¶ 116, 118; *see also* ¶¶ 111, 131) are non-actionable puffery. *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 286 (S.D.N.Y. 2006) (company's statement that it is "excited" and "extremely encouraged" by new product's introduction "is non-actionable puffery").

**Statement Regarding MGI's Projected Performance Was Not Misleading.** Plaintiff claims the purported "issues" with the initiatives rendered misleading MGI's February 2022 projection of 15-20% revenue growth for 2022 "led by high-teens growth at Tinder." ¶ 120. Wrong. The alleged omissions are not inconsistent with MGI's projections. In fact, Plaintiff fails to identify any "issues" in February 2022 that would impact the projections. Nor does Plaintiff demonstrate that any alleged issues—regardless of when they existed—constituted more than "facts cutting the other way." *See supra* at 12. Moreover, the projections were plainly forward-looking statements and were surrounded by extensive cautionary language. *Id*.

**Statements Regarding Explore Adoption Rates Were Not Misleading.** Plaintiff alleges statements about Explore's adoption rates and engagement (*e.g.*, ¶¶ 121, 124, 125, 128, 131) were misleading because FE 2 alleges that **nine months after launch**, "engagement" was only five percent and that Explore was a "dud." ¶ 127. But whether or not Explore was a "dud" in the eyes of one employee does not render adoption rates disclosed by MGI inaccurate, nor was MGI required "to frame their disclosures in such a pejorative manner." *Bartesch*, 941 F. Supp. 2d at 508. And allegedly low engagement levels in July 2022 cannot render the alleged misstatements— all of which were made before May 5, 2022— false or misleading. *See supra* at 12.

**Statements About Tinder's Improvement Were Not Misleading**. Plaintiff alleges that MGI's statements about Tinder's improving execution in the fall of 2022—which are forward-looking opinions—were misleading because MGI "*admitted* . . . that Tinder's revenue shortfall

resulted from weaker-than-expected product execution at Tinder, the effects of which became more pronounced as the year progressed." ¶¶ 135-150. But MGI merely acknowledged that the financial *effects* of Tinder's *prior* execution became more pronounced as the year progressed, exactly what MGI told investors it expected. *Supra* at 6. Indeed, MGI's Q4 2022 revenue of $786 million was in line with the $780-$790 million guidance for Q4 2022, issued on November 2, 2022. *Id.* MGI never stated that Tinder's execution did not improve in the second half.

### B.      Plaintiff Fails to Plead a Strong Inference of Scienter

Plaintiff also fails to allege facts sufficient to give rise to a "strong inference" of scienter, as required by the PSLRA. *Tellabs, Inc. v. Makor Issues & Rts*., Ltd., 551 U.S. 308, 314 (2007). "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* Courts must weigh the "plausible, nonculpable explanations for the defendant's conduct" against the "inferences favoring the plaintiff." *Id.* at 323.

### 1.      Plaintiff Fails to Plead Conscious Misbehavior or Recklessness

Scienter may be inferred only where the plausible allegations amount to "either reckless or conscious behavior." *Martin*, 757 F. App'x at 153. To establish conscious misbehavior, it is "not enough for plaintiffs to merely allege that defendants 'knew' their statements were fraudulent or that defendants 'must have known' their statements were false." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 239 (3d Cir. 2004). Recklessness is a similarly high bar, limited to "extreme departure[s] from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to [the] defendant or is ***so obvious that the actor must have been aware of it***." *In re Digital Island Sec. Litig*., 357 F.3d 322, 332 (3d Cir. 2004). None of Plaintiff's allegations meet this standard.

***Plaintiff's "at issue" theory of scienter fails.*** Lacking specific scienter allegations for *any*

14

of the Defendants, Plaintiff resorts to allegations that Defendants "put their knowledge" "at issue" and thus automatically acted with scienter. ¶¶ 164-168. That is not the law. Inferring scienter merely because an executive spoke on the topic of an alleged misstatement would erode the PSLRA's pleading standard and would conflict with numerous judicial decisions dismissing securities cases on scienter grounds even where falsity is found. *See, e.g.*, *Martin*, 757 F. App'x at 154. It is axiomatic that "a strong inference of scienter that . . . Defendants knew their public statements and disclosures were false" cannot be inferred "by virtue of their employment." *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 555-56 (D.N.J. 2010).

Plaintiff may be invoking the "core operations" doctrine, which is inadequate to establish scienter and inapplicable here. *See Rahman*, 736 F.3d at 247. A plaintiff may be "entitled to a 'core operations inference'" where a complaint alleges "that a defendant made misstatements concerning the 'core matters' of central importance to a company," *and* sets forth "additional allegation[s] of *specific information* conveyed to management and related to the fraud." *Martin*, 757 F. App'x. at 154. Plaintiff is not entitled to this inference.

