**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| LEOPOLD RIOLA BARDAJI, *Individually and on Behalf of All Others Similarly Situated,*<br><br>Plaintiff,<br><br>v.<br><br>MATCH GROUP, INC., SHARMISTHA DUBEY, BERNARD KIM, and GARY SWIDLER,<br><br>Defendants. | C.A. No. 23-0245-MN<br><br>**Class Action**<br><br>**Jury Trial Demanded** |

**ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
THE AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................................1

NATURE AND STAGE OF THE PROCEEDINGS ....................................................................1

SUMMARY OF ARGUMENT ..................................................................................................1

FACTUAL BACKGROUND ......................................................................................................1

ARGUMENT .............................................................................................................................1

      I.      False and Misleading Statements About the Integration of Hyperconnect..............2

      II.     False and Misleading Statements About the Rollout of Product Features
           and Execution of the Product Roadmap at Tinder .....................................................6

          A.     Tinder's Explore Feature .............................................................7

          B.     Tinder Coins and Execution of Tinder's 2022 Product Roadmap...............9

          C.     Kim and Swidler Mislead Investors That They Had Corrected
               Tinder's Execution Woes For the Second Half of 2022 ...........................11

      III.    The Amended Complaint Alleges Defendants Acted with Scienter......................12

      IV.    The Amended Complaint Adequately Pleads Loss Causation .............................19

CONCLUSION.........................................................................................................................20

# TABLE OF AUTHORITIES

**CASES**

*Allegheny Cty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189 (E.D. Pa. 2021) ........................................................................................................ 13, 16, 17

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.,* 70 F.4th 668 (3rd Cir. 2023) .................................................................................................... *passim*

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009)........................................................ 2, 7

*Hall v. Johnson & Johnson*, 2019 WL 7207491 (D.N.J. Dec. 27, 2019) ....................................... 4

*In re Advance Auto Parts, Inc. Sec. Litig.*, 2020 WL 599543 (D. Del. Feb. 7, 2020) .. 5, 13, 15, 17

*In re Aetna Inc. Sec. Litig.,* 34 F. Supp. 2d 935 (E.D. Pa. 1999)..................................................... 5

*In re AT&T Corp. Sec. Litig.*, 2002 WL 31190863 (D.N.J. Jan. 30, 2002) ................................... 5

*In re Cambrex Corp. Sec. Litig.*, 2005 WL 2840336 (D.N.J. Oct. 27, 2005)............................... 12

*In re Celgene Corp. Sec. Litig.*, 2019 WL 6909463 (D.N.J. Dec. 19, 2019)................................ 17

*In re Grand Canyon Educ., Inc. Sec. Litig.*,2023 WL 2072227  (D. Del. Feb. 17, 2023) ........................................................................................................................ 19

*In re Penn Treaty Am. Corp. Sec. Litig.,* 202 F. Supp. 2d 383 (E.D. Pa. 2002) ............................ 5

*In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801 (D.N.J. Aug. 28, 2017) ................. 16

*In re Stone & Webster Sec. Litig.,* 414 F.3d 187 (1st Cir. 2005)..................................................... 5

*In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635 (E.D. Pa. 2015) ............................... 17

*In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458 (E.D. Pa. 2014)........................................ 18

*Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009)............................................. 12, 16, 17

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.,* 513 F.3d 702 (7th Cir. 2008)................................. 5, 18

*McDermid v. Inovio Pharms., Inc.*, 520 F. Supp. 3d 652 (E.D. Pa. 2021) ..................................... 5

*Pelletier v. Endo Int'l PLC*, 439 F. Supp. 3d 450 (E.D. Pa. 2020)............................................... 13

*Rahman v. Kid Brands, Inc.*, 736 F.3d 237 (3d Cir. 2013)..................................................... 17, 18

*Roll v. Singh*, 2008 WL 3413863 (D.N.J. June 26, 2008) ............................................................. 5

*Roofer's Pension Fund v. Papa*, 2018 WL 3601229 (D.N.J. July 27, 2018) ................................ 17

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874 (E.D. Pa. 2018) ............................ 16

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007) ............................................. 12, 16

*Williams v. Globus Med., Inc.*, 869 F.3d 235 (3d Cir. 2017)............................................. 2, 5, 6, 10

*Winer Fam. Tr. v. Queen*, 503 F.3d 319 (3d Cir. 2007) .................................................................. 6

**STATUTES**

15 U.S.C. §78u-4(b)(1) ................................................................................................................... 2

**PRELIMINARY STATEMENT**

A common theme pervades Defendants' motion to dismiss the Amended Complaint ("AC"): rather than wrestle with the substance of Plaintiff's allegations, Defendants set up a strawman to easily sweep aside. But Plaintiff's actual allegations properly plead securities fraud. This case centers on Defendants' material misrepresentations and omissions to investors about: (1) the integration of Hyperconnect, a South Korean company that Match Group acquired in June 2021, and (2) Tinder's new product offerings, Explore and Tinder Coins, which were supposed to stem the decline in Tinder's user numbers, revenue, and profitability. ¶¶100-150.[1]

**NATURE AND STAGE OF THE PROCEEDINGS**

On September 22, 2023, Defendants moved to dismiss, D.I. 36. This answering brief responds to Defendants' arguments in their supporting Opening Brief ("OB"), D.I. 37.

**SUMMARY OF ARGUMENT**

1. Defendants' motion to dismiss should be denied because the AC meets the requirements of Rule 9(b) and the PSLRA and pleads all required elements of a Section 10(b) claim.

**FACTUAL BACKGROUND**

Match Group is a technology and social media company that operates online dating brands and apps including Tinder, Hinge, Match, Meetic, OkCupid, Pairs, PlentyOfFish, Azar, and Hakuna. ¶4. The AC relies on interviews with former high-ranking Match and Tinder executives: a former Chief Product Officer at Tinder (FE 1), a former Senior Manager of Corporate Strategy at Match Group (FE 2), a former Vice President of Communications at Tinder (FE 3), and a Former Senior Marketing Manager at Tinder (FE 4). ¶¶5, 72-99.

