## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LEOPOLD RIOLA BARDAJI, Individually )
and on Behalf of All Others Similarly )
Situated, )
       )
       Plaintiff, )
       )
       v. )         Civil Action No. 23-245-MN
       )
MATCH GROUP, INC., SHARMISTHA )
DUBEY, BERNARD KIM, and GARY )
SWIDLER, )
       )
       Defendants. )

### REPORT AND RECOMMENDATION

Presently before the court in this securities action for violations of Sections 10(b) and

20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") is a motion to dismiss for

failure to state a claim under Rule 12(b)(6), filed by defendants Match Group, Inc. ("MGI"),

Sharmistha Dubey, Bernard Kim, and Gary Swidler (collectively, "Defendants").[1]  (D.I. 36)  For

the following reasons, I recommend that the court GRANT the motion to dismiss.

## I.       BACKGROUND[2]

Lead plaintiff Northern California Pipe Trades Trust Funds ("NCPTTF;" together with

putative class members, "Plaintiffs") brought this suit on March 6, 2023 and amended the

---

[1] The briefing and filings associated with the pending motion are found at D.I. 37, D.I. 38, D.I.
42, D.I. 43, and D.I. 45.

[2] The Background is based on the allegations in the amended complaint and the documents
incorporated by reference in the amended complaint, which must be accepted as true in deciding
the pending motion to dismiss. *See Umland v. Planco Fin.*, 542 F.3d 59, 64 (3d Cir. 2008).  The
court takes judicial notice of publicly filed SEC documents, which were attached as exhibits to
Defendants' motion to dismiss and were not challenged by Plaintiffs.  (D.I. 38, Exs. H, M); *see
In re Chemed Corp., S'holder Derivative Litig.*, C.A. No. 13-1854-LPS-CJB, 2019 WL 3215852,
at *3 n.6 (D. Del. Feb. 26, 2019); *In re Pattern Energy Grp. Inc. Sec. Litig.*, C.A. No. 20-275-
MN, 2022 WL 957761, at *2 n.6 (D. Del. Mar. 30, 2022).

complaint about four months later, seeking to recover damages on behalf of all investors who purchased MGI common stock between November 3, 2021 and January 31, 2023 (the "Class Period"). (D.I. 1; D.I. 34 at ¶¶ 3, 36) MGI owns and operates a global portfolio of online dating services, including Tinder, Hinge, Match.com, Meetic, OkCupid, Pairs, PlentyOfFish, Azar, and Hakuna. (D.I. 34 at ¶ 4) The amended complaint alleges that Defendants made material misrepresentations and omissions to investors regarding the integration of Hyperconnect, a South Korean "social discovery and video technology" company acquired by MGI in June of 2021. (*Id.* at ¶¶ 6, 100-10) Plaintiffs also contend that Defendants misrepresented the capacity of Tinder's new product offerings, Explore and Tinder Coins, to stem the decline in Tinder's user numbers, revenue, and profitability. (*Id.* at ¶¶ 111-50)

### A. Acquisition of Hyperconnect

During an investor call on February 9, 2021, MGI announced a $1.725 billion deal to acquire Hyperconnect and described the anticipated benefits of the deal. (D.I. 34 at ¶ 49; D.I. 38, Ex. A at 2) When asked how quickly MGI anticipated being able to leverage Hyperconnect's technology and product features to other MGI applications, Chief Executive Officer Sharmistha Dubey declined to specify a timeline for integration. (D.I. 38, Ex. A at 6) Confidential former employees of MGI represented that MGI's limited due diligence revealed Hyperconnect's "slower execution," and MGI had no plan to integrate Hyperconnect's technology into its portfolio products in the second quarter of 2021, before the acquisition. (D.I. 34 at ¶¶ 101-02, 104)

