# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| LEOPOLD RIOLA BARDAJI, *Individually and on Behalf of All Others Similarly Situated,* | |
| Plaintiff, | C.A. No. 23-0245-MN |
| v. | Class Action |
| MATCH GROUP, INC., SHARMISTHA DUBEY, BERNARD KIM, and GARY SWIDLER, | Jury Trial Demanded |
| Defendants. | |

**OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

I.    TINDER ........................................................................................................................1

     *Coins* ........................................................................................................................1

     *Explore.* ....................................................................................................................3

     *Product Execution* ...................................................................................................7

     *Scienter.* ...................................................................................................................8

II.   HYPERCONNECT .....................................................................................................9

III.  CONCLUSION .........................................................................................................11

## TABLE OF AUTHORITIES

**CASES**

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668 (3rd Cir. 2023) ................................................................................................................ 1, 5

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009) ............................................. 1

*In re Advance Auto Parts, Inc. Sec. Litig.*, 2020 WL 599543 (D. Del. Feb. 7, 2020) ............... 6, 8

*In re AT&T Corp. Sec. Litig.*, 2002 WL 31190863 (D.N.J. Jan. 30, 2002) ................................... 6

*In re Penn Treaty Am. Corp. Sec. Litig.,* 202 F. Supp. 2d 383 (E.D. Pa. 2002) ............................ 6

*In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635 (E.D. Pa. 2015) .................................. 9

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) ........................................................... 5

*McDermid v. Inovio Pharms., Inc.*, 520 F. Supp. 3d 652 (E.D. Pa. 2021) ................................. 3, 5

*Roll v. Singh*, 2008 WL 3413863 (D.N.J. June 26, 2008) ................................................................ 6

*Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698 (9th Cir. 2016) ................................................ 5

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874 (E.D. Pa. 2018) .............................. 9

*Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115 (N.D. Cal. 2017) .................................................. 6

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007) ...................................................... 8

*Wells Fargo Bank, N.A. v. Equiniti Tr. Co.*, 2024 WL 2973066 (D. Del. June 13, 2024) ................................................................................................................ 1

**STATUTES**

28 U.S.C. § 636(b)(1)(C) .................................................................................................................. 1

Fed. R. Civ. P. 72(b) ......................................................................................................................... 1

Lead Plaintiff Northern California Pipe Trades Trust Funds respectfully submits this objection to the Magistrate's June 27, 2024 Report and Recommendation, D.I. 52 (the "R&R"). The district court "'shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made' and 'may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.'" *Wells Fargo Bank, N.A. v. Equiniti Tr. Co.*, 2024 WL 2973066, at \*1 (D. Del. June 13, 2024) (quoting 28 U.S.C. § 636(b)(1)(C) and citing Fed. R. Civ. P. 72(b)).

The R&R overlooks the most salient allegations showing Defendants' statements about new Tinder features, Explore and Coins, were false and misleading when made, at times even confusing Defendants' characterization of former employee ("FE") accounts for their actual words. And the R&R misapplies the caselaw on puffery and corporate optimism in analyzing Defendants' statements about Explore, Coins, and Hyperconnect. At the pleading stage, where Plaintiff is entitled to all reasonable inferences in its favor, *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009), and the AC's particularized allegations are sufficient to plausibly allege Defendants' statements were false and misleading at the time they were made. *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 680-81 (3rd Cir. 2023). The R&R should be rejected and Defendants' Motion to Dismiss should be denied or the Court should allow Plaintiff leave to amend as recommended in the R&R.

## I. TINDER

*Coins*. When Defendants touted Coins to investors, they were touting the development, rollout, and anticipated impact of an already **shelved** feature. It was not going to be rolled out, so it could not be "on track," and it was not going to impact user engagement and revenue.

The R&R incorrectly finds that there was "[n]o contradiction re: Tinder Coins" because Defendants' disclosures were consistent with the FEs' statements, including that "prototype testing

- 1 -

and 'working out the kinks' was to continue throughout 2022." R&R 14. First, the statement about "working out the kinks" was not made by the FEs—rather, it was made by Defendant Dubey during the November 3, 2021 earnings call, which Plaintiff alleges was misleading. ¶¶118-119.[1] Second, FE 2 did not state that Defendants were continuing work on Coins throughout 2022, but that Coins was "shelved" in or around February 2022 after pre-launch research showed "baffled to negative" user reaction to coins which was presented to the head of products for Tinder and the corporate strategy team. ¶88. And, according to FE 1, this was after early testing data from the August 2021 "soft launch" demonstrated that Tinder Coins worsened user retention and caused users to stop using the app, which Tinder and Match Group leadership saw "right from the get-go." ¶¶113, 123. By year-end 2021, internal data showed it was obvious, per FE 2, that Tinder Coins was not working to improve and attract users to the app. ¶89. FE 4 corroborated these allegations by confirming that Tinder Coins was never a viable, usable product despite being promoted to consumers and the business press. ¶123. According to the FEs, Coins was not simply being delayed beyond 2022 as Defendants Dubey, and Swidler stated. ¶¶73-74, 86-89, 96-99. Nor was Match Group "currently testing" Coins or planning to "work out the kinks" through 2022.

