**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| LEOPOLD RIOLA BARDAJI, *Individually and on Behalf of All Others Similarly Situated,*<br><br>Plaintiff,<br><br>v.<br><br>MATCH GROUP, INC., SHARMISTHA DUBEY and GARY SWIDLER,<br><br>Defendants. | C.A. No. 23-0245-MN<br><br>**Class Action**<br><br>**Jury Trial Demanded** |

**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

1. Lead Plaintiff, Northern California Pipe Trades Trust Funds ("NCPTTF"), alleges the following based on the investigation conducted by its attorneys. This investigation included, but was not limited to, review and analysis of (i) Match Group, Inc.'s ("Match Group" or the "Company") public filings with the U.S. Securities and Exchange Commission ("SEC"), (ii) transcripts of Match Group's public conference calls, (iii) Match Group's press releases, (iv) independent media reports regarding Match Group, (v) securities analysts' reports and advisories about the Company, (vi) other public statements issued by the Company, (vii) media reports about the Company, and (viii) interviews of former Company employees ("FE"). Lead Plaintiff believes substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## INTRODUCTION

2. This is a securities class action alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5, 17 C.F.R. § 240.10b-5, as promulgated thereunder, against Defendants Match Group, former Chief Executive Officer Sharmistha Dubey, and current Chief Financial Officer Gary Swidler.

3. This action is brought on behalf of all investors who purchased Match Group common stock during the period February 2, 2022 through January 31, 2023 ("Class Period"). Lead Plaintiff alleges Defendants made false and misleading statements and failed to disclose material facts which caused Match Group's stock to trade at artificially inflated and artificially maintained prices. Lead Plaintiff and Class members purchased Match Group common stock at these inflated prices, and Lead Plaintiff and Class members suffered losses when the truth was revealed and Match Group's stock price plummeted.

4. Match Group owns and operates the largest global portfolio of online dating services including Tinder, Hinge, Match.com, Meetic, OkCupid, Pairs, PlentyOfFish, Azar, and

Hakuna. Of these, Tinder is Match Group's largest brand, which generated more than half of Match Group's revenue during the Class Period. Tinder quickly rose to scale and popularity soon after its launch in 2012, but it has since faced increased competition in the dating app sector.

5. This action alleges Defendants made materially false and misleading statements and omitted to disclose material facts about Tinder's new product offerings for 2022, Explore and Coins. As alleged herein, Defendants' public statements about these new product offerings were false and materially misleading when made based on interviews of a former Chief Product Officer at Tinder (FE 1), a former Senior Manager of Corporate Strategy for Match Group (FE 2), a former Vice President of Communications at Tinder (FE 3), a Former Senior Marketing Manager at Tinder (FE 4), a Former Product Engineer at Tinder (FE 5), a Former Director of Data Science and Analytics at Tinder (FE 6), and a Former Localization Program Manager at Tinder (FE 7), all of whom held those positions prior to and during the Class Period.

6. Tinder is an iconic dating app that popularized the phrase "Swipe Right." It was acquired by Match Group in July 2017. Tinder's platform has remained largely unchanged, prompting users to either "swipe right" to like another user's profile or "swipe left" to dislike another user's profile. Newer apps such as Bumble and Hinge have focused on personality-based matching with the goal of quality over quantity. Tinder is the largest app by revenue owned by Match Group, accounting for approximately half of Match Group's total revenue. In the face of increased competition and innovation from newer dating apps, Defendant Swidler made clear that "Tinder needs to face that that's the competitive reality that it's dealing with" and "need[s] to innovate."

7. In 2021, Match Group revealed several new product features that Tinder was to roll out in 2022 to create more user engagement and, in turn, generate more revenue. In a letter to

shareholders filed on Form 8-K with the SEC on November 2, 2021, (the "November 2021 Shareholder Letter") Match Group, Dubey and Swidler spelled out for investors that Tinder's "monetization plan" for 2022 had "three pillars:" 1 –Explore: "[t]he increased engagement driven by experiences in Explore are expected to drive Swipes, Likes and other activity to boost revenue growth via existing features;" 2 – Targeted Conversion Drivers; and 3 – "Virtual Goods." "Virtual currency, called Tinder Coins, . . . can also be used to incentivize certain behaviors to help members make more meaningful connections on Tinder, such as verifying their profile or adding video to their bio. And, perhaps most importantly, Coins will be essential for the virtual goods and trading ecosystem planned for 2022 and beyond."

8. In Match's February 1, 2022 letter to shareholders, filed on Form 8-K with the SEC ("the "February 2022 Shareholder Letter), Match Group, Dubey, and Swidler misrepresented that "approximately two-thirds of active users are engaging with Explore" and that "Tinder continues to roll out Tinder Coins," which "will help power Tinder's virtual goods ecosystem that is being built in 2022." And Dubey falsely said of Coins, "The plan is to accelerate the rollout in Q2 and be globally out by Q3."

9. In May 2022, Match Group, Dubey, and Swidler falsely stated that Tinder was "largely on track with the initiatives we laid out in our prior shareholders' letter," that Tinder Coins was "on track to launch globally" in the summer of 2022, and that "Tinder Explore adoption levels continue to be high across active users."

10. According to former employees, Explore was a "dud" from its inception, and Explore never attained more than single-digit percentages of user engagement. In other words, user engagement with Explore never even reached 10% between the Fall of 2021 and June 2022. In June 2022, only 5% of users were engaging with Explore, and this was representative of

Explore's user engagement from its introduction in the Fall of 2021 through the end of 2022. Tinder's product team gave Explore high priority leading up to and immediately following its release, but the feature was deprioritized before May 2022—the dedicated Tinder team that had been working on Explore stopped working on it because the feature struggled to gain traction.

11. Tinder Coins was initially tested in a soft launch in August 2021, with the Company receiving negative feedback from users. Tinder continued to test Coins more broadly, and, by February 2022, Tinder decided to put Coins on hold because of how negative the feedback was from users. A former employee confirmed this decision would not have been made without Dubey and Swidler's agreement. During an "all hands" meeting held in March or early April 2022, attended by Defendants Dubey and Swidler, it was announced by another Match Group executive that the rollout of Tinder Coins had been "put on hold." In February 2022, the entire team of engineers working on Tinder Coins ceased working on the product and did not resume work on it at any time in 2022.

12. Bernard Kim replaced Defendant Dubey as CEO of Match Group on May 31, 2022.

13. On August 2, 2022, Match Group, Kim, and Swidler announced in a letter to shareholders, filed on Form 8-K with the SEC, that they expected Tinder's growth to slow in the second half of 2022 because of "disappointing execution on several optimizations and new product initiatives," and that Tinder has "not been able to realize the monetization successes that we typically deliver." Kim admitted that "*Tinder did not deliver on its product roadmap for the first half of the year*," including Explore, and Kim and Swidler explained that the Company was delaying the launch of several initiatives and optimizations it had expected to generate growth in 2022, including Tinder Coins. Match Group also announced that the Tinder CEO would be

replaced, but the role still has not been filled. Kim would fulfill the role in the interim while the Company continued to search for a successor.

14. During an August 3, 2022 conference call with investors and shareholders (the "August 3, 2022 Investor Call"), Kim explained that "Tinder did not deliver on its product roadmap for the first half of the year. And execution on a number of initiatives have been delayed that we were counting on for growth in Q3 and Q4. Typically, Tinder works on big initiates on the first half of the year that materialize in Payer and revenue growth in the second half of the year. But that didn't happen this time around. So, we don't expect the same revenue bump that we typically see." Kim continued "[a]s an example, a lot of time was spent building Explore. It's a strong gateway with high engagement, but we haven't succeeded yet on innovating the user experience and then also building monetization features to maximize its potential." After the second quarter of 2022, Match Group never again discussed the Explore product feature, and it was conspicuously absent from Tinder's 2023 roadmap.

15. Kim also stated that "after seeing mixed results from testing Tinder Coins, we've decided to take a step back and re-examine that initiative so that it can more effectively contribute to Tinder's revenue."

16. In response to this news, Match Group's common stock price fell by $13.47 per share on August 3, 2022, or 17.5%.

17. The effects of Tinder failing to execute on its product roadmap did not fully materialize until Match Group announced its 2022 year-end financial results on January 31, 2023 and discussed those results during a conference call with analysts and investors the next day. During the February 1, 2023 investor call, Defendant Swidler explained why Match Group failed to deliver on its guidance. There were "3 areas" that caused the shortfall. One-third of the reason

was "FX [foreign exchange] headwinds." *Another "half of the rest or 1/3 comes from what [Kim] just talked about, which is Tinder missed execution and lack of delivery of initiatives, not having hit product roadmap and delivered as we expected in the first half of the year."* The third area was weakness in the Asia Pacific markets.

18. Match's common stock declined $2.71 per share, or 5%, from $54.12 per share at close on January 31, 2023 to close at $51.41 per share on February 1, 2023.

19. This action seeks to recover for the losses suffered by Lead Plaintiff and members of the Class due to Defendants' false or misleading statements and omissions during the Class Period, and the resulting precipitous decline in the price of Match Group common stock upon the revelation of the truth.