*First*, Plaintiff's conclusory allegations that the Hyperconnect integration was "of vital importance" to MGI, ¶ 163, and that Tinder was MGI's "most important brand," ¶ 168, are insufficient without supporting allegations since Plaintiff must demonstrate that "the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Percoco v. Deckers Outdoor Corp.*, 2013 WL 3584370, at *5 (D. Del. July 8, 2013); *see also Bd. of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 873 (S.D.N.Y. 2011), *aff'd*, 475 F. App'x 353 (2d Cir. 2012) ("[T]here is no cognizable limit to the scope of the 'core operations' inference suggested by Plaintiffs, which would potentially sweep in knowledge of all customer contract terms, price levels, delivery

15

schedules, and other operational details [within company's primary division].").

*Second*, the doctrine is inapplicable absent egregiously false statements in response to pointed questions about the alleged fraud. *See, e.g.*, *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 269-70 (3d Cir. 2009) (core operations inference where CFO "explicitly denied the existence of [pricing] discounting in response to repeated questions about pricing from analysts" and where plaintiffs alleged that defendants engaged in massive discounting on a large scale during the class period); *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *21-22 (D.N.J. July 27, 2018) (allegations "narrowly surpassed the bar" where "high-ranking executives allegedly involved in the pricing decisions at issue" represented, in response to "pointed analyst questions," that pricing was impacted by competitive forces and where plaintiffs alleged a price-fixing scheme for which the DOJ "raided [the company's] offices as part of a criminal price-fixing probe").

Here, by contrast, Plaintiff focuses on more general statements regarding the integration as a whole or the progress of the initiatives as a whole, which are the product "of many different components, only one of which [are the alleged issues]." *Avaya*, 564 F.3d at 269-70 (no basis to infer defendants "must have known its earnings projections were false because of the existence of unusual price reductions," because statements about earnings do not "imply [defendants] would have been aware of particular pricing developments").

*Third*, Plaintiff sets forth no "specific information conveyed to management" that contradicted their public statements. *Martin*, 757 F. App'x. at 154. Although Plaintiff alleges that MGI's board was informed of Hyperconnect's underperformance, ¶ 12, the same information was disclosed to investors, *supra* 4-5. The only other specific information allegedly conveyed to management was Explore's purportedly low engagement rates in the summer of 2022, but that was *after* the alleged misstatements concerning Explore, and the information was only allegedly

16

conveyed to Mr. Kim who is not alleged to have made any misrepresentation regarding Explore.

    ***Plaintiff's FE reports are irrelevant.*** Plaintiff's remaining allegations rest on conclusory allegations from former employees that do not meet the reliability standards necessary to be credited. *See Cal. Pub. Emps. Ret. Sys. v. Chubb*, 394 F.3d 126, 146 (3d Cir. 2004) (courts must scrutinize the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia."). Even crediting those allegations does not help Plaintiff. Plaintiff claims Hyperconnect "lacked strong strategic guidance" and "had slower execution," ¶ 166, but does not explain how these criticisms from a former employee contradict Defendants' opinions, particularly where the views are not alleged to have been conveyed to Defendants. Nor does Plaintiff explain how a single employee describing Explore as a "dud" contradicts Defendants' statements. *See In re Hertz Global Holdings Inc.*, 905 F.3d 106, 115 (3d Cir. 2018) (plaintiffs failed to connect allegations that defendant "had accounting problems" with inference that "defendants were aware they caused those problems"); *see also Lululemon*, 14 F. Supp. 3d at 581 (FEs "thoughts and opinions as to various quality issues . . . do not establish what specific contradictory information the makers of the statements had and the connection . . . between that information and the statements").

    Plaintiff's reliance on alleged claims by FE 2 that "user reaction [to Tinder Coins] was baffled to negative," ¶ 169, does not support scienter because Plaintiff sets forth no allegations about whether Defendants had access to that data or how it contradicts any public statements. Plaintiff cites reports from FE 4 to allege that "Defendants" knew that Explore "had a negligible impact on user engagement," *e.g.*, ¶ 171, but FE 4 does not allege that Defendants were aware of that information. Nor does FE 4 assert that the adoption rates represented by Defendants were

inaccurate; he merely alleges that Explore "***ended up*** having a negligible impact on user engagement." *Id.* Plaintiff's remaining generalized allegations about how feature initiatives were managed at MGI cannot support an inference of scienter because they do not contain facts demonstrating that Defendants were in possession of information contradicting their statements. *E.g.*, ¶¶ 171-72; *see In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 360 (D.N.J. 2007).

Having alleged neither that a single egregiously false statement was the subject of a pointed question, nor a single piece of undisclosed information provided to Defendants that contradicted their statements, Plaintiff fails to plead recklessness or conscious misbehavior.

### 2.    Plaintiff Fails to Plead Motive and Opportunity

Motive and opportunity cannot "serve as an independent route to scienter." *Avaya*, 564 F.3d at 245. At most, they can bolster allegations where there is "a concrete and personal benefit to the individual defendants resulting from [the alleged] fraud." *Bartesch*, 941 F. Supp. 2d at 511.

***Motive to preserve revenue is insufficient.*** Allegations concerning Defendants' desire to preserve MGI's main revenue source, ¶ 173, fail because allegations that executives had incentive to "improve the lot of their companies" describe goals common to the entire business community. *Rahman*, 736 F.3d at 246 n. 13; *see also Pharmanet*, 720 F. Supp. 2d at 552.