**ARGUMENT**

When evaluating a motion to dismiss, the Court accepts factual allegations as true and draws

---

[1] Refences to "¶__" are to the AC, D.I. 34.

all reasonable inferences in favor of plaintiff to determine whether the complaint states a claim that is facially plausible. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Rule 9(b) and the PSLRA require that securities fraud claims "include particularized allegations of fraud." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.,* 70 F.4th 668, 680 (3rd Cir. 2023); *see* 15 U.S.C. §78u-4(b)(1). Defendants challenge three elements of Plaintiff's §10(b) claim: the existence of a materially false or misleading statement, scienter, and loss causation. *Williams v. Globus Med., Inc.*, 869 F.3d 235, 240 (3d Cir. 2017). Each challenge fails. Indeed, the information provided by the FEs[2]—*none of which Defendants ask the Court to disregard or discount*—along with other corroborative allegations, show Defendants knew (contrary to their public assurances) that Hyperconnect was not delivering the value on which investors had been sold, as there was little to no integration of its teams and technologies. Further, Tinder's new product offering Explore was a "dud" from the outset and did not increase user engagement; just months after investors were told Explore was performing well, Dubey was fired and Explore disappeared from management's investor calls and SEC filings. Likewise, Tinder Coins, another new product offering, tested poorly and was shelved in February 2022, so contemporaneous statements about its viability were false when made.

I.    **False and Misleading Statements About the Integration of Hyperconnect**

Swidler made false and misleading statements about Match Group's integration of Hyperconnect into its portfolio of brands. On February 2, 2022, March 7, 2022, and June 1, 2022, Swidler touted the progress made integrating Hyperconnect's team into Match Group. ¶100 ("[W]e

---

[2] A court can rely on former employee allegations where (1) the employee "would have access to the information alleged," (2) the pleading "provides an appropriate degree of detail about the information provided by" the employee, and (3) "other allegations in the amended complaint corroborate the information" from the former employees. *City of Warren,* 70 F.4th at 691-93. Here, each FE is described with sufficient detail establishing how they would know the information they allege, the information is provided in specific detail, and the allegations are corroborated.

continue to make great, great progress working with Hyperconnect."); ¶107 ("You never know when you mix two companies like that how it's going to go, but …We're working hand in glove.… And so the integrations are going really well."); ¶109 ("And the interaction between our apps and the Hyperconnect team to build video chat, to build audio chat has been really, really good.").

Swidler also boasted about the progress already made integrating Hyperconnect's technologies into Match Group's other apps. ¶105 ("And that, of course, doesn't include all the great stuff they're doing for us across the portfolio, which is meaningful as well."); ¶107 ("The integrations with our brands and [Hyperconnect's] audio and video chat capabilities is a huge step forward. It's going extremely well."); ¶109. And Swidler specifically told investors that Hyperconnect's team delivers quickly on new products. ¶100 ("[W]e think they are very quick on product.… They move fast."); ¶109 ("[W]e think the team is … very fast-moving.").

But contrary to Swidler's statements, there was little to no integration at all. Hyperconnect was not delivering the value on which investors were sold.[3] ¶101. According to FE 1, Match Group had no plan for how Hyperconnect's technology would plug into any of its products. *Id.* Match Group had done "very little due diligence" into whether and how Hyperconnect's technologies could integrate with Match Group's products, leading to only "loose" ideas that Hyperconnect's AI was a "potentially interesting" add-on to matching experiences and that using Hyperconnect's video technology instead of third-party technology might save money. *Id.* Feasibility was unknown at the time of the acquisition, and representing to the contrary was materially misleading. *Id.* Hyperconnect's technologies did not have a direct plug-in to Match Group's existing products.

---

[3] And Hyperconnect was not "very quick on product" and "very fast-moving." Match Group's (limited) due diligence revealed that Hyperconnect in fact had "slower execution." ¶¶92, 104. Defendants misrepresent this as merely FE 2's opinion, OB 8, but a careful reading of FE 2's statement demonstrates this to be Match Group's conclusion from pre-acquisition due diligence.

¶102. Knowing this, Dubey told FE 1 that she would leave it up to the brands to figure out what, if anything, to do with Hyperconnect's video, audio, and AI resources.[4] ¶77.

Match Group leadership learned shortly after the Hyperconnect deal closed in June 2021 that Match Group's brands already had a roadmap with next year's projects already committed (none of which were integrations with Hyperconnect). ¶102. The brands could not disengage from their roadmaps to try to integrate Hyperconnect's technology. *Id.* And FE 2 explained that Hyperconnect "lacked strong strategic guidance" and did not focus on infrastructural improvements they could roll out to Match Group, instead continuing to develop mini games and metaverse programs (which went nowhere). *Id.* So no team was working on integration: Match Group's teams were not collaborating at all, let alone "well." *Id.* According to FE 1, Match Group leadership realized the integrations between Hyperconnect and Match Group's portfolio required too much work and would be of little benefit. *Id.* Match Group therefore did not roll out Hyperconnect's technology to Match Group's biggest brands, said FE 2. *Id.* Indeed, Kim—who was announced as new CEO to replace Dubey in May 2022—was, per FE 2, brought in to redirect Hyperconnect's focus to working with the rest of Match Group's portfolio because Dubey had been reluctant to do so. ¶103; *see Hall v. Johnson & Johnson*, 2019 WL 7207491, at *16 (D.N.J. Dec. 27, 2019) ("[C]ourts have similarly concluded that statements emphasizing the strength of a particular business operation may be actionable as securities fraud, where those operations are in reality deficient.").