MGI acquired Hyperconnect in June of 2021. (D.I. 34 at ¶¶ 7, 51) After the Hyperconnect acquisition closed, MGI's leadership learned that they could not disengage from their roadmaps to attempt to integrate Hyperconnect's technology onto their platforms and they

did not roll out the technology to the other brands.  (*Id.* at ¶ 102)  In a subsequent earnings call on November 3, 2021, Dubey disclosed that MGI was "seeing an unexpected softness" in the main revenue-driving application at Hyperconnect.  (*Id.* at ¶ 115; D.I. 38, Ex. B at 2-3)  Chief Financial Officer Gary Swidler confirmed that revenues from Hyperconnect fell below the expected range in the third quarter, due in part to delays in rolling out certain product initiatives. (D.I. 38, Ex. B at 4)  Although Swidler indicated MGI was working with the Hyperconnect team on product and marketing roadmaps to improve performance and deliver sustainable long-term growth, he predicted that Hyperconnect's fourth quarter revenues would be similar to those in the third quarter and those "current trends are going to persist into the first part of 2022."  (*Id.*, Ex. B at 4, 8)

MGI's Form 10-K for the fiscal year ending December 31, 2021 cautioned that the company "may experience operational and financial risks in connection with historical and future acquisitions," including the acquisition of Hyperconnect, if it is unable to "successfully integrate the operations and accounting, financial controls, management information, technology, human resources, and other administrative systems" with its existing operations and systems.  (D.I. 38, Ex. H at 22)  During a fourth quarter 2021 earnings call held in February of 2022, Swidler said that Hyperconnect's outlook remained relatively flat during the first and second quarters of 2022, with an expectation for growth in the second half of the year.  (*Id.*, Ex. C; D.I. 34 at ¶ 105)

On March 7, 2022, Swidler spoke at a Morgan Stanley industry conference about the status of the Hyperconnect integration, representing that the integration was "going extremely well" and "[t]he teams are working really well together."  (D.I. 34 at ¶ 107)  Swidler confirmed that Hyperconnect was already integrated at the Match Group and Meetic brands, and he indicated those efforts would be expanded to Plenty of Fish and Pairs in the second quarter of

2022. (*Id.*) Hyperconnect's products were not integrated into MGI's other brands at this time. (*Id.* at ¶ 108) Two months later, Bernard Kim replaced Dubey as CEO and was tasked with mitigating Hyperconnect's underperformance. (*Id.*)

Swidler made additional statements regarding the Hyperconnect integration at the Cowen industry conference on June 1, 2022, describing the Hyperconnect team as "fast-moving" and touting Hyperconnect's video chat and audio chat technology. (*Id.* at ¶ 109) Swidler confirmed that the Hyperconnect technology had been integrated in the Match, Meetic, and Pairs applications. (*Id.*) He also indicated that MGI was "looking at it in other places as well across our portfolio." (*Id.*)

### B. Tinder Initiatives "Explore" and "Tinder Coins"

In a letter to shareholders dated November 2, 2021, MGI disclosed Tinder's launch of Explore, an interactive social discovery interface, and Tinder Coins, a virtual currency that users could earn and spend in the application. (D.I. 34 at ¶¶ 20, 111-12) The letter represented that Explore was "already demonstrating increased activity and engagement among members" and was expected to "further increase the value of long-standing features." (*Id.* at ¶¶ 111-12; *see also id.* at ¶¶ 116-17) Tinder Coins, which was still in the prototype stage, was being tested in several global markets for its ability to allow users to unbundle subscription packages and buy certain subscription features on an a la carte basis. (*Id.* at ¶¶ 112, 114, 118) However, the product usage dashboard showed that Explore had only a negligible effect on user engagement, and early data showed users found Tinder Coins "a little too busy" for the user interface, resulting in a decrease in user retention. (*Id.* at ¶ 113)

In its Form 10-K for the fiscal year ending December 31, 2021, MGI cautioned that the size and level of engagement among its user base could decrease if it did not compete effectively

against current and future competitors and services, which would lead to adverse financial effects. (D.I. 38, Ex. H at 15)  MGI stated that a failure to improve user experience and keep up with changes in technology and user preferences could negatively impact the demand for MGI's services. (*Id.*, Ex. H at 18)