Accordingly, Match Group and Tinder leadership were aware "right from the get-go" that user testing in August 2021 showed Coins worsened user retention, ¶74, internal data made clear that Coins was not panning out by the end of 2021, ¶86, and development of **Coins was shelved by February 2022**, ¶88. So Defendants' statements about Coins in Match Group's November 2021 letter to shareholders ("Coins will be essential for the virtual goods and trading ecosystem planned *for 2022 and beyond*"), ¶112 (emphasis added), the February 2022 letter to shareholders ("Tinder

---

[1] Citations to ¶_ are to the Amended Class Action Complaint for Violations of the Federal Securities Laws, D.I. 34.

continues to roll out Tinder Coins" and "Coins will help power Tinder's virtual goods ecosystem"), ¶121, in response to analyst questions about Coins in February 2022 (that Tinder was seeing "increased engagement" from Coins and that Tinder would "accelerate the rollout in Q2 and be globally out by Q3"[2]), ¶126, in the May 2022 letter to shareholders (that Coins was "on track to launch globally this summer"), ¶130-31, and on the May 2022 earnings call (Tinder was "on schedule with what we planned to deliver in 2022")[3], ¶133, were false when made. *Cf. McDermid v. Inovio Pharms., Inc.*, 520 F. Supp. 3d 652, 667–68 (E.D. Pa. 2021) (plaintiff pled falsity of executive's "statement that Inovio was on track to meet its goal of producing one million vaccine doses in 2020" by alleging he knew one of Inovio's manufacturing partners lacked large scale manufacturing, another could not produce any doses without the first's intellectual property, and a third could only produce 500,000 doses in 2020).

Contrary to the R&R's findings, the FE allegations directly contradict Defendants' statements on Tinder Coins. Plaintiff has adequately pleaded these statements to be false and misleading when made. And as addressed below, none of the above statements are mere corporate puffery.

***Explore.*** Beginning on November 2, 2021, in Match Group's 3Q21 shareholder letter, Defendants Dubey and Swidler told investors that the Explore feature, which had been rolled out in 3Q21, was already generating increased user engagement with Tinder. *See* ¶111 (Explore is "already demonstrating increased activity and engagement among members."); ¶116 (Explore "increases engagement and activity"); ¶117 (Match Group "ha[d] early evidence of" Explore

---

[2] The R&R does not address any of these statements except the statement that Tinder would "accelerate the rollout in Q2" but it misquotes what Defendants said about Q3, contending that Defendants said they "planned to . . . accelerate the global rollout [of coins]. . . in the third quarter" despite that what Defendants actually said was that Coins would be "globally *out* by Q3."

[3] Further contradicting this statement is Kim's August 3, 2022 admission to an analyst question that "Tinder did not deliver on its product roadmap for the first half of the year.

accelerating Tinder revenue per payer).

On February 1, 2022, Dubey and Swidler continued to tout the effect of Explore in Match Group's 4Q21 shareholder letter by boasting about the high percentage of Tinder users adopting and engaging with Explore. *See* ¶121 ("To date, the level of adoption of Explore has exceeded our expectations, with approximately two-thirds of active users engaging with Explore."); ¶¶124-25 (Explore has "clearly had a productive start with almost 70% of users adopting this experience" and "high levels of engagement and likes, messages and conversations.").

Swidler then said during a March 7, 2022 Morgan Stanley industry conference that "getting people to adopt [Explore], go check it out" had "happened really well. Adoption, men, women, by geography has been really strong." ¶128. And on May 2022, in Match Group's 1Q22 shareholder letter, Dubey and Swidler said, "Tinder Explore adoption levels continue to be high across active users," and "We're largely on track with the initiatives we laid out in our prior shareholders' letter" (Explore and Coins). ¶131.