## JURISDICTION AND VENUE

20. This Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

21. This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1337.

22. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c), and (d) because Match Group is incorporated in this District.

23. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of national securities exchanges.

## PARTIES

24. Lead Plaintiff, Northern California Pipe Trades Trust Funds ("NCPTTF"), the trust funds for Plumbers & Steamfitters Local 342, with principal executive offices located at 935 Detroit Ave., Suite 242A, Concord, California 94518, purchased Match Group common stock during the Class Period on the Nasdaq Global Select Market and was damaged thereby. *See* ECF No. 12-2, Ex. B.

25. Defendant Match Group is a Delaware corporation with principal executive offices located at 8750 North Central Expressway, Suite 1400, Dallas, Texas 75231. Match Group common stock trades in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "MTCH." Match Group owns and operates the largest global portfolio of online dating services, including Tinder, Match.com, Meetic, OkCupid, Hinge, and Plenty of Fish.

26. Defendant Sharmistha Dubey was the Company's Chief Executive Officer ("CEO") from March 1, 2020 until May 31, 2022, and remains a Company director. Dubey is a control person of Match Group within the meaning of Section 20(a) of the Exchange Act. Dubey also currently serves as a director of Fortive Corporation (a technology conglomerate), Naspers (a multinational internet, technology, and multimedia holding company), and Prosus (a global investment group that is among the largest technology investors in the world). While serving as CEO of Match Group, Dubey oversaw its portfolio of brands, including Tinder. Dubey previously served as Match Group's President from 2018 to 2020, overseeing strategy, research, and development across the Match Group portfolio, including Tinder. She also served as the Chief Operating Officer of Tinder, where she led the team that launched Tinder Gold, one of its subscription products, which established Tinder as the highest-grossing non-gaming app globally. Dubey also previously served in various other roles across the Match Group portfolio, including as President of Match Group Americas, overseeing all product, engineering, and revenue functions

at the portfolio's domestic brands, and Chief Product Officer of Match Group. She holds a B.S. degree in Engineering from the Indian Institute of Technology and a master's in engineering from The Ohio State University.

27. Defendant Gary Swidler has served as the Company's President since January 26, 2023, and has been, at all relevant times, the Company's Chief Financial Officer ("CFO"). Swidler joined Match Group as CFO in 2015. Swidler is also a control person of Match Group within the meaning of Section 20(a) of the Exchange Act. As CFO, Swidler oversees finance, accounting, tax, treasury, strategy, corporate development, and investor relations as well as corporate communications, ad sales, user privacy, safety, and data security. Before Match Group, Swidler held various roles at Bank of America for 18 years, including Managing Director and leading the Financial Institutions Investment Banking Group.

28. Defendants Dubey and Swidler are also referred to as the "Individual Defendants." Match Group and the Individual Defendants are referred to collectively as "Defendants."

29. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Match Group, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers, and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading before its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions with the Company and access to material nonpublic information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the

positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## BACKGROUND

### I. Background on Match Group and Tinder

30. Match Group is a technology and social media company that operates one of the world's largest portfolios of online dating brands and apps. The Match.com platform was launched in 1995 and helped create the online dating category with the ability to search profiles and receive algorithmic recommendations. Match.com was acquired by media and internet company IAC Inc. in 1999. Match Group was officially formed in 2009, and IAC drove its acquisition of a sizable stake in the dating app industry. Match Group's most notable dating apps include Tinder, Hinge, Match, Meetic, OkCupid, Pairs, PlentyOfFish, Azar, and Hakuna. Match Group was spun off as a separate public company in July 2020.

31. Tinder, which generated more than half of Match Group's revenue during the Class Period, is Match Group's largest and most important brand. Tinder grew from around zero revenue in 2014 to an estimated $1.4 billion in 2020.

32. Tinder was launched in 2012 and rose to scale and popularity faster than any other service in the online dating category, growing to over 10.8 million payers as of the fourth quarter of 2022. The Tinder app offers a platform where users can search and match with potential romantic partners based on their preferences and location. The well-known swiping mechanism is a quick way for users to sort through potential matches by swiping right or left, while the chat function enables users that match with each other to communicate. The customer segments Tinder targets are mainly singles aged 18-35, focusing on modern daters who value convenience and are more likely to use mobile devices for their social interactions and dating life.

33. Tinder employs a freemium model, through which users are allowed to enjoy many of the core features of Tinder for free, including limited use of the Swipe Right® feature (used to approve profiles to match with other users) and unlimited communication with other users. To use premium features, such as unlimited use of the Swipe Right feature, the ability to change one's location, more profile controls, and an ad-free experience, a Tinder user must subscribe to one of several subscription offerings: Tinder Plus®, Tinder Gold®, or Tinder Platinum®. Tinder users and subscribers may also pay for certain premium features, such as Super Likes and Boosts (to increase profile visibility), on a pay-per-use basis. Tinder Explore was later marketed as another feature available for users to interact with others in ways that are non-traditional to Tinder.

34. Tinder's revenue model capitalizes on its large user base and their desire for an enhanced online dating experience. While Tinder generates revenue predominately through its freemium app model and in-app purchases, it also makes money through advertising partnerships, selling ad space to third-party brands and businesses that want to reach its user base.

## II. Leading Up to the Class Period, Tinder Faced Increased Competition from Rival Dating Apps and Pressure to Engage with Younger Users

35. Tinder's initial popularity quickly attracted new competitors in the online dating market, which now contributes to market saturation and reduced brand loyalty. Leading up to the Class Period, Tinder began to face increased competition from rival dating apps, including Bumble, Hinge, OkCupid, and Coffee Meets Bagel. These apps set out to distinguish themselves from Tinder and were designed to facilitate more meaningful connections by emphasizing personality-based matching and focusing on quality over quantity. Smaller competitors, such as Happn, Plenty of Fish, and The League, also competed for user attention, and Meta also recently entered the dating space with Facebook Dating, further increasing competition in the sector.

36. As a result, Tinder now operates in a highly competitive market, with many companies vying for user engagement and market share. Defendant Swidler recognized that "*Tinder needs to face that that's the competitive reality that it's dealing with*. And when you face a tougher competitive reality, that's the time where you need to step up your game. *You need to innovate, you need to execute better than you have historically when you had more of the world to yourself.*" Yet, before Explore was launched in 2021, Tinder's interface remained largely unchanged since its inception in 2012, focusing on profile photos for which users can either swipe right or left on potential matches.

37. While Tinder has a large user base, it has also become synonymous with casual dating and "hookup culture," which can alienate potential users looking for more serious relationships. This perception is driven by Tinder's simple interface, which focuses almost entirely on photos and locations. Additionally, some users may be tempted to download competitor apps due to the limited number of times users can "swipe right" on Tinder for free without a premium subscription, which can also lead to a decrease in user satisfaction and retention.

38. Tinder's static focus on photos and locations continued to drive its "hookup" image as competitor apps introduced deeper and more immersive approaches. Newer apps such as Bumble, Hinge, Coffee Meets Bagel, Siren, and Her are not as heavily based on images and aim to give users the ability to show more of their interests, personality, and identity. Bumble distinguishes itself by only allowing women to send the first message to their matches, and Siren, which was launched in 2015, abandons the swipe interface entirely to avoid objectifying participants.

39. Other more recently created apps, such as Snack, are increasingly capturing the attention of Gen Z, a large audience for dating apps that Tinder is also seeking to attract. Snack

bills itself as "TikTok meets Tinder" and invites users to upload short videos for potential matches to scroll through. Other new apps include Lolly, which allows users to "match with people while exploring sweet video content[;]" S'more, which blurs profile photos until people start messaging; and Feels, which features a carousel of short-form videos on profiles, where users are invited to express themselves in more dimensions. Feels is specifically marketed as the "anti-dating app," for people who believe that "swiping is boring" and that platforms like Tinder are too superficial. Laurent de Tapol, Feels' cofounder, stated in June 2021 that the app had attracted 150,000 users since launching in April 2021.

40. In an attempt to address its competitive pressures, Match Group announced new product initiatives for Tinder in its November 2021 Shareholder Letter. Dubey and Swidler, who both signed the letter, represented that "our flagship brand, Tinder, in its mission to keep the magic of human connections alive, is already in the midst of a radical product transformation. Tinder's iconic Swipe® feature will remain a key part of the experience, but with its deep and engaged user base, there is so much more Tinder can provide. The first pieces of this transformation are already coming into view, starting with the launch of Explore™." They continued that "[t]he interactive and social experiences within Explore are the harbinger for Tinder's long-term vision. Ultimately, Tinder plans for Explore to host exclusive shared and live experiences where members can interact and connect with each other. The experiences can be tailored for international markets to bring specific cultural moments to life on Tinder around the world. These new and fun ways to meet and make more meaningful connections are expected to be important drivers for increasing engagement and reactivation, regularly giving people new reasons to return to the app."