***Stock-based and performance-based compensation is insufficient.*** Allegations regarding Defendants' compensation, ¶¶ 176, 181, fail because motive allegations based "merely on the attenuated connection between [the] nature of Defendants' compensation and the company's [business goals] are insufficient." *Wilson v. Bernstock*, 195 F. Supp. 2d 619, 638 (D.N.J. 2002).

***Defendants acquired stock during the Class Period.*** Plaintiff does not allege that Defendants sold stock during the Class Period. This alone negates scienter. *E.g.*, *Pharmanet*, 720 F. Supp. 2d at 550. Further, on August 4, 2022, Defendant CEO Bernard Kim purchased more than $1 million of MGI stock, Ex. N, which is obviously inconsistent with a belief that MGI's

18

stock was inflated through fraud because "a defendant would not sink his own ship." *Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 176 F. Supp. 3d 387, 396 (D. Del. 2016). Similarly, MGI authorized a share repurchase program following the release of Q1 2022 earnings, Ex. O at 14, which undermines scienter "because it would make no economic sense for a company to buy back its stock at a price it knows to be inflated." *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018), *aff'd*, 779 F. App'x 69 (2d Cir. 2019).[6]

### 3.    Plaintiff's Scienter Theory Makes No Sense

Even assuming Plaintiff alleged any inference of scienter, the non-culpable opposing inference that Defendants were simply optimistic about MGI's initiatives and, as often happens, certain of these initiatives did not turn out as favorably as Defendants believed, is more compelling.

Plaintiff's competing theory requires at least three untenable logical leaps. *First*, Defendants hid issues at Hyperconnect in order to "commit fraud," but simultaneously disclosed that Hyperconnect's performance was "below expectations." *Second*, Defendants concealed "known issues" related to the Tinder initiatives in Q1 2022—while selling none of their own shares—only to disclose that their revenue expectations "for the second half of the year are below our original expectations" in Q2 2022. *Third*, to complete the supposed "fraud," Defendants made up new "lies" about getting back on track, but simultaneously released revenue guidance (that MGI met), which incorporated the effects of the issues disclosed in Q2 2022. The Court need not accept Plaintiff's implausible theory in the face of MGI's repeated disclosure of negative information. *See, e.g.*, *Fan v. StoneMor Partners LP*, 927 F.3d 710, 718 (3d Cir. 2019) (disclosures of negative information supported opposing inference); *In re Grand Canyon Educ., Inc. Sec. Litig.*, 2021 WL

---

[6]    Plaintiff also fails to plead a single fact suggesting Defendants possessed "actual knowledge" of falsity for forward-looking statements (*e.g.*, ¶¶ 105, 111-12, 117, 118, 120, 122, 126, 130-33), as is required under the PSLRA.  15 U.S.C. § 78u-5(c)(1)(B)(i).

3491779, at *17 (D. Del. Aug. 9, 2021) (where Plaintiff's theory "does not make a whole lot of sense," it cannot "be found cogent or at least as compelling" as the non-culpable inference).

### C.    Plaintiff Fails to Plead Loss Causation

To establish loss causation, Plaintiff must show a "causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Plaintiff relies upon two purported "corrective disclosure" events: (i) MGI's August 2, 2022, announcement that it took an impairment charge related to Hyperconnect and expected lower revenue growth in the second half of the year due to some delays with certain Tinder initiatives; and (ii) MGI's February 1, 2023 disclosure of "disappointing financial results." Both fail.

*First*, the August Hyperconnect impairment—caused by already-disclosed weaknesses, discount rates, and foreign exchange rates—is insufficient because it did not "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint." *Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 75 (2d Cir. 2013). The August disclosure regarding the Tinder initiatives is also not corrective because the reduced guidance was caused by a series of "less sexy, less notable initiatives," not Coins or Explore, which were the subject of the alleged misrepresentations. *Supra* at 8.

*Second*, the February 1, 2023 earnings release cannot qualify as a "corrective" because MGI had already disclosed that it expected reduced growth in the second half of the year. *Supra* at 6. MGI reiterated that message throughout the Fall of 2022, including in its November 1, 2022 guidance where it projected "$780 million to $790 million" in company revenue and "relatively flat" year-over-year "direct revenue" from Tinder, *supra* at 4-6, precisely in line with the $786 million in actual Q4 revenue and "flat" direct revenue from Tinder.

## VI.    CONCLUSION

For the reasons discussed herein, Plaintiff's Complaint should be dismissed with prejudice.

20

OF COUNSEL:

Michael Carlinsky
Jesse Bernstein
Brenna Nelinson
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
michaelcarlinsky@quinnemanuel.com
jessebernstein@quinnemanuel.com
brennanelinson@quinnemanuel.com


September 22, 2023

MORRIS, NICHOLS, ARSHT &
TUNNELL LLP

*/s/ Lauren K. Neal*
Kenneth J. Nachbar (#2067)
Lauren K. Neal (#5940)
Emily C. Friedman (#7054)
1201 North Market Street
Wilmington Delaware 19801
(302) 658-9200
knachbar@morrisnichols.com
lneal@morrisnichols.com
efriedman@morrisnichols.com
   *Attorneys for Defendants*

21