Defendants fail to wrestle with the most salient facts put forward by FE 1 and FE 2,[5] instead

---

[4] Along those lines, FE 1 had a discussion with Tinder CTO Tom Jacques in 2Q21 about what Tinder could do with Hyperconnect. ¶102. And when the CTOs of Tinder and Hinge met with the Hyperconnect team, the CTOs asked many questions about what Hyperconnect could do or implement for their applications but received no answers. *Id.*

[5] And contrary to Defendants' naked assertion, there is no conflict between FE 1's statement that Match Group did "very little due diligence" into whether and how Hyperconnect's technologies

relying on cherry-picked allegations and strategically placed ellipses to mispresent their statements and Plaintiff's case. *See* OB 7-11. Only a single sentence within Swidler's three statements says what Match Group "thinks,"[6] *see* ¶109; no other statement is couched as an opinion. Swidler's statements about the *present* progress of integration (*e.g.,* "Our teams are collaborating really well;" "We're working hand in glove") are not forward-looking as they represent then-exiting facts.[7] *See Makor Issues & Rts., Ltd. v. Tellabs, Inc.,* 513 F.3d 702, 705 (7th Cir. 2008) (finding no safe harbor for saying sales are "still going strong" because it speaks to current sales); *see also In re Stone & Webster Sec. Litig.,* 414 F.3d 187, 212-13 (1st Cir. 2005).

Nor are Swidler's statements too vague or mere puffery. In context, saying Match Group was making great progress integrating Hyperconnect's personnel and technology materially misleads against the truth of little to no integration. *See In re Advance Auto Parts, Inc. Sec. Litig.*, 2020 WL 599543, at *4 n.2 (D. Del. Feb. 7, 2020) (holding "we remain confident with the progress we're making as we execute our plan…" was not puffery because it "explicitly" says there is a plan and the company was making progress on its execution).[8] Nearly identical statements falsely claiming positive progress integrating business units have been found actionable in this circuit. *See In re Aetna Inc. Sec. Litig.,* 34 F. Supp. 2d 935, 944-45 (E.D. Pa. 1999) (holding statement "Joe has

---

could integrate with Match Group's products, ¶75, and FE 2's statement about what Match Group's due diligence into Hyperconnect uncovered, ¶90. *See* OB 8.

[6] Though, per FE 2, this opinion was not sincerely held. *See City of Warren*, 70 F.4th at 686.

[7] Even if they were forward-looking statements, Swidler's March 7, 2022 and June 1, 2022 conference statements, ¶¶107, 109, included no cautionary language at all; the transcripts reflect no attempt to even reference the risk disclosures in the Company's SEC filings. Defendants neglect to highlight this obvious flaw in their disingenuous position. OB 9 & n.5. And in any event, hypothetical risk disclosures do not insulate from risks that have already come to fruition; those disclosures are, themselves, securities fraud. *Williams*, 869 F.3d 242; *see also McDermid v. Inovio Pharms., Inc.*, 520 F. Supp. 3d 652, 667 (E.D. Pa. 2021).

[8] *See also Roll v. Singh*, 2008 WL 3413863, at *8 (D.N.J. June 26, 2008); *In re AT&T Corp. Sec. Litig.*, 2002 WL 31190863, at *23 (D.N.J. Jan. 30, 2002); *In re Penn Treaty Am. Corp. Sec. Litig.,* 202 F. Supp. 2d 383, 392-93 (E.D. Pa. 2002).

done a great job leading the rapid and successful integration of the health business …" not puffery because it "describes [the efforts to integrate Aetna and USHC] as 'successful'").[9]

Finally, Defendants pointing to specific "integrations" Swidler touted does not establish that he did not mislead. He pointed to three of the Company's smallest brands.[10] Dubey and Swidler justified the high-priced acquisition because the technology would roll-out across all brands. Paying $1.7 billion for technology that would not fit into Match Group's most important apps made no sense. The suggestion that Hyperconnect's audio and video chat technology inside Match, Meetic, and Pairs foretold success integrating the technology into Tinder and Hinge was false and misleading because the CTO of Tinder could not find any meaningful integration. ¶76.

## II. False and Misleading Statements About the Rollout of Product Features and Execution of the Product Roadmap at Tinder

Defendants' arguments ignore most of the AC's allegations and misrepresent others (including their own statements).[11] They invoke the safe harbor reserved for forward-looking statements, OB 12-13, yet close inspection shows their words to all be representations of past and present fact.[12] *E.g.*, ¶125 ("[W]e're seeing high levels of engagement and likes, messages and conversations.");

---

[9] Defendants rely on a misleadingly cropped quote from *Winer Fam. Tr. v. Queen*, 503 F.3d 319, 330 (3d Cir. 2007). *See* OB 11. The omitted portion undermines their position: "[B]y revealing one fact about a product, one must reveal all others that … are needed so that what was revealed would not be so 'incomplete as to mislead.'" *Id.*

[10] *See* D.I. 38-1, at 285-86, 291. In 2022 Match Group reported $3.189 billion in revenue. Tinder was responsible for $1.8 billion; Hinge (the second-largest app) $284 million; Pairs, Hakuna Live, and Azar all combined for $322 million, and Match, Meetic, Plenty of Fish, OK Cupid, BLK, Chispa, and The League collectively totaled $790 million in revenue. *Id.*

[11] For example, Defendants would have the Court believe that Kim and Swidler admitted on January 31, 2023 that a significant portion of Tinder's revenue growth shortfall "resulted from weaker-than-expected product execution at Tinder, the [*financial*] effects of which became more pronounced as the year progressed." *See* OB 13, 20. But the word "financial" is made up by their lawyers post-hoc: they simply did not say "*financial* effects." *See* ¶158. The "effects" of poor product execution became more pronounced as the year progressed. Defendants' attempts to add words and change statements should be disregarded.