In February of 2022, MGI disclosed a projection for 15% to 20% year-over-year growth in total revenue in fiscal year 2022 "led by high-teens growth at Tinder." (D.I. 34 at ¶ 120)  In support of this projection, MGI represented that "the level of adoption of Explore has exceeded our expectations, with approximately two-thirds of active users engaging with Explore." (*Id.* at ¶ 121)  But Dubey's representation that almost 70% of Tinder users had adopted the experience of Explore by the end of the fourth quarter in 2021 was not reflective of product usage dashboard results showing negligible user engagement with Explore. (*Id.* at ¶¶ 87, 113, 124-25, 127)

MGI also described the continuing roll out of Tinder Coins in a dozen countries, and Dubey disclosed MGI's plan to launch Tinder Coins globally by the third quarter of 2022 based on increased engagement and retention in the twelve test markets. (*Id.* at ¶¶ 122, 126)  However, early data from the soft launch of Tinder Coins in August of 2021 showed a loss of Tinder users due to the application. (*Id.* at ¶ 127)  The product was still not viable or usable in July of 2022, and Dubey acknowledged that increased revenues from Tinder Coins would not materialize until 2023 and beyond. (*Id.* at ¶¶ 122-23, 126)

In May of 2022, Defendants represented that they were "largely on track" with the Explore and Tinder Coins initiatives because Explore adoption levels "continue to be high across active users" and Tinder Coins was expected to launch globally in the summer of 2022. (*Id.* at ¶¶ 130-31, 133)  Yet the head of products for Tinder and the corporate strategy team received pre-launch results from Tinder Coins in February of 2022 showing that user reaction to Tinder

Coins "was baffled to negative." (*Id.* at ¶¶ 88, 132)  Months later, MGI conceded that user engagement for Explore was low and Tinder Coins would be abandoned after Tinder made no progress on its product roadmap during the first half of 2022.  (*Id.* at ¶ 134)

At an industry conference in September of 2022, Swidler acknowledged Tinder's lack of successful product execution, stating that "Tinder did not deliver on its product roadmap for the first half" of 2022.  (*Id.* at ¶¶ 135-36)  Swidler's statements to this effect were consistent with Kim's admission in August of 2022 that "Tinder did not deliver on its product roadmap for the first half of the year." (*Id.* at ¶¶ 153-54)  Both Swidler and Kim reassured investors of Tinder's course correction and improved trajectory.  (*Id.* at ¶¶ 136-38, 140, 143, 145, 148-49)  Defendants no longer promoted Explore as a Tinder feature by the end of 2022, and MGI admitted on January 31, 2023 that Tinder's revenue shortfall "resulted from weaker-than-expected product execution at Tinder, the effects of which became more pronounced as the year progressed." (*Id.* at ¶¶ 139, 158)

## II.  LEGAL STANDARDS

### A.  Sections 10(b) and 20(a) of the Securities Exchange Act

Section 10(b) of the Exchange Act makes it unlawful "to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]"  15 U.S.C. § 78j(b).  Rule 10b-5 implements Section 10(b) and makes it unlawful:

    (a) To employ any device, scheme, or artifice to defraud,

    (b) To make any untrue statement of a material fact or to omit to state a material
        fact necessary in order to make the statements made, in the light of the
        circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim for violation of Section 10(b) of the Exchange Act and Rule 10b-5, plaintiffs must plead "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 114 (3d Cir. 2018); *see also Scott v. Vantage Corp.*, 64 F.4th 462, 475 n.10 (3d Cir. 2023). An individual's liability for fraudulent misrepresentations made in violation of Rule 10b-5 can be imputed to the company that employs the individual. *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 251-52 (3d Cir. 2009).