But according to FE 2, Match Group's own internal data showed it be a "dud" from the start and that it did not increase user engagement with Tinder. ¶87. FE 2 knew this from mining Match Group's data warehouse for comparative metrics, such as average length of time users spent on Tinder before Tinder was introduced versus after it was launched. *Id.* Indeed, by the end of 2021, "it became evident that Explore … [was] not panning out…. [T]he 'underlying metrics' showed a 'big red flag' that in 6-12 months Tinder was going to see a hit to the top line and they needed to do something about user retention." ¶89. FE 4 said Explore ended up having a negligible effect on user engagement, which FE 4 knew from the product usage dashboard circulated by the Match Group data analytics team; users did not engage daily with Explore. ¶99. Kim admitted on August 3, 2022 that "Tinder did not deliver on its product roadmap for the first half of the year…. As an

- 4 -

example, a lot of time was spent building Explore … but we haven't succeeded yet on innovating the user experience." ¶154. By year-end 2022 Explore was no longer a touted Tinder feature. ¶158; *see also* D.I. 38-1, at 250-445.

Dubey and Swidler's claims that high numbers of Tinder users were adopting and engaging with Explore, and that Match Group was "largely on track" with its rollout of the Explore feature "do[] not reconcile easily with" the FE's allegations and Kim's August 3 admission. *City of Warren*, 70 F.4th at 690. But the R&R incorrectly determined that Plaintiff's only contradictory information establishing falsity is FE 2's allegation that nine months after Explore's debut, in June 2022 (*i.e.*, after Defendants' statements), user engagement with Explore was only 5%.[4] R&R 14. The R&R simply disregards the AC's other allegations establishing falsity. Moreover, FE 2's ability to recall specific user engagement data from June 2022 (because Kim specifically asked for this data after it was absent from a weekly meeting, ¶87) does nothing to undercut the straightforward nature of his other allegations that Explore was a "dud" from the start and by year-end 2021 it was evident that Explore was "not panning out" because "the 'underlying metrics' showed a 'big red flag.' ¶¶87, 89. FE 4 corroborates FE 2's statements. The FE allegations show Dubey and Swidler's statements touting high Tinder user adoption of and engagement with

---

[4] The R&R also noted the difference between adoption and engagement, incorrectly concluding that Defendants' statements touting high user adoption and specific user adoption rates are not actionable because Plaintiff "do[es] not suggest Defendants' adoption metrics were inaccurate." It was misleading for Defendants to tout high adoption rates—effectively, the percentage of users did anything once in the Tinder Explore tab—while concealing that the user engagement metrics on which Match Group was principally focused showed Explore to be a "dud." *See Inovio*, 520 F. Supp. 3d at 667 "[O]nce Defendants chose to speak about their various manufacturing deals and progress, they had a duty to include material information that would render those statements not misleading.") (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44-45 (2011)); *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016) ("'[O]nce defendants cho[o]se to tout' positive information to the market, 'they [are] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information that cuts against the positive information.").

Explore and an "on track" rollout were false, or at the very least misleading, when made.

The R&R mistakenly concludes that statements about Explore's effect on Tinder user engagement and the "on track" rollout of Explore and Coins were inactionable puffery, *see* R&R 13 (citing *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1141-42 (N.D. Cal. 2017)), but Defendants did not attack the statements cited above as puffery. *See* D.I. 37, at 13. And for good reason: Defendants touted Explore and Coins as the "harbinger for Tinder's long-term vision" ¶111, and stock market analysts repeatedly asked about them and their impact on Tinder. ¶¶117-18, 125-26, 128, 147. Statements that Explore "is already demonstrating increased activity and engagement," that Match "ha[d] early evidence of" Explore accelerating Tinder revenue per payer, quantifying percentages of users adopting and engaging with Explore, and representing the rollout of Coins to be "on track" are all concrete representations of then-present fact that are capable of being proven untrue; they are not "so vague and of such obvious hyperbole that no reasonable investor would rely upon them." *In re Advance Auto Parts, Inc. Sec. Litig.*, 2020 WL 599543, at *5 (D. Del. Feb. 7, 2020); *see also id.* at *4 n.2  (holding "we remain confident with the progress we're making as we execute our plan" was not puffery because it "explicitly" says there is a plan and the company was making progress on its execution).[5] *Shenwick*, relied on by the R&R, agrees. There, the court upheld as actionable statements that "DAU to MAU ratios in the quarter were similar to what they were" at Analyst Day, while dismissing as puffery statements that Twitter was

---

[5] *See Roll v. Singh*, 2008 WL 3413863, at *8 (D.N.J. June 26, 2008) (finding actionable "statements that [defendant] 'hope[d]' to continue commercial and technical relationships with Wave AG and that he and Wave LLC would continue to provide assistance and support to Roll and Wave AG"); *In re AT&T Corp. Sec. Litig.*, 2002 WL 31190863, at *23 (D.N.J. Jan. 30, 2002) (finding actionable statements regarding "the success of Business Services, the Corporation's continued strides toward delivering bundled services and the hard facts about the progress of the broadband build-out"); *In re Penn Treaty Am. Corp. Sec. Litig.*, 202 F. Supp. 2d 383, 392-93 (E.D. Pa. 2002) (holding statement "we are not in trouble" to be actionable against backdrop of the company had outgrown its capital base and was running out of the money it needed to keep growing).