41. The November 2021 Shareholder Letter stated that Tinder's "monetization plans" include

> three key pillars.[1] O**ptimize Existing Experience:** Much optimization remains possible at Tinder. The increased engagement driven by experiences in Explore are expected to drive Swipes, Likes and other activity to boost revenue growth via existing features. These experiences are still nascent today, providing ample opportunity to further increase the value of long-standing features. [2] T**argeted Conversion Drivers; [and 3] Virtual Goods:** The ease and efficiency of in-app virtual currency will underpin and maximize the opportunities for these new revenue features. Virtual currency, called Tinder Coins, is currently being tested in several markets including a few markets in Europe. As we look ahead to 2022, users around the globe will be able to purchase Tinder's à la carte offerings, including Boost™ and SuperLike™, using Coins. Coins will allow for the unbundling of subscription packages in select markets and selling certain subscription features (such as See Who Likes You) on a pay-as-you-go basis in markets where members find this structure more appealing. Coins can also be used to incentivize certain behaviors to help members make more meaningful connections on Tinder, such as verifying their profile or adding video to their bio. And, perhaps most importantly, Coins will be essential for the virtual goods and trading ecosystem planned for 2022 and beyond. (emphasis added).

## FORMER TINDER AND MATCH GROUP EMPLOYEES

42. **Former Employee 1 ("FE 1"**) was the Chief Product Officer at Tinder from approximately July 2020 through November 2021. FE 1 reported directly to Tinder's CEO, Jim Lanzone. Each of the Tinder CEOs reported directly to Match Group's CEO. FE 1 worked alongside Tinder's CFO (Joseph Ciesla) and CTO (Thomas Jacques). FE 1 said that under Dubey's tenure as CEO of Match Group, Tinder released almost no new features during 2022, which was "ineffective" and had a "huge, huge impact" on Tinder. In 2021, Tinder had a number of "irons in the fire" to improve overall revenue because competition was heating up—particularly from Hinge and Bumble, who were starting to eat into market share, though not dramatically. FE 1 stated that it was normal for Tinder to be delivering many initiatives per year, and for a small portion to fall behind or be discontinued (*e.g.*, 80/100 delivered, 20/100 behind or discontinued), but that those numbers flipped in 2022: most initiatives fell behind or were discontinued, and only a few were delivered (and those that were delivered, were delivered late).

43. FE 1 explained that "Roadmap" is a common term within the software development industry: it consists of a set of deliverables, setting out the different phases of a feature or an idea from prototype to market to release, and is broken down by team. Virtual currency, i.e. Tinder Coins, was supposed to go live in 3Q22. The intention was that Tinder users could use virtual currency to spend $1-2 to stand out from others in an "a la carte kind of way" if they could not afford a $15 per month subscription.

44. Tinder rolled out a "soft launch" in some smaller test territories beginning in August 2021, mainly in Asia, where the user base is used to microtransactions with virtual currency. According to FE 1, the early data in August 2021 basically told them that the feature was probably a "little too busy" for the UI (user interface). As a result, they lost some users; retention was slightly worse even though there was an improvement in monetization. They saw this "right from the get-go." Users would install Tinder and be introduced to several features as they go through learning how to use the app. This additional feature was virtual currency microtransactions, but the data was showing that this might be "one feature too far" and caused users to stop using the app. Users would get confused or think it's too busy or too much work.

45. **Former Employee 2 ("FE 2")** was the Senior Manager of Corporate Strategy for Match Group from May 2018 through October 2022. FE 2 reported to Caleb Liu, the Vice President of Corporate Strategy. Liu reported to Swidler, to Dubey, and then to Kim after he succeeded Dubey. FE 2 had direct communication and was in meetings with each of these individuals. FE 2's responsibilities included helping to communicate to Match Group's CEO and Board updated information on corporate strategy for all of the Match Group brands, assisting the corporate development team with mergers and acquisitions, and working on competitive intelligence. On a granular level, this meant they put together presentation decks for management

and the Board of Directors, and they assembled investor relations materials. Less officially, they also spent time dealing with the management turnover at Tinder by getting new CEOs up to speed and helping them set the agenda in their tenure.

46. FE 2 said that the CEOs of each brand in the Match Group portfolio met weekly with the then-current Match Group CEO. These regular meetings started under Mandy Ginsberg and continued under Dubey and Kim. At these meetings, the focus on Tinder was almost always on growth, while with Hinge it was user retention. Along with the weekly meetings, FE 2 sent comparative intel reports once a month to every Match Group executive (including Dubey and Swidler, brand CEOs, and others) that ranked the top 20 dating apps in the U.S. and Western Europe by quarter-over-quarter and year-over-year change in downloads. FE 2 said that Dubey and Swidler knew about the drop in users at Tinder from these comparative intel reports.

47. Part of FE 2's job was to put together slide decks for inclusion at Match Group Board of Director meetings. FE 2 participated in bi-weekly meetings which occurred in the weeks leading up to Board Meetings. Each of these meetings were attended by, among others, Dubey and Swidler. Dubey and Swidler provided their instructions on what information was to be shared with the Board. At every meeting, there were presentations about three or four brands of focus, Tinder, international growth and expansion, and Hyperconnect[1]. There was always a section with slides presenting financial information, including revenues and user growth for each brand. Board meetings had a tightly controlled invite list controlled by Dubey and Swidler.

48. FE 2 said Dubey and Swidler wanted to see double-digit (i.e., at least 10%) user engagement with Explore so they could share it with the Board. But FE 2 said Board slide decks

[1] A South Korean social networking company recently acquired by Match Group in the summer of 2021.

never included any information about Explore user engagement in 2021 or 2022 because Explore had never reached 10% user engagement. If it had reached 10% user engagement, they would have shared it with the Board.

49. After Kim succeeded Dubey as CEO on May 31, 2022, Kim requested data concerning the actual user engagement figures for Explore. FE 2 specifically recalled user engagement with Explore being only 5% in June 2022 because Kim sent an information request email for Explore user engagement metrics to the Match Group analytics team after the information was not provided at a weekly meeting. FE 2 was on the distribution list for these information requests.

50. FE 2 also recalled that they were asked by a hiring manager in the summer of 2022 to put together a case study around Tinder and Explore for a listed strategy position, and the hiring manager said the position needed to be filled because "Explore numbers are in the low single digits and we need to increase engagement."

51. Explore, rolled out in 3Q21, was a "dud" because of the low percentage of users that engaged by actually going into the Explore tab on Tinder; it had little impact on attracting new users. Explore was supposed to be an alternative discovery model for users who were exhausted with swiping to identify potential dating partners by finding other people with similar interests.

52. The problem was that Tinder only required basic information to join—an email address and a few other data points—so most users had no interests or other personal information to discover. The failure of Explore was determined by mining the data warehouse for comparative metrics, such as average length of time users spent on the app before Explore was introduced versus after it was launched. Match Group's strategy team also looked at conversion—the number

of users who converted to subscribers from using it for free. These user engagement figures were readily available in a "table in our data warehouse" without the use of SQL inquiries.

53. FE 2 also explained that the terms "engagement" and "adoption"—used by Dubey and Swidler to describe user interaction with Explore—are "deliberately fuzzy." There is no industry standard definition for them like MAU (monthly active users), and they were basically considered interchangeable terms.

54. Tinder's Board decks were not backward-looking; they did not provide information to compare metrics over time, and they did not show user acquisition numbers. Instead, they were mostly about new products and designed to blow past potential opportunities for reflection to avoid alarming anyone. Dubey directed the strategy team to prepare the decks this way. To collect information for the Board decks, FE 2 accessed the data warehouse used by Match Group and performed various SQL[2] queries. For example, FE 2 would query the number of minutes users spent on an app per week. This analysis could be performed on two different apps to determine the effectiveness (or lack thereof) of a new feature. The Board would receive the headline number, *e.g.* "People who have Tinder Places spent an additional 10 minutes on Tinder." FE 2 said Dubey and Swidler felt the Board members understood business trends, but not product metrics, so Dubey and Swidler carefully controlled the information going to the Board and wanted to control the discussion about uncomfortable topics; they did not want the Board in the weeds on product decisions. For example, if there was a bad month for downloads of an app, the number of downloads might be shown quarter over quarter instead of month over month—whatever would

[2] SQL (often pronounced "sequel") stands for Structured Query Language, which is a domain-specific programming language designed for managing data held in a relational database management system. SQL allows a user to access many records with a single command and without the need to specify how to reach a record.

raise the least amount of questions. The emphasis—which came from Dubey and Swidler—was on presenting the next initiative to the Board, to distract the Board from the current situation with Tinder or why it was not performing well.

55. FE 2 said that Tinder Coins had been in development for a long time and was intended to attract younger users and users outside the United States. The idea was that Gen Z and Asia-Pacific ("APAC") users have comfort with and like to use virtual currency.

56. By February 2022, the development of Tinder Coins was nearly complete. Before the rollout, however, given the prior unfavorable reaction from users, the Match Group corporate strategy team was tasked with gauging consumer sentiment about Coins before its release. The corporate strategy research team conducted "brand sentiment surveys" for "all Match Group brands." Roughly 2,000 "online daters" were asked questions about their "frequency of usage" of each Match app; their opinion of the "brand traits" of each brand; and so on. The consumer research team was also directed to perform this work when Tinder's product roadmap was still being discussed. "They were deciding between different features to increase user engagement," FE 2 explained. "Panels" of users were convened for the research. They were shown "three choices" of potential features for Tinder and asked which ones they thought were most appealing.