[12] In any event, hypothetical risk disclosures do not inoculate against events that have already materialized. *Williams*, 869 F.3d at 242.

¶126 ("And we are seeing some increased engagement and retention."); ¶131 ("Tinder Coins … is on track to launch globally this summer."); ¶140 ("Product execution is already improving."). Defendants also blithely mislabel FE reports of Tinder's own market testing results—including FE 2's description of Explore as a "dud" (which was based on Match Group's user engagement data for Tinder)—as mere "facts that cut the other way." *See* OB 13. But they cannot simply excise well pleaded allegations—which the Court must accept as true—from consideration. *See Fowler*, 578 F.3d at 210.

### A.  Tinder's Explore Feature

Defendants misled investors about the rollout of the Explore feature for Tinder. First, on November 2, 2021, in Match Group's 3Q21 shareholder letter, Dubey and Swidler claimed that "Tinder … is already in the midst of a radical product transformation" because Explore is "already demonstrating increased activity and engagement among members." ¶111; *see also* ¶116 (Explore "increases engagement and activity"); ¶117 (Match Group "ha[d] early evidence of" Explore accelerating Tinder revenue per payer). Dubey and Swidler touted Explore as "the harbinger for Tinder's [new] long-term vision." ¶111. Dubey and Swidler later boasted about the high percentage of Tinder users adopting Explore. On February 1, 2022, in Match Group's 4Q21 shareholder letter, Dubey and Swidler said, "To date, the level of adoption of Explore has exceeded our expectations, with approximately two-thirds of active users engaging with Explore." ¶121; *see also* ¶¶124-25 (Explore has "clearly had a productive start with almost 70% of users adopting this experience" and "high levels of engagement and likes, messages and conversations."); ¶128 ("[G]etting people to adopt [Explore], go check it out" had "happened really well. Adoption, men, women, by geography has been really strong."); ¶131 ("Tinder continues to evolve and transform its product. Tinder Explore adoption levels continue to be high across active users.").

But as FE 2 explained, Explore was a "dud" from inception and did not increase user

engagement. ¶¶87, 113. FE 2 stated that by year-end 2021 it was obvious the product rollout for Explore was not working to improve and attract users to the app. ¶89. FE 2 knew this from mining Match Group's data warehouse for comparative metrics, such as average length of time users spent on Tinder before Tinder was introduced versus after it was launched. ¶87. FE 4 similarly said that Explore had a negligible effect on user engagement, which they knew from the product usage dashboard circulated by the Match Group data analytics team; users did not engage daily with Explore. ¶¶99, 113. FE 3 and FE 4 both stated that Tinder would pre-announce products while they were still prototypes with uncertain viability. ¶113. Explore was supposed to be an alternative discovery model allowing users to bypass traditional swiping to find other people with similar interests. ¶87. But Tinder only required basic information to join—an email address and a few other data points—so most users had no interests or other personal information to discover. *Id.* Indeed, nine months after rollout, only five percent of Tinder users were engaging with the feature.[13] ¶87. User adoption—the only metric Defendants publicly quantified—was a meaningless metric for assessing the success of Explore; "getting people to adopt [Explore], go check it out" meant only that a user had clicked on the Explore tab in Tinder after the app had automatically updated. Defendants falsely touted increased user engagement when Match Group's own data demonstrated Explore had no such effect, and Defendants falsely justified increased revenue growth at Tinder based on so-called higher user engagement with Explore (and because of Tinder coins discussed below). They misleadingly boasted about high percentages of user adoption when user engagement was how Match Group was internally assessing its impact. Dubey

---

[13] Given these details about Match Group's constant monitoring and internal distribution of comparative user engagement details and Explore's immediate failure to attract users and improve user engagement, it is reasonable to infer that user engagement with Explore before June 2022 was not meaningfully better than the 5% in June 2022 noted by FE 2. *Cf.* OB 12. Indeed, Defendants fail to wrestle with most of the facts from FEs 2 and 4.

and Swidler's claim of high rates of Tinder user adoption and engagement with Explore "does not reconcile easily with" the allegations of FE 1 and 2. *City of Warren*, 70 F.4th at 690. Plus, the temporal proximity between Defendants' incompatible statements—Dubey and Swidler's May 3 claim that "Tinder Explore adoption levels continue to be high across active users" and Kim's August 3 admission that "Tinder did not deliver on its product roadmap for the first half of the year. . . As an example, a lot of time was spent building Explore. . . . but we haven't succeeded yet on innovating the user experience."—supports falsity. *Id.* (announcing large charge eight weeks after statement that reserve levels were fine supported falsity). By year-end 2022 Explore was no longer a touted Tinder feature. ¶158; *see also* D.I. 38-1, at 250-445.

### B. Tinder Coins and Execution of Tinder's 2022 Product Roadmap

Defendants also repeatedly misled investors about the rollout of Tinder Coins and progress in executing Tinder's 2022 product roadmap. In statements beginning November 2, 2021, Dubey and Swidler stated that Tinder Coins was "being tested in several markets" and will be "essential" for the "virtual goods and trading ecosystem planned for 2022." ¶¶112, 118, 126, 131. On February 2, 2022, Dubey said testing of Tinder Coins showed "increased engagement and retention," and the plan was "to accelerate the rollout in Q2 and be globally out by Q3." ¶126. On May 3 and 4, 2022, Dubey and Swidler assured investors that Tinder was "on track" and "on schedule" with executing its 2022 product roadmap, Tinder Coins was "on track to launch globally this summer," and they "s[aw] major potential for Tinder Coins." ¶¶130-31, 133. And on November 2, 2022, Kim said he was "excited about … our 2023 roadmap," which focused on "evaluating virtual goods and coins to unlock untapped power users" as one of four key areas. ¶142.