Section 20(a) of the Exchange Act allows a plaintiff to assert a derivative cause of action against individuals who exercise control over a "controlled person," including a corporation, that has violated § 10(b). 15 U.S.C. § 78t(a); *Avaya*, 564 F.3d at 252. To establish a violation under § 20(a), the plaintiff must prove that a third party under the defendant's control violated the Exchange Act and that the defendant was a "culpable participant" in the unlawful conduct. *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484 (3d Cir. 2013).

**B. Rule 12(b)(6) and the Private Securities Litigation Reform Act**

Rule 12(b)(6) permits a party to seek dismissal of a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although detailed factual allegations are not required, the complaint must set forth sufficient factual

matter, accepted as true in the light most favorable to the plaintiff, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). A claim is facially plausible when the factual allegations allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 663; *Twombly*, 550 U.S. at 555-56.

When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiffs. *Umland v. Planco Fin.*, 542 F.3d 59, 64 (3d Cir. 2008). The court may consider only the allegations in the complaint, documents incorporated by reference into the complaint, and matters of which the court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

Claims under § 10(b) of the Exchange Act and Rule 10b-5 are subject to the heightened pleading standard of the Private Securities Litigation Reform Act ("PSLRA"), which effectively subsumed the particularity requirement of Rule 9(b). *Avaya*, 564 F.3d at 253. The heightened pleading standard of the PSLRA requires a plaintiff to (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading;" and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs*, 551 U.S. at 321 (quoting 15 U.S.C. § 78u-4(b)(1)-(2)).

## III.   DISCUSSION

### A. Material Misstatements

Defendants contend that the amended complaint should be dismissed because the alleged misrepresentations are either accurate and non-contradictory, or they are non-actionable statements of opinion, puffery, and/or forward-looking statements. (D.I. 37 at 7-11) According

8

to Defendants, information on the true state of the Hyperconnect integration was disclosed in earnings calls and shareholder letters. (*Id.* at 8)

Plaintiffs respond that Defendants' representations are contradicted by statements made by four confidential witnesses who were former employees of MGI, including the former Chief Product Officer at Tinder ("FE 1"), a former Senior Manager of Corporate Strategy for Match Group ("FE 2"), a former Vice President of Communications at Tinder ("FE 3"), and a Former Senior Marketing Manager at Tinder ("FE 4"). (D.I. 42 at 2-6; D.I. 34 at ¶ 5) These former employees explained that Defendants had no plan for integrating Hyperconnect's technology, integration was not feasible in several applications, and there was no collaboration between MGI and Hyperconnect on integration. (D.I. 42 at 3-4)

As set forth in the chart below, the operative pleading fails to allege material misrepresentations regarding the Hyperconnect integration, even when viewed in the light most favorable to Plaintiffs:

| HYPERCONNECT INTEGRATION | |
|---|---|
| **Alleged misrepresentation / omission** | **Disposition** |
| "[W]e continue to make great, great progress working with Hyperconnect. . . . Our teams are collaborating really well globally. We're learning from them. They're learning from us. So it's really going well from that standpoint. And we think they are very quick on product. . . . They move fast." (D.I. 34 at ¶ 100) | ***Puffery / Corporate optimism*** – Statements regarding the substantial success of integrating two companies after a merger or acquisition "have been found to be examples of corporate optimism" which are not actionable. *Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *7 (N.D. Cal. Nov. 14, 2016) (citing cases); *see also Tanaskovic v. Realogy Holdings Corp.*, 2021 WL 211049, at *20-21 (D.N.J. Jan. 21, 2021) (concluding that vague and general statements about "continu[ing] to make great progress" on programs and "moving quickly to make strategic changes to improve profitability over time" were non-actionable, immaterial puffery). |
| | ***Non-actionable opinion*** - Statements about what Defendants "think" are not actionable under the PSLRA as long as the opinion was truly held when uttered. *Allegheny County* |