"seeing perhaps the most exciting results" from a new initiative. *See* 282 F. Supp. 3d at 1140-42.

***Product Execution.*** The R&R again fails to acknowledge many allegations supporting Plaintiff's claims that Defendants' Kim and Swidler misled when, beginning on August 2 and 3, 2022, they reassured investors that the change in leadership at Tinder had corrected the team's course, and execution of the product roadmap was back on track. *See, e.g.*, ¶136 ("[R]eversing course of that is underway…. We have seen an improvement in the trajectory."); ¶137 ("And so all indications are [that the team is succeeding with a straightforward roadmap]. Progress is being made, and we're on track for [the next couple of] quarters."); ¶138 ("[Tinder's lack of execution is] already underway of being cured and will not be a factor in 2023."); ¶140 ("Product execution is already improving …. The improved product velocity and focus is a notable improvement compared to the first half of 2022."); ¶149 ("[T]he most important thing … we need people to focus on, is really the change and improvement in Tinder product execution that is underway….").

But poor execution at Tinder was not being "cured" in the second half of 2022, nor was the team "on track" for the next couple of quarters. ¶¶139. Kim and Swidler admitted on January 31, 2023 that Tinder was only **then** "beginning to execute on its clearly defined product roadmap." ¶158. According to FEs 1, 2 and 4, Tinder failed to execute because of high turnover at the executive level in products and marketing, and relatedly, lower marketing spend for Tinder during the relevant time, as well as turnover in a comparatively small engineering bench, which the Company did not address. ¶139. Contrary to the R&R's assessment, Kim's admission that Tinder's revenue shortfall for fiscal year 2022 "resulted from weaker-than-expected product execution at Tinder, *the effects of which became more pronounced as the year progressed,*" ¶¶139, 158, and Swidler's concession that "our business overall and Tinder in particular, *decelerated as the year went on.*" ¶¶139, 158, both support the conclusion that product execution was not improving in

August, September, and November 2022 when Defendants' spoke.

**Scienter.** The R&R does not reach the element of scienter.[6] That said, Plaintiff pleads a strong inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007).

According to FE 2, and corroborated by FE 4, Dubey and Swidler had access to and frequently monitored user time spent on an app per week from Match Group's data warehouse; this data was circulated across Match Group through the product usage dashboard by the data analytics team. ¶¶81, 99. Plaintiff has thoroughly explained what, according the FEs, Match Group's internal data showed and when. *See supra* at 2, 4. FE 2 said Dubey (and later Kim) met weekly with the CEOs of each brand in the Match Group portfolio; the focus on Tinder was almost always on growth; FE2 sent comparative intel reports once a month to every Match Group executive (including Dubey and Swidler). ¶79. FE 2 said Dubey and Swidler directed the creation of Board slide presentations by Match Group strategy team and carefully controlled the information going to the Board because they wanted to control the discussion about uncomfortable topics; Dubey and Swidler emphasized presenting the next initiative to the Board to distract from the current situation with Tinder or why it was not performing well. ¶¶80-81. *See Advance Auto*, 2020 WL 599543, at *8 (finding scienter adequately pled where "'Defendants had access to internal forecasts and the company's financial data' indicating that the company 'could not meet the projected revenues.'")

Tinder is Match Group's largest and most important brand, accounting for over 50% of Match Group revenue. ¶168. According to FE 2, Tinder suffered two years of sequential user decline starting in 2020 with top-of-the-funnel slowdown; Tinder user numbers, revenue, and profitability were declining. ¶79; *see In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 654 (E.D. Pa.

---

[6] Plaintiff fully briefed the basis for finding scienter in its opposition brief. D.I. 38, at 16-22.

2015) (business segment comprising 44% of sales was "critical" and "[a]s such, defendants would have been alerted to extensive sales declines and markdowns in UO's North American stores, as alleged by the confidential witnesses"). Furthermore, Dubey and Swidler sold Explore as "the harbinger for Tinder's new long-term vision" and repeatedly touted specific percentage of users adopting and engaging with Explore. ¶111; *see SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 906 (E.D. Pa. 2018) ("Their public comments regarding the clinical data in press releases and earnings calls confirm they had intimate knowledge of the data."). Finally, per FE 2, Dubey and Swidler knew about the effect that repeated CEO and CPO turnover at Tinder had on product execution—they fired Nyborg over Tinder's failure to launch products and execute the product roadmap. ¶85.