57. After the corporate strategy research team completed its pre-launch research on user sentiment about Tinder Coins, a "readout" was presented to the head of products for Tinder and the corporate strategy team. (The presentation occurred in or around February 2022.) The results of the research study on consumer sentiment about Tinder Coins showed that "user reaction was baffled to negative." People at the presentation on the results of the Tinder Coins research were surprised to learn about users' negative response, FE 2 said. But because the results were so

negative, Tinder Coins was "shelved" in February 2022. FE 2 did not hear about Tinder Coins after that and through his remaining tenure at Match Group.

58. FE 2 said Match Group executives, Dubey and Swidler, would have needed to sign off on the decision to shelve the development and rollout of Coins. Tinder only has a few product updates being worked on per year, so Match Group executives were typically focused on and involved in all of them; they received "ongoing, continuous progress reports throughout the year."

59. FE 2 said that midway through Nyborg's tenure at Tinder (end of 2021), it became evident that Explore and Tinder Coins were not panning out. Tinder saw revenue declining even before Nyborg started, but it takes a while for that to impact the top line. There were some pricing adjustments that masked declines so the Company could still say to the investor that Tinder is growing revenues. But the "underlying metrics" showed a "big red flag" that in 6-12 months, Tinder was going to see a hit to the top line and they needed to do something about user retention. Under Nyborg that was not being addressed.

60. **Former Employee 3 ("FE 3")** was the Vice President for Communications at Tinder from October 2021 through August 2022. FE 3 reported to Jenny McCabe, the Chief Communications Officer at Tinder at the time. FE 3 said that in their time at Tinder, Tinder failed to deliver on a variety of planned launches. The big problem was that Tinder was a rudderless organization from a product perspective. Tinder lacked a consistent chief product officer, and changing leadership repeatedly changed direction. The result is that products were talked about publicly that should not have been discussed because they were not ready. FE 3 described Tinder during their tenure as having the poorest leadership they had experienced in their multiple-decade-long career.

61. **Former Employee 4 (“FE 4”)** was a senior marketing manager at Tinder from September 2019 through July 2022. FE 4 reported to Amy Wiedemann, Senior Director of Integrated Marketing at Tinder, who reported to Nicole Parlapiano, Tinder’s Vice President of Marketing, North America. However, FE 4 received direction directly from both Wiedemann and Parlapiano. FE 4 said the churn in leadership at Tinder—three CEOs, three CMOs, and two CPOs during his employment—impacted business priorities and stunted team development. FE 4 said it was part of their job to know Tinder’s product roadmap because they worked on product marketing. Product priorities were also constantly changing.

62. According to FE 4, a new Tinder product was often “announced before it was in the market.” FE 4 said that “there was a disconnect”: A new feature “was touted as a future product when it was [actually] still a prototype, before it [had been] rolled out to the public.” FE 4 knew this, because they “knew what the comms strategy was for the [product] features.” The strategy consisted of promoting a Tinder product still under development by the product team “to the consumer and the industry press.”

63. FE 4 said that Tinder Coins was promoted to consumers and the business press despite still being in prototype. And by the time of FE 4’s departure from Tinder in July 2022, Tinder Coins was still not a viable, usable product.

64. As for Explore, FE 4 was deeply familiar with the feature because they were responsible for its marketing strategy, including position its launch in the U.S. in summer/fall of 2021. Explore ended up having a negligible effect on user engagement, which FE 4 knew from the product usage dashboard circulated by the Match Group data analytics team. FE 4 said that users did not engage daily with Explore.

65. **Former Employee 5 (“FE 5”)** was a product engineer at Tinder from July 2021 through December 2022. FE 5 was one of the ten Tinder employees (including developers, engineers, and quality assurance staff) who worked on Coins and Explore at Tinder.

66. FE 5 said that it “was not accurate” that Coins was “on track to launch globally” in the summer of 2022, as publicly stated by Match Group, Dubey, and Swidler. In late 2021, the Tinder coins engineering team members, including FE 5, received an email informing them that Tinder Coins was “not user friendly.” There were no bugs or engineering delays associated with Coins. In fact, the quality assurance engineers had tested Coins in 2021 and “liked it.” But by late 2021, FE 5 and other engineers working on Coins were informed by email that users had tested the product, and user feedback was negative: Coins was “not easy to use” and users “did not like it.”

67. In response to this user feedback, FE 5’s engineering manager (to whom FE 5 directly reported) focused the engineering team on trying to make Coins more user friendly, which they did for a period of two or three months. But FE 5 said their engineering team “did not hear back” with respect to their attempts at product improvements.

68. Then, in February 2022, FE 5 and other members of the engineering team working on Coins received an email informing them that Coins was “on hold.” FE 5 and the other engineers who had been working on Coins immediately shifted their efforts to Explore, and FE 5 spent the rest of his employment at Tinder on engineering related to Explore. All 10 Tinder engineers assigned to Coins ceased working on Coins as of February 2022 and did not perform any additional work related to Tinder Coins through December 2022.

69. In March or April 2022, there was a Match Group-wide “all-hands meeting,” which FE 5 attended via Microsoft Teams (though some staff attended in-person), including Match Group

executives and employees, Tinder staff, and "everybody" from all the different brand entities. Dubey and Swidler attended the meeting via Teams, which FE 5 knew because Dubey and Swidler were introduced/announced at the start of the meeting. The purpose of the meeting was to provide "Company-wide announcements." During the meeting, attendees were informed of what FE 5 and their engineering colleagues already knew—that Coins had been put on hold. No explanation was shared for why Coins had been put on hold, and no questions were taken or answered on the topic.

70. **Former Employee 6 ("FE 6")** was Director of Data Science and Analytics at Tinder from March 2018 to May 2022. FE 6 was the "lead analyst on Explore." FE 6 acknowledged user engagement of Explore was low, and said, "the actual usage [of Explore] did not change over time." There was "pretty widespread transparency in usage" levels related to Explore that was "available" to executives and distributed in reports. Explore "got a disproportionate share of executive-level attention because it was new, said FE 6, and Explore was allocated "about a third or a quarter of resourcing" within "Core product." But by the time FE 6 departed Tinder in May 2022, "Explore was not a very high priority." There had been a "dedicated team working on" Explore, which had "struggled to gain traction" with users, and "ultimately [the team] stopped working on it by May 2022.

71. **Former Employee 7 ("FE 7")** was a Localization Program Manager at Tinder from 2019 through March 2022. FE 7 said that Tinder Coins had been "scrapped" before they departed from Tinder in March 2022. FE 7 also stated that Coins and Explore were being "artificially inflated internally and externally to shareholders and the media."

# MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS

## A. February 1, 2022 Fourth Quarter 2021 Letter to Shareholders

72. On February 1, 2022, the Company announced its financial results for the fourth quarter of fiscal year 2021 ("4Q21"). On the same date, Match Group filed the February 2022 Shareholder Letter on Form 8-K with the SEC, signed by Defendants Dubey and Swidler. In the letter, Defendants announced strong growth at Tinder, which "generated nearly $1.7 billion in Direct Revenue in 2021, up 22% over 2020, with year-over-year growth above 20% in each of the last three quarters of the year."

73. The February 1, 2022 letter touted the rollout of Tinder's new Explore feature:

> Explore provides a space where Tinder members can discover people who are into the same things, as well as participate in experiences that help people get to know each other better once they meet.
>
> * * *
>
> Explore also enables Tinder to localize product-market fit and surface more region-specific profile information, cultural events, and content. To date, the level of adoption of Explore has exceeded our expectations*, with approximately two-thirds of active users engaging with Explore.*




74. The letter also touted the rollout of Tinder Coins:

> Tinder continues to make strong progress on the product roadmap we laid out in detail in last quarter's shareholder letter. Tinder *continues to roll out Tinder Coins,*

> their in-app virtual currency, which is now in a dozen countries. Coins will help power Tinder's virtual goods ecosystem that is being built in 2022.

75. The statement that "approximately two thirds of active users [are] engaging with Explore" and graphic representation of 62%-71% "Active User[] Adoption of Explore Since Launch" were materially false and misleading when made as Explore user engagement percentages never exceeded single digits from the time of its launch in fall 2021 through June 2022. FE 2 said that Explore user engagement figures never reached double-digit use, or 10%, because, if it had, that information would have been reported to Match Group's Board, and FE 2 said such information was never included any Board presentations between 2021 and 2022. FE 2 also said that after Kim became CEO, he requested the data usage metrics for Explore which, as of June 2022, were 5%. FE 6 confirmed that the 5% user engagement data point recalled by FE 2 was not a one-off, but instead represented Explore's user engagement every month since its launch in the Fall of 2021: "the actual usage [of Explore] did not change over time." Furthermore, FE 2 said Explore was a "dud" because of the low percentage of users that engaged by actually going into the Explore tab on Tinder. And FE 4 too said Explore ended up having a negligible effect on user engagement because users did not engage daily with Explore. Similarly, FE 7 stated that Coins and Explore were "seemingly artificially inflated internally and externally, to shareholders and the media."