According to FE 1, early testing data from the August 2021 "soft launch" demonstrated Tinder Coins worsened user retention and caused users to stop using the app, which Tinder and Match Group leadership saw "right from the get-go." ¶¶113, 123. By year-end 2021 it was obvious, per

- 9 -

FE 2, that Tinder Coins was not working to improve and attract users to the app. ¶89. Members of FE 2's research team conducted pre-launch research on user sentiment about Tinder Coins, which showed that user reaction was "baffled to negative." ¶88. A "readout" of this research was presented to the head of products for Tinder and the corporate strategy team in February 2022. *Id.* So negative were these results that Tinder Coins was "shelved." *Id.* FE 4 said that Tinder Coins was promoted to consumers and the business press despite still being in prototype; as late as July 2022, Tinder Coins remained a non-viable, unusable product. ¶123. Again, Dubey and Swidler's statements do "not reconcile easily with" the allegations of FE 1 and 2. *City of Warren*, 70 F 4th at 690. It was therefore misleading to represent Tinder Coins as "on track" when testing showed such bad user response that the feature was "shelved" and remained non-viable and unusable in July 2022.[14] *See Williams,* 869 F.3d at 241.

It was misleading for Dubey and Swidler to, on February 1, 2022, project 15% to 20% year-over-year growth in total revenue, "led by high-teens growth at Tinder" for fiscal year 2022. ¶120. Those projections assumed meaningful rollouts of Explore (already a "dud" shortly after launch in late 2021) and Tinder Coins (which was never a viable product and shelved after August 2021 test results). ¶123; *cf.* OB 13.

As for product roadmap execution, Tinder was not "on track" with progress on new products in the first two quarters of 2022. Swidler conceded during a September 14, 2022 industry conference that Tinder had not been executing on new products in Q1 and Q2 of 2022.[15] ¶¶129,

---

[14] Defendants skirt these allegations, disingenuously positing that they were just following their stated plan to "work out the kinks." OB 12. But Coins had already been "shelved" when Defendants touted their progress rolling it out.

[15] Swidler's self-serving statement on August 3, 2022 that "in May, we still believe[d] we were going to deliver those initiatives" (which cannot be taken as true at this stage) just supports Plaintiff's theory that Defendants' recklessly presented a rosy picture of progress in the hope that the underlying truth would catch up to their fiction.

136. Kim similarly admitted on August 3, 2022 that "Tinder did not deliver on its product roadmap for the first half of the year" and "misfires and turnover on the team … led to delays in product and execution in the first half of the year." ¶¶153-54. Indeed, Explore was a "dud" soon after launch, and Tinder Coins was "shelved" after a soft launch in limited territories. ¶¶87-88. *City of Warren*, 70 F.4th at 691 (temporal proximity of false statement to revelation supports falsity).

### C. Kim and Swidler Mislead Investors That They Had Corrected Tinder's Execution Woes For the Second Half of 2022

After Kim and Swidler revealed Tinder's poor product execution on August 2 and 3, 2022, they proceeded to falsely reassure investors that the change in leadership at Tinder had corrected the team's course, and execution of the product roadmap was back on track. *See, e.g.*, ¶136 ("[R]eversing course of that is underway…. We have seen an improvement in the trajectory."); ¶137 ("And so all indications are [that the team is succeeding with a straightforward roadmap]. Progress is being made, and we're on track for [the next couple of] quarters."); ¶138 ("[Tinder's lack of execution is] already underway of being cured and will not be a factor in 2023."); ¶140 ("Product execution is already improving …. There is a palpable improvement in … product execution…. Tinder had seen an improvement in product cadence under the direction of its new Chief Product Officer, who has helped the product team execute on the clear vision the leadership team has set forth…. The improved product velocity and focus is a notable improvement compared to the first half of 2022."); ¶143 ("We expect … improved product execution" to drive accelerated "revenue growth as we move through 2023."); ¶145 ("We've cleaned a lot of that up. It is starting to work a lot better [at Tinder]."); ¶148 ("[O]ur assumptions" and "outlook" for the year "looks on track."); ¶149 ("[T]he most important thing … we need people to focus on, is really the change and improvement in Tinder product execution that is underway….").

But poor execution at Tinder was not being "cured" in the second half of 2022, nor was the

team "on track" to meet "assumptions" and "outlook." ¶¶139, 158. As Kim admitted, Tinder's revenue shortfall for fiscal year 2022 "resulted from weaker-than-expected product execution at Tinder, *the effects of which became more pronounced as the year progressed*." ¶¶139, 158. Swidler conceded that "our business overall and Tinder in particular, *decelerated as the year went on*." ¶¶139, 158. And tellingly, both stated that Tinder was only "beginning to execute on its clearly defined product roadmap" on January 31, 2023. ¶158. According to FEs 1, 2 and 4, Tinder failed to execute because of high turnover at the executive level in products and marketing, and relatedly, lower marketing spend for Tinder during the relevant time, as well as turnover in a comparatively small engineering bench, which the Company did not address. ¶139.

## III.    The Amended Complaint Alleges Defendants Acted with Scienter

For scienter, a plaintiff must "allege facts giving rise to a strong inference of either reckless or conscious misbehavior." *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 267 (3d Cir. 2009). Reckless or conscious misbehavior can be established by alleging "defendants' knowledge of facts or access to information contradicting their public statements." *In re Cambrex Corp. Sec. Litig.*, 2005 WL 2840336, at *11 (D.N.J. Oct. 27, 2005). "A refusal to acknowledge the obvious or to investigate the doubtful may also give rise to an inference of scienter." *Id.* The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre or even the 'most plausible of competing inferences,'" but must merely be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). The question is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323.

The AC pleads a strong inference of scienter based on allegations that Defendants had access to, knew, or recklessly disregarded non-public information that directly contradicted statements they made about (1) the integration of Hyperconnect into Match Group's portfolio of online dating

services, and (2) the rollout and execution of Tinder's new product offerings, such as Explore and Tinder Coins, which were supposedly going to stem the decline in Tinder user numbers, revenue, and profitability.[16] *See Advance Auto Parts*, 2020 WL 599543, at *8 (defendants' access to information contradicting their public statements established a strong inference of scienter); *Allegheny Cty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 228 (E.D. Pa. 2021).