| | |
|---|---|
| | *Employees' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 225 (E.D. Pa. 2021). About a month after Defendants made this statement in February of 2022, Swidler confirmed that Hyperconnect had been integrated at Match Group and Meetic, and integration with Plenty of Fish and Pairs was nearing completion. (D.I. 34 at ¶ 107) Defendants were not required to describe Hyperconnect's execution as "slow." *See Bartesch v. Cook*, 941 F. Supp. 2d 501, 508-09 (D. Del. 2013) ("The law. . . does not require companies to frame their disclosures in such a pejorative manner."). <br><br> ***No contradiction*** – Defendants never disclosed a specific timeline for integration of Hyperconnect on specific platforms. (D.I. 38, Ex. A at 6) (declining to disclose how quickly MGI believed it could leverage Hyperconnect's technology in February of 2021). |
| "[O]ur outlook is still for a relatively flat performance in Q1 and Q2 [of 2022] on the Hyperconnect side." (D.I. 34 at ¶ 105) | ***No contradiction*** - On November 3, 2021, MGI disclosed Hyperconnect's revenue was "below our expected range" and MGI was seeing "an unexpected softness" in the main revenue-driving app at Hyperconnect. (D.I. 38, Ex. B at 2-4) MGI anticipated fourth quarter revenues along the same lines as the weaker third quarter performance and lowered its expectations for Q4 accordingly. (*Id.*, Ex. B at 4) Swidler also expressly disclosed his expectation that "current trends are going to persist into the first part of 2022" with respect to lower-than-expected revenue for Hyperconnect. (*Id.*, Ex. B at 8) These disclosures are consistent with Swidler's representation in February of 2022 that Hyperconnect's performance would remain flat during the first two quarters of 2022. *See Bartesch*, 941 F. Supp. 2d at 508 (finding no fraudulent misstatement or omission where the defendant publicly disclosed the challenges it faced in public SEC filings). <br><br> ***Forward-looking statements*** – Defendants' forward-looking projections for future performance are not actionable because they were accompanied by cautionary statements about how MGI may experience operational and financial risks if integration is unsuccessful. (Q4 2021 S'holder Letter dated February 1, 2022 at 27; D.I. 38, Ex. C at 2, 14; *see also id.*, Ex. H at 22); *see In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 371 (3d Cir. 1993) ("[W]hen an offering document's forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the 'total |

| | |
|---|---|
| | mix' of information the document provided investors.  In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law."). |
| Anticipated acceleration of growth in Q3 and Q4,[3] "of course, doesn't include all the great stuff [Hyperconnect is] doing for us across the portfolio, which is meaningful as well." (D.I. 34 at ¶ 105) | ***No contradiction*** - Hyperconnect was integrated into Meetic and Match Group at the time the statement was made, and Swidler disclosed the benefits derived from those integrations which were not challenged by Plaintiffs as misrepresentations. (D.I. 38, Ex. C at 12) (describing cost savings from replacement of third-party vendor and increased responsiveness to changes). Swidler further confirmed that planned integrations into Pairs and Plenty of Fish were in progress.  (*Id.*)  Swidler stated that there was "great potential" to integrate Hyperconnect into the Tinder platform but offered no timeline for doing so.  (*Id.*)<br><br>***Puffery / Corporate optimism*** – Statements regarding the substantial success of integrating two companies after a merger or acquisition "have been found to be examples of corporate optimism" which are not actionable.  *Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *7 (N.D. Cal. Nov. 14, 2016) (citing cases); *see also Tanaskovic v. Realogy Holdings Corp.*, 2021 WL 211049, at *20-21 (D.N.J. Jan. 21, 2021) (concluding that vague and general statements about "maintaining business momentum and continuing to generate sustainable organic growth" were non-actionable, immaterial puffery). |
| "The integrations with our brands and their audio and video chat capabilities is a huge step forward.  It's going extremely well.  The teams are working really well together.  You never know when you mix two companies like that how it's going to go, but Hyperconnect is really innovative, really responsive.  We're working hand in glove. . . .  And so the integrations are going really well[.]" (D.I. 34 at ¶ 107) | ***Puffery / Corporate optimism*** – Statements regarding the substantial success of integrating two teams after a merger or acquisition "have been found to be examples of corporate optimism" which are not actionable.  *Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *7 (N.D. Cal. Nov. 14, 2016) (citing cases); *see also Tanaskovic v. Realogy Holdings Corp.*, 2021 WL 211049, at *20-21 (D.N.J. Jan. 21, 2021) (concluding that vague and general statements about "continu[ing] to make great progress" on programs were non-actionable, immaterial puffery).<br><br>***No contradiction*** - Hyperconnect was integrated into Meetic and Match Group at the time the statement was made, and Swidler disclosed the benefits derived from those integrations which were not challenged by Plaintiffs as misrepresentations. (D.I. 38, Ex. C at 12) (describing cost savings from replacement of third-party vendor and increased responsiveness to changes). |