## II.    HYPERCONNECT

The R&R correctly credits the allegations of former employees "that Defendants had no plan for integrating Hyperconnect's technology, integration was not feasible in several applications, and there was no collaboration between Match Group and Hyperconnect on integration." R&R 9. Nonetheless, the R&R erroneously concluded that this information and the other well-pled allegations do not contradict any of the alleged false statements made by Defendants concerning the Hyperconnect integration.

First, Swidler's public claims in February 2022 that "[o]ur teams are collaborating really well globally," ¶100, and in March 2022 that "[t]he teams are working really well together…. We're working hand in glove," ¶¶101-02, are directly contradicted by the reality that "**there was no collaboration** between Match Group and Hyperconnect on integration." R&R 9. The R&R highlights that "Defendants never disclosed a specific timeline for integration," R&R 10, 12, but Plaintiff makes no claim about integration progress relative to a timeline—teams cannot be "collaborating really well" and "working hand in glove" when there is no collaboration between

them.[7] The R&R also says the AC's allegations "about a lack of due diligence performed before the Hyperconnect acquisition in 2021 are not relevant to Defendants' representations about Hyperconnect's performance in 2022." R&R 12. But this misunderstands the relevance of Defendants' minimal diligence: Dubey and Swidler failed to inquire into the feasibility of integrating Hyperconnect's technology into Match Group's products and delegated to the brands to figure out if and how the technology could be used, but the brands had no bandwidth to do so because their year-long product roadmaps were already in place; meanwhile, Hyperconnect was focused on minigame and metaverse instead of integration. ¶¶75-77, 90-93. These allegations explain why there was no collaboration, and whether Hyperconnect's technology could be integrated was an unknown that would only be resolved if each brand's team got around to it.

Second, Swidler's statements in February 2022 that Hyperconnect's team is "very quick on product" and "move[s] fast," and in June 2022 that Hyperconnect's team is "very fast-moving" are directly contradicted by FE 2's allegations that Match Group's diligence into Hyperconnect—which spanned three years from 2018 through 2020—revealed Hyperconnect had "slower execution," that Hyperconnect's programming talent turned out not to be so great, that Hyperconnect "lacked strong strategic guidance," and that Hyperconnect did not focus on infrastructural improvements they could roll out to Match Group, instead continuing to develop mini games and metaverse programs that went nowhere. ¶¶90-92, 102, 104. The R&R concludes "defendants were not required to describe Hyperconnect's execution as 'slow,'" R&R 10, but that is only true insofar as there is no duty to disclose. Here, Swidler affirmatively made false representations about the Hyperconnect team's performance.

---

[7] The R&R also improperly concludes that these statements are non-actionable puffery/corporate optimism. These statements make concrete factual representations that Match Group and Hyperconnect's teams were collaborating. *See supra* at 6.

- 11 -

## III.    CONCLUSION

For all these reasons, the Magistrate Judge's R&R should be rejected and Defendants' Motion to Dismiss should be denied. In the alternative, Plaintiff should be afforded leave to amend.

Dated:  July 11, 2024

*Of Counsel:*

Jeffrey C. Block (*pro hac vice*)
Jacob A. Walker (*pro hac vice*)
Sarah E. Delaney (*pro hac vice*)
Michael D. Gaines (*pro hac vice*)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
(617) 507-6020 fax
jeff@blockleviton.com
jake@blockleviton.com
sarah@blockleviton.com
michael@blockleviton.com

*Counsel for Lead Plaintiff Northern California Pipe Trades Trust Funds and Lead Counsel for the Putative Class*

Jesse L. Jensen (*pro hac vice forthcoming*)
Robert Kravertz (*pro hac vice forthcoming*)
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
1251 Avenue of the Americas
44th Floor
New York, NY 10020
(212) 554-1400 phone
(212) 554-1444 fax
jesse.jensen@blbglaw.com
robert.kravertz@blbglaw.com

*Additional Counsel for Lead Plaintiff Northern California Pipe Trades Trust Funds and the Putative Class*

**BLOCK & LEVITON LLP**

 /s/  *Kimberly A. Evans*
Kimberly A. Evans (#5888)
3801 Kennett Pike, Suite C-305
Wilmington, DE 19807
(302) 499-3600 phone
kim@blockleviton.com

*Counsel for Lead Plaintiff Northern California Pipe Trades Trust Funds and Lead Counsel for the Putative Class*

- 12 -