76. Dubey and Swidler also knew or recklessly disregarded that the statement and accompanying graphic representation touting Tinder Explore engagement by "two-thirds of active users" were false and misleading when made. According to FE 2, and corroborated by FE 4 and FE 6, Dubey and Swidler had access to and frequently monitored user time spent on an app per week from Match Group's data warehouse; this data was circulated across Match Group through the product usage dashboard by the data analytics team. FE 2 said Dubey met weekly with the

CEOs of each brand in the Match Group portfolio, and the focus on Tinder was almost always on growth. FE2 sent comparative intel reports once a month to every Match Group executive (including Dubey and Swidler). Additionally, FE 2 said Dubey and Swidler directed the creation of Board slide presentations by Match Group strategy team and carefully controlled the information going to the Board because they wanted to control the discussion about uncomfortable topics; Dubey and Swidler emphasized presenting the next initiative to the Board to distract from the current situation with Tinder or why it was not performing well. It is reasonable to infer that if Dubey and Swidler so actively controlled the flow of information to the Board, they similarly controlled the flow of information to the investing public. Indeed, explained FE 2, Dubey and Swidler did not speak of user interaction with Explore in industry standard terms, like MAU (monthly active users); instead, Dubey and Swidler used "engagement" and "adoption," which are "deliberately fuzzy" and basically interchangeable.

77. Defendants' statement that "Tinder continues to roll out Tinder Coins," and "Coins will help power Tinder's virtual goods ecosystem that is being built in 2022" were materially false and misleading when made because Coins was no longer being rolled out by Tinder. Coins had been "shelved" (in the words of FE 2), "put on hold" (in the words of FE 5) and "scrapped" (in the words of FE 7) by February 2022 after pre-launch research on user sentiment about Coins showed user reaction was "baffled to negative." This research was presented to the head of products for Tinder and the Match Group corporate strategy team, but, said FE 2, Match Group executives Dubey and/or Swidler would have needed to sign off on the decision to shelve the development and rollout of Coins. FE 5 (along with the rest of the Coins engineering team) was immediately instructed to pivot his efforts from Coins to Explore, FE 2 heard nothing further about Coins for the remaining eight months of his tenure at Match Group, and FE 4 confirmed Coins was not yet

a viable, usable product at the time of his departure from Tinder in July 2022. Coins could not help to power Tinder's virtual goods ecosystem being built in 2022 because the development of Coins had been indefinitely "shelved"/"put on hold."

78. Dubey and Swidler also knew or recklessly disregarded that the statements representing the continued rollout of Coins and important role for Coins in the 2022 development of a virtual goods ecosystem were false and misleading when made. FE 2 explained that the decision to "shelve" development of Coins would have needed signoff from Match Group executives (Dubey and Swidler) because they were focused on and involved in all product updates for Tinder. Furthermore, the pre-launch research showing "baffled to negative" user reaction was presented to Tinder's head of products and the Match Group corporate strategy team, both of whom worked closely with Dubey and Swidler on the development and rollout of Tinder Coins.

**B. February 2, 2022 Fourth Quarter 2021 Earnings Call**

79. During an earnings conference call to discuss the Company's 4Q21 financial results on February 2, 2022, Defendants continued to assure investors that notable product updates would drive substantial growth for Tinder in 2022. For example, Defendant Dubey stated,

> Now Tinder, beyond a 22% revenue growth, in 2021, Tinder released its biggest update since the invention of the Swipe feature, and this was the launch of Tinder Explore. Explore provides Tinder with additional flexibility to expand use cases to more dimensions of discovery and social live experiences. Explore enhances responsiveness, offers surface and opportunity for regionally tailored experiences; has exciting media, video dating hybrids such as Swipe Night, wedding dates, concert Festival Mode; *and it's clearly had a productive start with almost 70% of users adopting this experience.*
>
> The 2022 roadmap has many more enhancements planned, along with new monetization opportunities later in the year.

80. Similarly, in response to an analyst's question about how product initiatives such as Explore would "affect[] the arc of Tinder growth over the next few years," Defendant Dubey stated,

> So Tinder Explore, what it did, it allowed us to create, successfully, a new surface area and experience without hurting the very efficient Swipe machine. And the goal now is to have new and personalized experiences that are fun, interactive, useful in helping spark connections. *And we've already got 70% of our users adopting the experience, and we're seeing high levels of engagement and likes, messages and conversations.* So looking ahead, our plan is to continuously launch and feature a variety of novel and engaging experiences here**.**

81. In response to an analyst question about the expected contribution of Tinder Coins, Defendant Dubey stated:

> Maybe I'll start with the Tinder Coins, and then Gary can jump in. Shweta, the *Tinder Coins is currently testing in 12 markets.* And the use cases are both for incentivizing certain core actions and also increasing access to existing revenue products. *And we are seeing some increased engagement and retention from these incentives. And there's a bunch of testing going on, on various sort of monetization experiences.*
>
> The plan is to <u>*accelerate the rollout*</u> *in Q2 and be globally out by Q3.* However, the biggest value of coins to us is its ability to power new economies such as the virtual goods. And that is a whole new construct that we are hoping to be able to test in the back half of the year, and hence, we're not counting on any sort of meaningful contribution to 2022 revenue, it's more a 2023 and beyond revenue contribution. (emphasis added.)

82. Dubey's statements that "it's [Explore] clearly had a productive start with almost 70% of users adopting this experience," and "we've already got 70% of our users adopting the experience, and we're seeing high levels of engagement and likes, messages and conversations" were materially false and misleading when made because, for the reasons explained in ¶75, Explore user engagement percentages never exceeded single digits from the time of its launch in fall 2021 through June 2022, and Explore did not see high levels of engagement. For the reasons explained in ¶76, Defendant Dubey knew or recklessly disregarded that these statements about Explore engagement were false and misleading when made.

83. Dubey's statements that "Tinder Coins is currently testing in 12 markets;" "we are seeing some increased engagement and retention from these incentives;" "there's a bunch of testing going on, on various sort of monetization experiences;" "The plan is to accelerate the rollout

in Q2 and be globally out by Q3;" and "the biggest value of coins to us is its ability to power new economies such as the virtual goods," were all false and misleading when made. First, according to FE 2, by "February 2022, the development of Tinder Coins was nearly complete" on a technical level, but had not yet been rolled out because multiple iterations of testing had revealed overwhelmingly negative user feedback. The rollout had in fact been stalled and indefinitely put "on hold" because of the negative user feedback. So Dubey's statement that "the plan is to *accelerate* the rollout in Q2" was false and misleading when made. Second, while Dubey represented that "there's a bunch of testing going on" she misled by failing to reveal that the early and then-current testing of Coins showed user reaction to Coins was very negative. As FE 5 said, by late 2021 Tinder engineers received an email that Coins was "not user friendly" and they were tasked with trying to improve the product to make it more user friendly. Thus, the testing of Coins demonstrated users did not like it and the engineers were working on trying to improve it, until February 2022 when it was decided that Coins was being "put on hold." Third, it was materially misleading to claim Tinder was "seeing increased engagement and retention from" Coins when testing had demonstrated the opposite. Indeed, Tinder engineers were working on trying to make Coins more user friendly in response to negative feedback and the lack of user engagement. Plus, the corporate strategy team, which reported to Dubey and Swidler, was tasked with conducting research regarding Coins, and their research—completed and analyzed by February 2022—demonstrated that users' reactions to Coins was "baffled to negative." As more fully explained in ¶¶77-78, the rollout of Coins was "put on hold" in February 2022 because of those research results, and the decision to put Coins on hold was announced company-wide at the "all hands meeting" in March or April 2022. So the plan could not have been "to be globally out by Q3" when Dubey and Swidler had approved the decision to indefinitely "put on hold" the rollout of Coins.

### C. March 7, 2022 Morgan Stanley Industry Conference

84. Defendants continued to assure investors that Tinder's new features were driving substantial growth and that Tinder was poised to soon monetize its new product features. For example, at the Morgan Stanley Technology, Media, and Telecom Conference on March 7, 2022, in response to an analyst's question about "the strategy and monetization opportunity around virtual currency" and the effect of the Explore tab, Defendant Swidler stated,

> So the Explore tab, I think, is a gateway to doing lots of different things. It's a gateway to enable people to filter and say, "Oh, I went into that room, and that's where the dog lovers were or that's where the people who went to Berkeley are, and that's kind of who I want to meet, and so that's where I'm going." So it's got a very sort of basic function in the Tinder ecosystem.
>
> But it also opens us up to lots of different experiences, whether it's Swipe Night, which is an interactive experience that everyone kind of does at the same time and can bond over. We're about to roll out Festival Mode, which we've been delaying because of COVID. But basically, that's going to enable people to connect through Tinder and say, I'm going to the same South by Southwest or some other festival that's coming up, and we're doing that with Live Nation. And so it's a good example of the use of Explore for things that are happening right now that people are going through. They can share the experience in common. They meet online but then meet off-line, so it's a good collision of the online and off-line worlds. We're doing it with partners, with name brands that people have heard of. So there's lots of interesting things that we're going to be able to do with the Explore tab, and we're just in the very early innings.
>
> *I mean, I think the key thing was obviously building it, getting people to adopt it, go check it out. That's happened, and it's happened really well. Adoption, men, women, by geography has been really strong,* and so now we can start to really build on it and give people different experiences, give them more reasons to go there, more reasons to spend time on Tinder. And then we can start to turn our attention to monetization down the road.