The Hyperconnect acquisition was Match Group's largest to date, yet Dubey and Swidler did little to no due diligence about how Hyperconnect's AI and livestream technologies could integrate with Match Group's portfolio of apps. ¶52. Indeed, Dubey admitted to FE 1 that while Hyperconnect had interesting AI, the apps would have to figure out how to integrate the technology. ¶77. As FE 1 and 2 both said, there was *no* integration in 2021. Indeed, apps such as Tinder and Hinge already had a product roadmap and 2021's projects committed, ¶76, so no one was working to integrate the teams or technology. FE 2 also stated that Dubey and Swidler were aware of and tolerated Hyperconnect's errant focus to keep its CEO happy and retain engineering talent rather than working on integrating Hyperconnect's technology with Match Group's apps, such as Tinder and Hinge. ¶92. The Board replaced Dubey as Match Group CEO precisely because Dubey had been reluctant to focus Hyperconnect. ¶95. FE 2—who worked with Dubey and Swidler on Hyperconnect and helped prepare slide decks for Board meetings, ¶78—said Hyperconnect's failure to add expected value was discussed at board meetings attended by Dubey and Swidler for four consecutive quarters, beginning with the third quarter of 2021. ¶94.

The Individual Defendants likewise had access to and were monitoring information about Tinder's product roadmap. ¶¶79-81, 87-88. Tinder generated more than half of Match Group's

---

[16] The Individual Defendants' scienter is imputed to Match Group, the corporate defendant. *See Pelletier v. Endo Int'l PLC*, 439 F. Supp. 3d 450, 469 (E.D. Pa. 2020).

revenues and Tinder was specifically discussed at every Board meeting. ¶80. Dubey and Swidler knew Tinder was suffering from two years of sequential user decline, according to FE 2, and Explore and Tinder Coins were new initiatives to reverse the declines. ¶82. As the Company's most important brand, the growth of Tinder was monitored and often discussed internally. FE 2 stated that the CEOs of each brand in the Match Group portfolio met weekly from at least May 2018 through October 2022, which almost always included discussions of Tinder's growth and focused on new products (as directed by Dubey). ¶¶79, 80. To collect information for the Board decks, FE 2 accessed the data warehouse used by Match Group, which could show the number of minutes users spent on an app per week and determine the effectiveness (or lack thereof) of a new feature. ¶81. The Board would receive this information, which Dubey and Swidler carefully controlled. *Id.* User engagement for Explore was monitored internally, according to FE 4, through a product usage dashboard circulated by the data analytics team, which showed that Explore ended up having a negligible effect on user engagement. ¶99. FE 2 confirmed that Explore was a "dud" from the start and that "Match executives knew that Explore engagement was only 5%" by mid-2022. ¶¶21, 62. Kim knew that Explore user engagement was only five percent because he specifically had an information request email sent for Explore user engagement metrics to the Match Group analytics team after the information was not provided at a weekly meeting. ¶87.

FE 1 also said early data from August 2021 informed the product team that Tinder Coins was "one feature too far" and caused some users to stop using Tinder. ¶74. According to FE 2, after the research team completed its pre-launch research on user sentiment about Tinder Coins, a "readout" was presented to the head of products for Tinder and the corporate strategy team in or around February 2022. ¶88. The results of the study showed that "user reaction was baffled to negative" which was why Tinder Coins was shelved. *Id.* FEs 3 and 4 explained Tinder's products

- 14 -

would often be pre-announced while they were still prototypes with uncertain viability. ¶170.

Through the FEs, the AC alleges Defendants knew or were reckless in not knowing that Hyperconnect was not being integrated, Explore was not having a meaningful effect on user engagement, and Tinder Coins was not a viable, usable product. *See Advance Auto Parts,* 2020 WL 599543, at *8. Defendants' improperly attempt to dispute or distort the well-pled allegations. To start, Defendants' argument that Plaintiff does not explain how FE testimony that Hyperconnect "lacked strong strategic guidance" and "had slower execution" supports scienter is wrong and improperly isolates individual facts from the totality of Plaintiff's allegations. OB 17. As alleged, the FE allegations about Hyperconnect demonstrates that Hyperconnect's technology was not being integrated into Match Group's leading apps which is what Dubey and Swidler misrepresented. ¶101. Defendants' argument that "user reaction [to Tinder Coins] was baffled to negative" does not support scienter also misses the point. OB 17. Defendants misrepresented that Tinder Coins showed promise and supported growth at Tinder in 2022; yet users reacted negatively to it, undercutting a claim that Tinder Coins was being well received (and therefore supported growth and increased revenues). According to FE 1, early data in August 2021 revealed that Tinder Coins was probably a "little too busy" for the UI (user interface), resulting in a loss of some users, which was apparent "right from the get-go." ¶74. In February 2022, Tinder Coins was scrapped, ¶88-89, yet Dubey and Swidler misrepresented that it was "on track to launch globally [in the] summer [of 2022]." ¶25. And in late 2021 and into 2022, Dubey and Swidler misrepresented Tinder Coins as an initiative that would help reverse declines at Tinder but either knew, or recklessly disregarded, that Tinder Coins had already been poorly received by users.