---

[3] The amended complaint does not designate Defendants' projection of growth in the third and fourth quarters of 2022 as a misrepresentation.  (D.I. 34 at ¶ 105)

|  | Swidler further confirmed that planned integrations into Pairs and Plenty of Fish were in progress. (*Id.*) Swidler stated that there was "great potential" to integrate Hyperconnect into the Tinder platform but offered no timeline for doing so. (*Id.*) The amended complaint's averments about a lack of due diligence performed before the Hyperconnect acquisition in 2021 are not relevant to Defendants' representations about Hyperconnect's performance in 2022. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580-81 (S.D.N.Y. 2014) (explaining that statements made before the class period did not render false or misleading the company's statements made during the class period); *see also Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 803 (S.D.N.Y. 2020) ("[T]he FAC is silent as to any basis to believe either that these witnesses have knowledge as to [the company's] current operations or that their statements about past practices apply to the present[.]"). |
|---|---|
| "Hyperconnect, we think the team is . . . very fast-moving. . . They've got great video technology, great audio chat and video chat technology, and we've been leveraging that. . . . [W]e're looking at it in other places as well across our portfolio. And the interaction between our apps and the Hyperconnect team to build video chat, to build audio chat has been really, really good. . . . And so the leveraging of their capabilities around video and audio has really gone well, and their kind of look into the future with different technologies like related to metaverse has also gone really well." (D.I. 34 at ¶ 109) | ***Puffery / Corporate optimism*** – Statements regarding the substantial success of integrating two teams after a merger or acquisition "have been found to be examples of corporate optimism" which are not actionable. *Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *7 (N.D. Cal. Nov. 14, 2016) (citing cases); *see also Tanaskovic v. Realogy Holdings Corp.*, 2021 WL 211049, at *20-21 (D.N.J. Jan. 21, 2021) (concluding that vague and general statements about "continu[ing] to make great progress" on programs and "moving quickly to make strategic changes to improve profitability" were non-actionable, immaterial puffery). |
|  | ***No contradiction*** - Hyperconnect was integrated into multiple MGI applications at the time the statement was made, and Swidler disclosed the benefits derived from those integrations which were not challenged by Plaintiffs as misrepresentations. (D.I. 38, Ex. C at 12) (describing cost savings from replacement of third-party vendor and increased responsiveness to changes). Swidler further confirmed that planned integrations into Pairs and Plenty of Fish were underway. (*Id.*) Swidler stated that there was "great potential" to integrate Hyperconnect into the Tinder platform but offered no timeline for doing so. (*Id.*) The amended complaint's averments about a lack of due diligence performed before the Hyperconnect acquisition in 2021 are not relevant to Defendants' representations about Hyperconnect's performance in 2022. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580-81 (S.D.N.Y. 2014) (explaining that statements made before the class period did not render false or misleading the company's statements made during the class |

|  | period); *see also Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 803 (S.D.N.Y. 2020) ("[T]he FAC is silent as to any basis to believe either that these witnesses have knowledge as to [the company's] current operations or that their statements about past practices apply to the present[.]"). |
|---|---|