85. Swidler's statement that "That's [getting people to adopt it, go check it out] happened, and it's happened really well. Adoption, men, women, by geography has been really strong," was materially false and misleading when made because, for the reasons explained in ¶75, Explore user engagement percentages never exceeded single digits from the time of its launch in Fall 2021 through June 2022, and Explore did not see high levels of adoption or engagement. For

the reasons explained in ¶76, Defendant Swidler knew or recklessly disregarded that these statements about Explore engagement were false and misleading when made.

### D. May 3, 2022 First Quarter 2022 Letter to Shareholders

86. On May 3, 2022, the Company announced its financial results for the first quarter of fiscal year 2022. On the same date, Match Group filed a letter to shareholders on Form 8-K with the SEC, signed by Defendants Dubey and Swidler. In the letter, Defendants Match Group, Dubey, and Swidler assured investors that the Company would deliver on its previously announced initiatives for Tinder: "*We're largely on track with the initiatives we laid out in our prior shareholders' letter and are especially excited about the future for Tinder Explore and virtual goods.*" The prior initiatives "laid out" in the prior letters were Explore and Coins.

87. Defendants Match Group, Dubey, and Swidler again touted the rollout of Explore and reiterated the planned launch of Coins for the summer of 2022:

> Tinder continues to evolve and transform its product. *Tinder Explore adoption levels continue to be high across active users.* Explore recently launched Festival Mode™ as one of many ways members can discover and interact with each other through shared interests and experiences. Launched in conjunction with Live Nation, this feature enables members to connect before or during 20 of the biggest festivals around the world.
>
> *Tinder Coins, its in-app virtual currency, is on track to launch globally this summer.* Ultimately, we see major potential for Tinder Coins to support further customization of premium experiences for members, incentivize positive network behaviors, and be the financial backbone for the virtual goods and trading ecosystem which we expect to begin testing in the second half of 2022. Tinder also continues to iterate and test a set of monetization features designed for female users, with a planned launch of a new female-focused package in the second half of 2022.

88. Defendants' statements that "Tinder Explore adoption levels continue to be high across active users" was materially false and misleading when made because, for the reasons explained in ¶75, Explore user engagement percentages never exceeded single digits from the time of its launch in fall 2021 through June 2022, and Explore did not see high levels of adoption or

engagement. For the reasons explained in ¶76, Defendants knew or recklessly disregarded that these statements about Explore engagement were false and misleading when made.

89. Defendants' statements that "We're largely on track with the initiatives we laid out in our prior shareholders' letter;" "Tinder Coins, its in-app virtual currency, is on track to launch globally this summer;" and "Ultimately, we see major potential for Tinder Coins to support further customization of premium experiences for members, incentivize positive network behaviors, and be the financial backbone for the virtual goods and trading ecosystem which we expect to begin testing in the second half of 2022," were all false and misleading when made. Dubey and Swidler attended an "all hands" meeting, held in either March or April 2022 at which it was announced that Tinder Coins was being scrapped and/or put on hold. It was therefore false, and materially misleading, to represent that a scrapped product was "on track to launch this summer" and to claim to see "major potential for Tinder Coins" a product that had been scrapped and put on hold.

### E. May 4, 2022 First Quarter 2022 Earnings Call

90. During an earnings conference call on May 4, 2022, Defendant Dubey falsely stated that "by and large, *we are on schedule with what we planned to deliver in 2022*."

91. This statement was materially false and misleading when made because, for the reasons explained in ¶¶75, 77, Explore was a "dud," its user engagement remained at around 5%—never reaching double-digit engagement numbers and the rollout of Coins had been indefinitely "shelved" and "put on hold" by February 2022. For the reasons explained in ¶¶76, 78, 89, Defendants knew or recklessly disregarded that this statement was false and misleading when made. Plus, less then 3 months later, Kim would admit that Tinder did not execute on its roadmap during the first half of 2022, that user engagement for Explore was low, and that Match Group had "decided to take a step back and re-examine [Tinder Coins] so that it can more effectively contribute to Tinder's revenue." Tinder Coins never launched.

### F. December 8, 2022 Barclays Industry Conference

92. At a Barclays Global Technology, Media and Telecommunications Conference on December 8, 2022, in response to an analyst question about Tinder Coins, Defendant Swidler stated, "It's on the road map for kind of middle to back half of next year. *It was just delayed is the way that I would think about it. It was pushed from 2022 to 2023 to give it more time to be refined*."

93. The statement identified in paragraph 92 was false and misleading when made. Coins had not been "delayed … to give it more time to be refined." As explained by FE 2, the technical development of Coins was nearly complete by February 2022. And FE 5 explained, there were no bugs or engineering delays associated with Coins. Instead, as explained in ¶¶76, 78, 89, Swidler knew that overwhelmingly negative user reaction to the product led to its rollout being indefinitely "put on hold"/"shelved" by February 2022. Tinder's engineering team performed no additional work on Coins throughout 2022.

## THE TRUTH BEGINS TO EMERGE

94. On August 2, 2022 after the close of the markets at 4:18 p.m., Match Group filed its 2Q22 Letter to Shareholders on Form 8-K. The letter announced financial results for the second quarter of 2022, including Tinder direct revenue growth of 13% on a year-over-year basis (in line with earlier forecasting), but the Company warned that it expected Tinder's growth to slow in the second half of 2022, projecting third quarter direct revenue growth in just the mid-single digits for Tinder. In the letter, Kim attributed this expected slowdown to poor execution and accordingly revealed an overhaul of the Tinder leadership:

> Over these past few quarters, Tinder has continued to iterate on Explore™, including the launch of Music Mode™ and Blind Date, and we continue to believe there is much more opportunity for leveraging Explore. *However, over that same period, we have not been able to realize the monetization successes that we typically deliver. Tinder's current revenue growth expectations for the second half of the year are below our original expectations as a result of disappointing execution on several optimizations and new product initiatives.* I believe Tinder's

> overall product execution and velocity can be improved and that we need to do more to excite our user base to drive top of funnel growth.
>
> *Today we're announcing the departure of Tinder CEO Renate Nyborg, and I have made some changes to the management team and structure that I am confident will help deliver Tinder's full potential.* While we search for a permanent Tinder CEO, I will oversee a newly formed team of executives who will manage day-to-day operations and will ensure the Tinder organization is well coordinated, ships great new features at increased velocity, and delivers on Tinder's promise.

95. Kim also stated that "after seeing mixed results from testing Tinder Coins, we've decided to take a step back and re-examine that initiative so that it can more effectively contribute to Tinder's revenue."

96. On August 3, 2022, Kim again discussed during the 3Q22 earnings call that he had replaced the Tinder leadership team because Tinder had not delivered on its product roadmap for the first half of 2022:

> With the current Tinder CEO stepping down, I've put a new leadership team in place who will report directly to me, while I lead the recruiting efforts for a new CEO. This team has a great working dynamic that's already apparent and brings proven expertise to Tinder's next phase of growth. They're passionate, strategic leaders who are also able to get into the trenches, experiment, lead by example and get things done. I'm confident that this new team will work well together to build product and enhancements and innovation.
>
> But I do want to acknowledge that there have been some misfires and turnover on the team that have led to delays in product and execution in the first half of the year. I believe that our new team can right that ship, but it will take some time to execute and build momentum.
>
> * * *
>
> From my experience, product innovation always drives user adoption and engagement. We have great products. But I want to speed up product delivery, bring new dynamic features to life and set big audacious goals. At Tinder, we need some time to regain product momentum. I'm committed to product innovation that will give our users more reasons to come back more often and for new singles to sign up and start dating.

97. And in response to an analyst's question about "what went wrong at Tinder," Kim admitted,

> *Tinder did not deliver on its product roadmap for the first half of the year. And execution on a number of initiatives have been delayed that we were counting on for growth in Q3 and Q4*. Typically, Tinder works on big initiatives on the first half of the year that materialize in Payer and revenue growth in the second half of the year. But that didn't happen this time around. So we don't expect the same revenue bump that we typically see.
>
> *As an example, a lot of time was spent building Explore.* It's a strong gateway with high engagement, but we haven't succeeded yet on innovating the user experience and then also building monetization features to maximize its potential. I do believe that there is a lot of market opportunity and great product ideas at Tinder, but it's all about execution.