Defendants wrongly assert Plaintiff does not allege Defendants had access to contrary data and information about Explore and Tinder Coins, and that data and information they did have access

to did not contradict their public statements. *See* OB 17-18. But this is exactly what the FE allegations show.[17] ¶¶79-81, 87-89, 99. The Individual Defendants often discussed internal metrics, demonstrating that they indeed had access to and were aware of such information. For example, on November 2, 2021, Dubey and Swidler stated Explore was "already demonstrating increased activity and engagement among members." ¶111. Later, in the February 1, 2022 letter to shareholders, Dubey, and Swidler stated "more than 50% of users have already tried [Explore]" and "approximately two-thirds of active users [are] engaging with Explore." ¶121. The letter included a chart showing the percentage of active users that adopted Explore since launch. *Id.* Swidler commented on these metrics again on March 7, 2022, stating, "[a]doption, men, women, by geography has been really strong," ¶128.  On February 2, 2022, Dubey stated "we've already got 70% of our users adopting [Explore], and we're seeing high levels of engagement and likes, messages and conversations." ¶125. On May 3, 2022, Defendants Match Group, Dubey, and Swidler said, "Tinder Explore adoption levels continue to be high across active users." ¶131. Defendants had access to contrary user data regarding Explore but simply misrepresented its acceptance by Tinder users.[18] ¶¶79-81, 87-89, 99.

Defendants incorrectly assert that the core operations inference is inapplicable here. OB 15-

---

[17] *See Allegheny Cty.*, 532 F. Supp. 3d at 233 ("Defendants argue that Plaintiffs have not provided evidence of a single meeting, or document, showing that the Individual Defendants had knowledge of the facts which contradicted their misleading statements. But a strong inference of scienter does not require a 'smoking gun.'") (citing *Tellabs*, 551 U.S. at 324); *Avaya*, 564 F.3d at 268 (though the shareholders did "not point to any particular document or conversation that would have informed" the defendants, finding scienter based on circumstantial evidence)).

[18] *See e.g., Allegheny Cty.*, 532 F. Supp. 3d at 228 (inferring scienter where executive "held himself out to investors as knowledgeable" by speaking "in detail" about project); *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 906 (E.D. Pa. 2018) ("Their public comments regarding the clinical data in press releases and earnings calls confirm they had intimate knowledge of the data. Indeed, that is what they wanted the public, particularly investors, to think."); *In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at *16-17 (D.N.J. Aug. 28, 2017).

16. During the Class Period, over half of Match Group's revenue came from Tinder—it was therefore a "core matter of central importance to the company and its high-level executives" that "give[s] rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 246-47 (3d Cir. 2013).[19] Plaintiff's allegations about structural issues at Tinder and Defendants' access to information about new product initiatives are sufficient to allege additional information conveyed to management that was related to the fraud. *See Allegheny Cty.*, 532 F. Supp. 3d at 232–33.[20]

The structure of the Individual Defendants' performance and stock-based compensation created a concrete and personal benefit to each of them, rewarding them for artificially inflating Match Group's stock price and providing an incentive to overstate Tinder's progress in executing its product roadmap and Match Group's ability to integrate Hyperconnect into its portfolio. ¶¶176-181; *In re Celgene Corp. Sec. Litig.*, 2019 WL 6909463, at *21 (D.N.J. Dec. 19, 2019). During the Class Period, the Individual Defendants received millions of dollars in performance compensation, bonuses, and other remuneration for their role in the fraud, which far exceeded their annual salaries. ¶178. Motive to preserve revenue and stock and performance-based compensation all add to the holistic scienter analysis. *See Celgene*, 2019 WL 6909463, at *21.[21]

---

[19] *See also In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 654 (E.D. Pa. 2015) ("UO's [comprising 44% of all sales by Urban] financial performance is critical to the financial health of the entire company. As such, defendants would have been alerted to extensive sales declines and markdowns in UO's North American stores, as alleged by the confidential witnesses[.]").

[20] Defendants also wrongly assert that the core operations doctrine is inapplicable absent egregiously false statements in response to pointed questions about the alleged fraud. OB 16. Neither of the cases they cite for this proposition held that to be a requirement. *See Avaya*, 564 F.3d at 269-70; *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *21-22 (D.N.J. July 27, 2018).

[21] Defendants suggest that scienter can be negated by a lack of stock sale allegations or Defendants' own allegations of stock purchases. This is false. *See Advance Auto*, 2020 WL 599543, at *8 ("[T]here is no per se rule that stock purchases negate any inference of scienter."). Match Group's

- 17 -

Defendants' motive and opportunity further supports the strong inference of scienter. *Rahman*, 736 F.3d at 245 ("[T]hough it is not necessary to plead motive to establish that a defendant acted with scienter, its presence can be persuasive when conducting a holistic review of the evidence."). To preserve Match Group's main source of revenue, the Individual Defendants were motivated to maintain Tinder's position as a top dating app in the face of increased competition and sequential user decline. ¶173. Match Group's strategy depended on the success of Tinder's "radical product transformation" and the integration of Hyperconnect with its advanced capabilities and engineers that could be deployed across the Match Group portfolio. ¶174.

Viewing the facts holistically, the AC raises a strong inference of Defendants' scienter. The most plausible inference drawn is that Defendants knew of the shortcomings associated with the Hyperconnect acquisition and Tinder's new product features but continued to falsely tell investors that the integration was going well, and that the evidence showed that Explore and Tinder Coins were being well received. Despite boasting of how well Explore was being received, after August 2022 it completely disappeared from discussion in Match Group earnings calls, and Tinder Coins had been shelved for six months.[22] Defendants gambled, hoping that reality would catch up to their fiction. It did not pan out. *Makor Issues*, 513 F.3d at 710. Plaintiff does not make any untenable logical leaps. It is Defendants who ask the Court to improperly construe the facts in their favor.[23]

---

share repurchase similarly does not negate scienter. *See In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 474 (E.D. Pa. 2014) ("[T]his Court finds that the repurchasing plan weighs neither in favor of nor against an inference of scienter.").