Defendants also argue that the amended complaint fails to identify a misrepresentation or omission about Tinder Explore and Coins, and the alleged misrepresentations set forth in the pleading are either accurate and non-contradictory, or they are non-actionable statements of opinion, puffery, and/or forward-looking statements. (D.I. 37 at 11-14)  Plaintiffs respond that Defendants misled shareholders by representing that Explore increased user engagement and that Tinder Coins was on track to launch globally in mid-2022 after a positive soft launch. (D.I. 42 at 7-10)  In truth, Plaintiffs maintain that Explore did not meaningfully increase user engagement, and Tinder Coins was negatively received by test users and was not on track for a 2022 launch. (*Id.*)  Despite Defendants' representations to the contrary, Plaintiffs contend that the trajectory for the Explore and Coins initiatives did not improve in the second half of 2022. (*Id.* at 11-12)

As set forth in the chart below, the operative pleading fails to allege material misrepresentations regarding the Explore and Tinder Coins initiatives, even when viewed in the light most favorable to Plaintiffs:

| "EXPLORE" & "TINDER COINS" | |
|---|---|
| **Alleged misrepresentation / omission** | **Defendants' arguments** |
| Plans and expectations for Tinder initiatives (*e.g.*, Explore was "already demonstrating increased activity and engagement among members" in November of 2021, and "Coins will help power Tinder's virtual goods | ***Puffery / Corporate optimism*** – Generic optimism about new product initiatives is not actionable.  (D.I. 34 at ¶¶ 111, 118, 130-31, 133); *see Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1141-42 (N.D. Cal. 2017) (statements about the success of new product initiatives in driving user engagement were generalized statements of optimism constituting non-actionable puffery). |

| | |
|---|---|
| ecosystem that is being built in 2022," with both initiatives "largely on track" through the first quarter of 2022.). (D.I. 34 at ¶¶ 111-12, 116-18, 122, 126, 130-31, 133) | **No contradiction re: Explore** – "To be actionable, a statement or omission must have been misleading at the time it was made[.]" *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002). The amended complaint alleges that Defendants' plans and expectations for Explore were misleading because Explore did not meaningfully increase user engagement. (D.I. 34 at ¶ 87) But these statements were made in November of 2021, and Plaintiffs' allegations of falsity are based on a 5% engagement metric for Explore that was disclosed in the summer of 2022, months after these statements were made. (*Id.*) The amended complaint does not contain any facts suggesting that Defendants knew statements about expectations for Explore were false at the time they were made. References to a "product usage dashboard" revealing a negligible effect on user engagement are not associated with a particular time frame. (*Id.* at ¶¶ 99, 113) This analysis applies to D.I. 34 at ¶¶ 111-12, 116-17.<br><br>**No contradiction re: Tinder Coins** - Defendants disclosed that Coins was "currently testing" and they planned to continue testing it to "work out the kinks" through 2022. (D.I. 34 at ¶¶ 118, 122) Defendants planned to accelerate the global rollout in the second and third quarters of 2022, while cautioning that testing would continue "in the back half of the year, and hence, we're not counting on any sort of meaningful contribution to 2022 revenue[.]" (*Id.* at ¶¶ 126, 131) These representations are not inconsistent with former employee statements that Coins testing in August of 2021 showed users found the platform "a little too busy" and user retention was slightly worse because prototype testing and "working out the kinks" was to continue throughout 2022. (*Id.* at ¶¶ 74, 99, 113) This analysis applies to D.I. 34 at ¶¶ 118, 122, 126, 130-31, and 133. |
| Explore adoption rates and engagement (*e.g.*, "To date, the level of adoption of Explore has exceeded our expectations, with approximately two-thirds of active users engaging with Explore."). (D.I. 34 at ¶¶ 121, 124-25, 127-28, 131) | **No contradiction** – Defendants represented that the launch of Explore led to increased adoption rates between November of 2021 and May of 2022. (D.I. 34 at ¶¶ 121, 124-25, 127-28, 131) Plaintiffs argue that these statements are false because Explore did not result in increased user engagement. (*Id.* at ¶ 127) But Plaintiffs acknowledge that "adoption and "engagement" are different metrics, and they do not suggest Defendants' adoption metrics were inaccurate. (D.I. 42 at 8-9) Moreover, the alleged misstatements were made between November of 2021 and May of 2022, but the first data metric showing low engagement levels was not disclosed until July of 2022. Even if statements about adoption levels were misleadingly suggestive of user engagement levels, the |