98. On January 31, 2023, Match Group reported disappointing financial results for 2022. In a letter to shareholders released the same day, Match Group, Kim and Swidler admitted that "a significant portion [of the shortfall] resulted from weaker-than-expected product execution at Tinder, the effects of which became more pronounced as the year progressed." They also stated that Tinder is only "beginning to execute on its clearly defined product roadmap" and completely omitted Explore, which was featured heavily in prior shareholder letters during the Class Period, from its "2023 Roadmap" shown below:



99. During a conference call with analysts and investors on February 1, 2023, Defendant Swidler explained why Match Group failed to deliver on its guidance. There were "3 areas" that caused the shortfall. One-third of the reason was "FX [foreign exchange] headwinds." *Another "half of the rest or 1/3 comes from what [Kim] just talked about, which is Tinder missed execution and lack of delivery of initiatives, not having hit product roadmap and delivered as we expected in the first half of the year.*" (emphasis added.) The third area was weakness in the Asia Pacific markets.

100. Match's common stock declined $2.71 per share, or 5%, from $54.12 per share at close on January 31, 2023 to close at $51.41 per share on February 1, 2023.

**ADDITIONAL EVIDENCE OF DEFENDANTS' SCIENTER**

101. At all relevant times, Defendants acted with scienter. Numerous facts detailed herein support that Defendants either had actual knowledge of the material facts they omitted to disclose, and which contradicted their false and misleading statements, or acted with reckless disregard for the truth or falsity of those statements and omissions. The allegations herein, considered holistically, support a strong inference of scienter. Match Group has the scienter of its management-level employees, including each of the Individual Defendants. The following subsections further bolster the indicia of scienter set out in the above allegations, and should not be construed to either summarize or replace the indicia of scienter alleged above.

**I. Tinder Was Critically Important to Match Group and Defendants Put Their Knowledge of Tinder's Rollout of Explore and Tinder Coin at Issue**

102. During the Class Period, Tinder was the Company's most important brand, representing over 50% of Match Group's revenue. As discussed above, Defendants repeatedly described Tinder's new product initiatives, including Explore and Tinder Coins. For example, in

November 2021, Defendants Match Group, Dubey, and Swidler represented that, "increased engagement driven by experiences in Explore are expected to drive Swipes, Likes and other activity to boost revenue growth via existing features." They further stated that "Coins will be essential for the virtual goods and trading ecosystem planned for 2022 and beyond." Given the multitude of statements concerning progress with Tinder's product roadmap and expected benefits, it is unreasonable to believe that the Individual Defendants were unaware of the significance and status of the product initiatives for Match Group's largest source of revenue, which they were discussing publicly, including in response to analyst questions on conference calls to discuss the Company's quarterly earnings.

103. In addition to being commonly discussed by Defendants in Match Group's public filings and statements to investors, user engagement for Explore was monitored internally. According to FE 4, the Match Group data analytics team circulated a product usage dashboard, which showed that Explore ended up having a negligible impact on user engagement. FE 4 specified that users did not engage daily with Explore, and FE 2 stated that Match executives were aware that user engagement for Explore was only at 5% by mid-2022. FE 1 further detailed that early data from August 2021 informed the product team that Tinder Coins was "one feature too far" and caused some users to stop using Tinder. In addition, according to FE 2, after the research team completed its pre-launch research on user sentiment about Tinder Coins, a "readout" was presented to the head of products for Tinder and the corporate strategy team in or around February 2022. The results of the research study on consumer sentiment about Tinder Coins showed that "user reaction was baffled to negative" which was the reason Tinder Coins was "shelved." And FE 6 said there was "pretty widespread transparency in usage" levels related to Explore that was "available" to executives and circulated in regular reports.

104. As described in more detail herein, FEs 1, 2, 3, 4, 5, and 6 also described cultural and structural issues at Tinder that hampered progress, with FEs 3 and 4 further explaining that Tinder's products would often be pre-announced while they were still prototypes with uncertain viability. FE 2 also stated that the CEOs of each brand in the Match Group portfolio met weekly from at least May 2018 through October 2022, which included discussions of Tinder's growth. FE 2 also described how Dubey and Swidler carefully controlled the flow of information to the Board so as to avoid having to answer uncomfortable questions.

105. The accounts of the former employees discussed above show that Defendants were aware of or recklessly disregarded information contradicting or otherwise undermining their statements about Tinder's growth, performance, and product roadmap during the Class Period. Defendants were in fact apprised of and had access to internal user metrics for new product initiatives.

## II. The Individual Defendants' Compensation Plans Provide Additional Motive to Mislead

106. As set forth herein, Defendants were motivated to engage in a fraudulent course of conduct due to increased competition in the dating app sector and pressure to innovate. During the Class Period, over 50% of Match Group's revenue was derived from Tinder, but as described by FE 2, Defendants Dubey and Swidler were aware that Tinder suffered two years of sequential user decline starting in 2020 with top-of-the-funnel slowdown. As a result, Defendants were motivated to maintain Tinder's position as a top dating app to preserve Match Group's main source of revenue.

107. Match Group's strategy to adapt and grow in response to these external pressures depended on the success of Tinder's "radical product transformation." As a result, and because over 50% of Match Group's revenue was derived from Tinder during the Class Period, Match

Group's ability to steer new innovations at Tinder was especially important to Match Group's financial performance and success.

108. The structure of the Individual Defendants' performance and stock-based compensation created a concrete and personal benefit to each of them, rewarding them for artificially inflating Match Group's stock price and providing an incentive to overstate Tinder's progress in executing its product roadmap.

109. The Company's bonus program was explained as follows in Match Group's Definitive Proxy Statement filed with the SEC on April 29, 2022:

> Match Group's bonus program is designed to reward performance on an annual basis and annual bonuses are discretionary. Because of the variable nature of the bonus program, and because in any given year bonuses have the potential to make up a significant portion of an executive's total direct compensation, *the bonus program provides an important incentive tool to achieve Match Group's annual objectives. Match Group generally pays bonuses shortly after year-end following finalization of the financial results for the year in question.*
>
> The determination of bonus amounts is based on a non-formulaic assessment of factors that vary from year to year, including a discretionary assessment of Company and individual performance. In determining individual annual bonus amounts, the Committee considers a variety of factors regarding the Company's overall performance, such as growth in profitability or achievement of strategic objectives by the Company, an individual's performance and contribution to the Company, and general bonus expectations previously established between the Company and the executive. The Committee does not quantify the weight given to any specific element or otherwise follow a formulaic calculation; however, *Company performance tends to be the dominant driver of the ultimate bonus amount.*

110. During the Class Period, the Individual Defendants received millions of dollars in performance compensation, bonuses, and other remuneration for their role in the fraud, which far exceeded their annual salaries. In 2021, Dubey's total compensation as CEO of Match Group was $25,397,675, including $21,137,675 in stock awards. Also in 2021, Swidler's total compensation was $15,367,669, including $12,682,669 in stock awards. In February 2021, Dubey was granted 33,055 restricted stock units ("RSUs") and 99,166 performance-based restricted stock units

("PSUs"). Swidler was granted 19,833 RSUs and 59,500 PSUs. In 2021, Dubey realized a value of $19,184,782 on vesting of RSUs, and Swidler realized a value of $4,549,186 on vesting of RSUs.

111. For the year 2022 (until May 2022), Dubey's total compensation was $23,016,375, including $18,771,038 in stock awards. Also in 2022, Swidler's total compensation was $23,677,633, including $20,992,633 in stock awards. In March 2022, Dubey and Swidler were granted RSUs and PSUs, the number of which was determined by dividing the values below by the 30-day volume-weighted average stock price ending on the date of Committee approval of the awards. Dubey was granted $7,500,000 in RSUs and $7,500,000 in PSUs (at target), and Swidler was granted $5,000,000 in RSUs and $5,000,000 in PSUs (at target).

112. As explained in Match Group's Definitive Proxy Statement filed with the SEC on May 1, 2023, the portion of PSUs that is earned and vests is based on Match Group's relative total stockholder return percentile rank among the Nasdaq-100 index composite companies.

113. As a result of their fraudulent conduct detailed above, Defendants collected performance-based compensation that well exceeded their annual salaries.

**LOSS CAUSATION/ECONOMIC LOSS**

114. During the Class Period, as detailed here, Defendants engaged in a scheme to deceive investors and the market and a course of conduct that artificially inflated the price of Match Group stock and operated as a fraud or deceit on Class Period purchasers of Match Group stock by misrepresenting and omitting material information about the performance and rollout of new features for Tinder. When Defendants' prior misrepresentations and omissions were disclosed to the market, beginning on August 2, 2022, Match Group's stock price fell as part of the artificial inflation came out of the price. The full artificial inflation did not come out of the stock price until February 1, 2023. As a result of their purchases of Match Group stock during the Class Period,

Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

115. Defendants' misleading statements and omissions of material facts, identified at ¶¶72-93, had the intended effect and caused Match Group stock to trade at artificially inflated prices during the Class Period.

116. Match Group's stock price suffered as a direct result of the disclosures made at 4:18 p.m., on August 2, 2020, as detailed in ¶¶94, which revealed (1) that the Company expected just mid-single digit revenue growth for Tinder's in the second half of 2022 due to poor leadership and execution; and (2) that Tinder's leadership was being overhauled. On August 3, 2022, as detailed in ¶¶95, Kim revealed that he had replaced the Tinder leadership team because Tinder had not delivered on its product roadmap for the first half of 2022, and Swidler disclosed that "some of the Tinder product initiatives and optimizations that we've been counting on for revenue growth in the second half of 2022 are not delivering as we'd expected and we[']re delaying some launches." In direct response, Match Group's stock price fell 17% from $76.71 per share at close on August 2, 2022 to close at $63.24 per share on August 3, 2022.