[22] *See e.g., PTC Therapeutics*, 2017 WL 3705801, at *19 ("That is not to say that plaintiffs version of events is factually bulletproof; surely it is not. Given the factual particulars alleged, however, the inference of scienter is 'at least as compelling' as an inference non-fraudulent intent, which means that these allegations survive the PSLRA standard, and should go forward to the discovery phase and be subjected to proof or disproof.").

[23] Defendants' mid-Class Period partial disclosures do not negate their prior or subsequent misleading statements. OB 19. This argument is merely an attempt to distort the facts as pled in

## IV.     The Amended Complaint Adequately Pleads Loss Causation

"Adequately alleging loss causation requires only pleading a sufficient causal nexus between the loss and the alleged misrepresentation[.]" *In re Grand Canyon Educ., Inc. Sec. Litig.*, 2023 WL 2072227, at *30-31  (D. Del. Feb. 17, 2023). Plaintiff points to four corrective disclosures: (1) Match Group's August 2, 2022 Letter to Shareholders, (2) Kim and Swidler's statements during the August 3, 2022 earnings call, (3) Match Group's January 31, 2023 Letter to Shareholders, and (4) Kim and Swidler's statements during the February 1, 2023 earnings call. Defendants argue only that two of the four disclosures—the shareholder letters—were not corrective; they do not challenge loss causation for their earnings call statements. Their arguments rely on ignoring most of the revelations made in those letters. *See* ¶¶14-15, 151-55, 158-60.

Match Group revealed on August 2, 2022 that it had taken an accounting impairment of $217 million related to the Hyperconnect acquisition, which "stemmed from a decline in projections related to a lower outlook for the business…." ¶151. This lower outlook for the business was fully consistent with Hyperconnect's poor integration with the rest of Match Group's portfolio, which was previously undisclosed. ¶¶14, 151. The factors Defendants point to as instead *solely* responsible for the impairment were identified in *a non-exhaustive list*.[24] ¶151. Kim added color during the August 3, 2022 earnings call when he revealed that he had "instructed the Hyperconnect

_____

the AC. As discussed above, Plaintiff adequately identified contradictory information that Defendants had access to at the time of their statements about Hyperconnect and Tinder that rendered them false and/or misleading.  Similarly, Match Group's ability to meet company-wide revenue guidance for 2022 does not render statements about Tinder's product transformation or the Hyperconnect integration not misleading. OB 19.

[24] Indeed, speaking on September 7, 2023 at an industry conference, Swidler acknowledged "*there's a lot of reasons why Hyperconnect underperformed* our expectations after the acquisition," emphasizing that the "three pieces to the Hyperconnect story" consist of "Azar, Hakuna, and then *the tech backbone for a bunch of the Match Group portfolio*." *See* Declaration of Kimberly Evans, Ex. A. Swidler's public statement is judicially noticeable. *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002).

- 19 -

team to … not invest heavily in metaverse at this time." ¶15. Hyperconnect's team had focused on metaverse instead of integrating its technology into Match Group's other apps. ¶92. As for Tinder, the August 2, 2022 shareholder letter attributed "Tinder's [lowered] revenue growth expectations" to "*disappointing execution on … new product initiatives*"—*i.e.*, Explore and Coins. ¶¶152, 154.

On August 3, 2022, Kim admitted that "Tinder did not deliver on its product roadmap for the first half of the year," and Kim and Swidler explained that the Company was delaying the launch of several initiatives and optimizations it had expected to generate growth in 2022, including Tinder Coins. ¶¶25, 154. Kim further revealed that he had replaced the Tinder leadership team, including the Tinder CEO, because of their failure to deliver. ¶186. In response to the revelations about Tinder, as well the $217 million Hyperconnect impairment charge, Match Group's common stock price fell by $13.47 per share on August 3, 2022, or 17.5%. ¶¶26, 184.

The January 31, 2023 shareholder letter revealed that poor product execution had never been fixed in the second half of 2022—"the effects of [weaker-than-expected product execution at Tinder] became more pronounced as the year progressed" and Tinder was only then (in early 2023) "beginning to execute on its clearly defined product roadmap." ¶158. Kim and Swidler reiterated these details on the earnings call the next day. ¶160. In response to this news, the price of Match Group common stock declined $2.71 per share, or 5%, from $54.12 per share at close on January 31, 2023 to close at $51.41 per share on February 1, 2023. ¶161.

## CONCLUSION

For all these reasons, Defendants' Motion to Dismiss should be denied. If, however, the Courts finds Plaintiff's allegations to be insufficient to state a claim for relief, Plaintiff respectfully requests leave to amend its allegations to cure any identified deficiencies.

November 6, 2023

*Of Counsel:*

Jeffrey C. Block (*pro hac vice*)
Jacob A. Walker (*pro hac vice*)
Sarah E. Delaney (*pro hac vice*)
Michael D. Gaines (*pro hac vice*)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
(617) 507-6020 fax
jeff@blockleviton.com
jake@blockleviton.com
sarah@blockleviton.com
michael@blockleviton.com

*Counsel for Lead Plaintiff Northern California
Pipe Trades Trust Funds and Lead Counsel for
the Putative Class*

Jesse L. Jensen (*pro hac vice forthcoming*)
Robert Kravertz (*pro hac vice forthcoming*)
**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**
1251 Avenue of the Americas
44th Floor
New York, NY 10020
(212) 554-1400 phone
(212) 554-1444 fax
jesse.jensen@blbglaw.com
robert.kravertz@blbglaw.com

*Additional Counsel for Lead Plaintiff Northern
California Pipe Trades Trust Funds and the
Putative Class*

**BLOCK & LEVITON LLP**

/s/  *Kimberly A. Evans*
Kimberly A. Evans (#5888)
3801 Kennett Pike, Suite C-305
Wilmington, DE 19807
(302) 499-3600 phone
kim@blockleviton.com

*Counsel for Lead Plaintiff Northern California
Pipe Trades Trust Funds and Lead Counsel for
the Putative Class*

- 21 -