| | |
|---|---|
| | amended complaint does not establish the statements were misleading at the time they were made. *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002). |
| "With respect to fiscal year 2022, Defendants Match Group, Dubey, and Swidler projected 15% to 20% year-over-year growth in total revenue, 'led by high-teens growth at Tinder.'" (D.I. 34 at ¶ 120) | ***No contradiction*** – The projected "high teens" growth rate at Tinder was a reduction from the 22% growth rate in 2021, and Dubey did not attribute Tinder's projected revenue growth rate to the success or failure of the Explore or Coins initiatives.  (Q4 2021 S'holder Letter dated February 1, 2022 at 4, 10)<br><br>***Forward-looking statement*** – Defendants' forward-looking projections for future performance are not actionable because they were accompanied by cautionary statements about how MGI's future financial performance is "inherently subject to uncertainties, risks and changes in circumstance that are difficult to predict," particularly with respect to foreign exchange impacts and the COVID virus.  (Q4 2021 S'holder Letter dated February 1, 2022 at 10, 27; D.I. 38, Ex. C at 2, 5; *see also id.*, Ex. H at 15); *see In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 371 (3d Cir. 1993) ("[W]hen an offering document's forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the 'total mix' of information the document provided investors.  In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law."). |
| Tinder's improving execution in the fall of 2022 (*e.g.*, "We have seen an improvement in the trajectory" and "[i]t's already underway of being cured and will not be a factor in 2023."). (D.I. 34 at ¶¶ 135-50) | ***No contradiction*** – Plaintiffs argue that these statements were false or misleading because on January 31, 2023, Defendants disclosed that Tinder's revenue shortfall "resulted from weaker-than-expected product execution at Tinder, the effects of which became more pronounced as the year progressed." (D.I. 34 at ¶ 139)  This does not establish that Tinder's product execution became worse in the second half of 2022—it shows that the revenue shortfall caused by poor product execution grew as the year progressed. (*Id.* at ¶ 149) (explaining in December of 2022 that improvement in Tinder execution "will take some time to play through into full financial results, but we think it's headed in the right direction."). |

I recommend that the court GRANT Defendants' motion to dismiss without prejudice because the amended complaint does not adequately allege a material misstatement or omission.

If the court accepts this recommendation, it need not reach whether the amended complaint sufficiently pleads scienter or loss causation. *See Takata v. Riot Blockchain, Inc.*, 2023 WL 7133219, at *10 (D.N.J. Aug. 25, 2023); *see also Goldenberg v. Indel, Inc.*, 741 F. Supp. 2d 618, 644 (D.N.J. 2010); *Freed v. Universal Health Servs., Inc.*, 2005 WL 1030195, at *11 (E.D. Pa. May 3, 2005).

**B. Control Person Liability Under Section 20(a)**

Section 20(a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." I recommend that the court dismiss Count II of the complaint for control person liability under § 20(a) because the amended complaint fails to allege a primary violation by Defendants under § 10(b). *See Bartesch*, 941 F. Supp. 2d at 513.

**IV.   CONCLUSION**

For the reasons discussed above, I recommend that the court GRANT Defendants' motion to dismiss. (D.I. 36) I recommend that the dismissal be made without prejudice in accordance with Plaintiffs' request for leave to amend. (D.I. 42 at 20)

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b). The objections and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right

16

to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated March 7, 2022, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: June 27, 2024

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE

17