117. The decline in Match Group's stock price on August 3, 2022 resulted from the revelation to investors and the market of the truth about the nature and extent of and/or the materialization of risks concealed by Defendants' Class Period material misstatements and omissions.

118. The disclosure on February 1, 2023, as detailed in ¶¶98-99, directly caused Match Group's stock price to fall from $54.12 per share at close on January 31, 2023 to close at $51.41 on February 1, 2023—a drop of 5%. At 4:11 p.m. on January 31, 2023, Match Group disclosed, in its 4Q22 letter to shareholders, disappointing financial results for 2022. They admitted that "a

significant portion [of the shortfall] resulted from weaker-than-expected product execution at Tinder, the effects of which became more pronounced as the year progressed." Defendants also conceded that Tinder is only "beginning to execute on its clearly defined product roadmap" and completely omitted Explore, which was featured heavily in prior shareholder letters during the Class Period. Swidler explained that why Match Group failed to deliver on its guidance. There were "3 areas" that caused the shortfall. One-third of the reason was "FX [foreign exchange] headwinds." Another "half of the rest or 1/3 comes from what [Kim] just talked about, which is Tinder missed execution and lack of delivery of initiatives, not having hit product roadmap and delivered as we expected in the first half of the year." The third area was weakness in the Asia Pacific markets. Of course, Tinder's 2022 product roadmap included Explore and Coins.

119. Swidler further revealed that "our business overall and Tinder in particular, decelerated as the year went on, and product execution was not what we expect[ed] it to be, especially in the first half of the year." Kim also admitted that "we head into 2023 with less momentum than what we would like."

120. The timing and magnitude of Match Group's stock price decline negates any inference that the losses suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific factors unrelated to Defendants' fraudulent conduct. On August 3, 2022, the NASDAQ was down only 0.2%.

121. The losses suffered by Lead Plaintiff and other members of the Class resulted from Defendants' fraudulent scheme to inflate Match Group's stock price and the subsequent, significant declines in the value of that stock when Defendants' prior misrepresentations and omissions were revealed.

## CLASS ACTION ALLEGATIONS

122. Lead Plaintiff brings this action as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), on behalf of a class consisting of all purchasers of the common stock of Match Group during the Class Period ("Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

123. The members of the Class are so numerous that joinder of them is impracticable. Throughout the Class Period, Match Group traded on the NASDAQ exchange. While the exact number of Class members is not presently known to Lead Plaintiff, and can be ascertained only through discovery, Lead Plaintiff believes there are thousands of members in the proposed Class. Record owners and other members of the Class can be ascertained through records maintained by Match Group and/or its transfer agent. Those record holders could be notified of the pendency of this action by mail.

124. Lead Plaintiff's claims are typical of the claims of the members of the Class, as all are similarly affected by Defendants' wrongful conduct in violation of federal law.

125. Lead Plaintiff will fairly and adequately protect the interests of the members of the class and has retained competent and experienced securities litigation counsel.

126. Common questions of law and fact exist as to all members of the Class and will predominate over any questions solely affecting individual members of the Class. Among the common questions of law and fact common to the Class:

(a) Whether the Exchange Act was violated by Defendants as alleged herein;

(b) Whether statements made by Defendants misrepresented and omitted material facts about Match Group's business, operations, and management; and

(c) To what extent the members of the Class have suffered damages, and the proper measure of those damages.

(d) A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. As the damages suffered by each individual Class member may be relatively small, the burden and expense of litigating individual cases would make it all but impossible for many members of the Class to redress wrongs done to them. There will not be any difficulty in managing this action as a class action.

**FRAUD ON THE MARKET**

127. Lead Plaintiff will rely on the presumption of reliance established by the fraud-on-the-market doctrine. Among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) These omissions and material misrepresentations were material;

(c) Match Group common stock traded in an efficient market throughout the Class Period;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Match Group common stock; and

(e) Lead Plaintiff and other members of the Class purchased Match Group common stock between the time Defendants misrepresented or failed to disclose material facts and the time the facts were disclosed, without knowledge of the misrepresented or omitted facts.

128. At all relevant times, the market for Match Group common stock was efficient, as:

129. Match Group filed periodic public reports with the SEC as a regulated issuer; and

130. Match Group regularly communicated with public investors via established communications mechanisms, including through the regular dissemination of press releases on major news wire services, communications through the financial press, securities analysts, the internet, and other similar reporting services.

**AFFILIATED UTE RELIANCE**

131. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the performance and rollout of features at Tinder—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. That requirement is satisfied here given the importance of the issues at hand.

**COUNT I**

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against all Defendants**

132. Lead Plaintiff incorporates ¶¶1-131 by reference.

133. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and concealed material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

134. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Match Group securities during the Class Period.

135. Along with the duties of full disclosure imposed on Defendants as a result of their affirmative false and misleading statements to the public, the Defendants had a duty to promptly disseminate truthful information about Match Group's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market prices of the Company's securities would be based on truthful, complete, and accurate information. SEC Regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

136. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the Class have suffered damages in connection with their purchases of Match Group common stock during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for Match Group securities and experienced losses when the artificial inflation was released from Match Group securities as a result of the revelations and prices decline detailed here. Plaintiffs and the Class would not have purchased Match Group securities at the prices they paid, or at all, if they had known that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

137. Because of the foregoing, Match Group, Dubey, and Swidler have each violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

138. Lead Plaintiff incorporates ¶¶1-131 by reference.

139. During her tenure as officer and director of Match Group, Dubey was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. Because of her position of control and authority as officer and director of Match Group, Dubey had the power and authority to cause Match Group to engage in the conduct complained of here. Dubey was able to, and did, control, directly and indirectly, the decision-making of Match Group, including the content and dissemination of Match Group's public statements and filings described herein, thereby causing the dissemination of the materially false and misleading statements and omissions as alleged herein.

140. In her capacity as Chief Executive Officer and director of Match Group, and as more fully described herein, Defendant Dubey participated in the misstatements and omissions set forth above. Indeed, Dubey had direct and supervisory involvement in the day-to-day operations of the Company and had access to non-public information about Match Group's deceptive and risky business practices. Dubey had the ability to influence and direct and did so influence and direct the activities of Match Group in its violations of Section 10(b) of the Exchange Act and Rule 10b-5 as detailed in ¶¶132-137.

141. During his tenure as officer of Match Group, Swidler was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. Because of his position of control and authority as officer and director of Match Group, Swidler had the power and authority to cause Match Group to engage in the conduct complained of herein. Swidler was able to, and did, control, directly and indirectly, the decision-making of Match Group, including the content and dissemination of Match Group's public statements and filings described herein, thereby

causing the dissemination of the materially false and misleading statements and omissions as alleged herein.

142. In his capacity as Chief Financial Officer of Match Group, and as detailed herein, Defendant Swidler participated in the misstatements and omissions set forth above. Indeed, Swidler had direct and supervisory involvement in the day-to-day operations of the Company and had access to non-public information about Match Group's deceptive and risky business practices. Swidler had the ability to influence and direct and did so influence and direct the activities of Match Group its violations of Section 10(b) of the Exchange Act and Rule 10b-5 as detailed in ¶¶132-137.

143. As a result, Individual Defendants were control persons within the meaning of Section 20(a) of the Exchange Act. Because of their position, and as a result of its aforementioned conduct and culpable participation, Dubey and Swidler are jointly and severally liable, pursuant to Section 20(a) of the Exchange Act, to Plaintiffs and the other members of the Class.

144. This claim is brought within the applicable statute of limitations.

145. By reason of the foregoing, Defendants Dubey and Swidler violated §20(a) of the Exchange Act, 15 U.S.C. §78(a).

## PRAYER FOR RELIEF

146. WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

(a) Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b) Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiff and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

147. Lead Plaintiff demands a trial by jury.

DATED: August 12, 2024

**BLOCK & LEVITON LLP**

/s/ Lindsay K. Faccenda
Kimberly A. Evans (#5888)
Lindsay K. Faccenda (#5772)
222 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 499-3600 phone
kim@blockleviton.com
lindsay@blockleviton.com

*Counsel for Lead Plaintiff Northern California Pipe Trades Trust Funds and Lead Counsel for the Putative Class*

*Of Counsel:*

Jeffrey C. Block (*pro hac vice*)
Jacob A. Walker (*pro hac vice*)
Sarah E. Delaney (*pro hac vice*)
Michael D. Gaines (*pro hac vice*)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
(617) 507-6020 fax
jeff@blockleviton.com
jake@blockleviton.com
sarah@blockleviton.com
michael@blockleviton.com

Jesse L. Jensen (*pro hac vice forthcoming*)
Robert Kravetz (*pro hac vice forthcoming*)
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
(212) 554-1400 phone
(212) 554-1444 fax
jesse.jensen@blbglaw.com
robert.kravetz@blbglaw.com

*Additional Counsel for Lead Plaintiff Northern California Pipe Trades Trust Funds and the Putative Class*