**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| LEOPOLD RIOLA BARDAJI, *Individually and on Behalf of All Others Similarly Situated,* | |
| Plaintiff, | C.A. No. 23-0245-MN |
| v. | **Class Action** |
| MATCH GROUP, INC., SHARMISTHA DUBEY, BERNARD KIM, and GARY SWIDLER, | Jury Trial Demanded |
| Defendants. | |

**ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
THE SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

PRELIMINARY STATEMENT .....................................................................................................1

NATURE AND STAGE OF THE PROCEEDINGS .....................................................................4

SUMMARY OF ARGUMENT .......................................................................................................5

ARGUMENT ..................................................................................................................................5

     I.      The Former Employees are Credible and Their Information is Reliable.................5

     II.     Dubey and Swidler Misled Investors About Tinder Coins.....................................8

     III.    Dubey and Swidler Misled Investors About Tinder Explore.................................14

     IV.    The SAC Alleges Defendants Acted with Scienter ...............................................16

     V.     The SAC Adequately Pleads Loss Causation ........................................................19

CONCLUSION.............................................................................................................................20

## TABLE OF AUTHORITIES

**CASES**

*Allegheny Cty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189 (E.D. Pa. 2021) .................................................................................................................... 6

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004) ...................................... 8

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.,* 70 F.4th 668 (3d Cir. 2023) ............................................................................................................. 5, 6, 7, 16

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009) ............................................................ 5

*Gorlamari v. Verrica Pharms., Inc.*, 2024 WL 4026176 (E.D. Pa. Sept. 3, 2024) ......................... 8

*In re Advance Auto Parts, Inc. Sec. Litig.*, 2020 WL 599543 (D. Del. Feb. 7, 2020) ............ 13, 19

*In re Cambrex Corp. Sec. Litig.*, 2005 WL 2840336 (D.N.J. Oct. 27, 2005) ......................... 16, 18

*In re Grand Canyon Educ., Inc. Sec. Litig.*, 2023 WL 2072227  (D. Del. Feb. 17, 2023) .................................................................................................................. 19

*In re Maxwell Techs., Inc. Sec. Litig.*, 18 F. Supp. 3d 1023 (S.D. Cal. 2014) ................................ 7

*In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801 (D.N.J. Aug. 28, 2017) ................. 17

*In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635 (E.D. Pa. 2015) ............................... 17

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167 (D.N.J. 2022) .................................................................................................................. 11

*Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009) .................................. 6, 12, 16

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702 (7th Cir. 2008) ................................ 19

*Martin v. GNC Holdings, Inc.*, 2017 WL 3974002 (W.D. Pa. Sept. 8, 2017) .............................. 10

*McDermid v. Inovio Pharms., Inc.*, 520 F. Supp. 3d 652 (E.D. Pa. 2021) ................................... 13

*OFI Risk Arbitrages v. Cooper Tire & Rubber Co.*, 2015 WL 4036179 (D. Del. Jul. 1, 2015) .................................................................................................................... 8

*Rahman v. Kid Brands, Inc.*, 736 F.3d 237 (3d Cir. 2013) .......................................................... 17

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874 (E.D. Pa. 2018) ..................... 11, 19

*Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115 (N.D. Cal. 2017)......................................... 13, 16

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007) .................................................... 17

*Williams v. Globus Med., Inc.*, 869 F.3d 235 (3d Cir. 2017).............................................. 5, 11, 13

*Wochos v. Tesla, Inc.*, 985 F.3d 1180 (9th Cir. 2021) ................................................................... 10

**STATUTES**

15 U.S.C. §78u-4(b)(1) ............................................................................................................... 6

## PRELIMINARY STATEMENT

The Second Amended Complaint ("SAC") states actionable claims for securities fraud, responding to the Court's Order dismissing the First Amended Complaint ("FAC") by streamlining and bolstering the claims, including with new allegations from Former Employees ("FEs")..

Match Group, Inc. ("MGI") executives Dubey and Swidler were under pressure to increase revenue and user growth at MGI's largest and most iconic segment, Tinder. Tinder accounts for over half of MGI's revenues, is consistently a chief focus of stock market analysts, and was discussed at every MGI Board meeting.

Thus, in November 2021, Dubey and Swidler announced a "radical product transformation" at Tinder headlined by its new product features, Explore and Tinder Coins. Explore and Coins were to "boost revenue growth" in 2022 and be "the harbinger for Tinder's long term vision."

Neither Explore nor Coins were well received by Tinder users, however, and neither had any positive impact on revenue. The problem for Dubey and Swidler was that Tinder set its "product roadmap" early in the year and its engineers worked on those new features during that year to have them ready for launch. Thus, Tinder could not easily swap one new product initiative for another, and as a result, as FEs 3 and 4 explained, "products were talked about publicly that were not ready" and might not pan out.

That is exactly what happened with Explore and Coins. Dubey and Swidler told investors in November 2021 that those two new initiatives would bring much needed growth to Tinder and even that Explore was *already* being well received. In reality, by the start of the Class Period on February 1, 2022, Explore had negligible user engagement and adoption, and Coins was on the verge of being scrapped because user feedback on it was highly negative. Throughout the Class Period, Dubey and Swidler continued to falsely promote these two already failed products, both of which were ultimately discarded as Tinder products in 2022.

- 1 -

The Class Period begins on February 1, 2022 when Dubey and Swidler sent a letter to MGI shareholders in which they represented that Tinder "continues to rollout Coins" and in response to a stock market analyst's question about Coins, Dubey represented that day that "we are seeing some increased engagement and retention from [Coins-related] incentives" and "the plan is to accelerate the rollout in Q2 and be out globally by Q3." But "increased engagement and retention" was not what testing showed, and this was not the plan. MGI's corporate strategy team was tasked with gauging consumer sentiment about Coins in February 2022 before its full rollout due to the highly unfavorable and negative consumer feedback received in late 2021. This process underscored user's negative reaction to Coins, so much so that in February 2022 Coins was scrapped as a planned product offering by Tinder. FE 5 (who provides new information in the SAC) was a product engineer at Tinder and one of ten employees on the team developing Coins. FE 5 said it was inaccurate to publicly claim that Coins was "on track" to "launch globally" in the summer of 2022. FE 5 said the Tinder team was emailed in February 2022 that Coins was being placed on hold and no Tinder engineer did any additional work on Coins for the remainder of 2022. FE 2 confirmed that both Dubey and Swidler's consent would be necessary before a new major initiative, like Coins, would be shelved. Despite shelving Coins, Dubey and Swidler continued to point to Coins as a product feature that would help transform Tinder.

In their motion to dismiss, Defendants disingenuously claim that, at the start of the Class Period, "MGI cautioned that Coins was not even a 2022 revenue item." D.I. 64, at 1. That is not what MGI said. In February 2022 Dubey said "we're not counting on any sort of meaningful contribution to 2022 revenue" *not* that there would be *no revenue at all*, as Defendants now suggest. Moreover, both Dubey and Swidler continued to promote Coins in 2022, consistent with the transformative initiative they had promoted to shareholders months earlier.

- 2 -

As for Explore, Dubey and Swidler boasted in a February 1, 2022 letter to shareholders that "approximately two thirds of active [Tinder] users *engage* with Explore," and They even included a chart depicting the "% of Active User *Adoption*" of Explore, in which those percentages ranging from 62% to 71%, depending on age, geography or gender. In a May 3, 2022 letter to shareholders, Dubey and Swidler claimed that "Explore adoption levels continue to be high across active users." In reality, these representations of how many users adopted or engaged with Explore were false and misleading when made.

FE 2 stated that Bernard Kim (who replaced Dubey as CEO in May 2022) specifically requested Explore user engagement data after it was omitted during a weekly meeting in June 2022, and user engagement was 5%. FE 6 (who provides new information for the SAC) was the lead analyst working on Explore and said that user engagement was low and the "actual usage of Explore did not change much over time."

That user engagement was low and usage did not change much over time dovetails with clarifying information from FE 2 that when FE 2 put together information for Board meetings, as directed by Dubey and Swidler, they wanted to tout successful features to the Board, which would have meant more than 10% user engagement for Explore. FE 2 said they never included any such information in any Board presentation after Explore was introduced in November 2021. Thus, read collectively, the combined allegations from FE 2, FE 6, and others sufficiently establish at the pleading stage that Explore user engagement was significantly lower than what Dubey and Swidler represented, so their statements materially false and misleading when made.

In their motion, Defendants baselessly contend that the terms "engagement" and "adoption" cannot have misled investors. But Defendants publicly used these terms—explained by FE 2 to be "deliberately fuzzy"—interchangeably, and Explore never achieved the percentages of usage

Defendants claimed, making their statements false. Plus, Defendants publicly touted these metrics as meaningful gauges of Explore's effect, so if they meant something other than what a reasonable investor would understand, it was their responsibility to define and clarify their own representations.

On August 2, 2022 investors began to learn the truth about Defendants' false claims about the purported product transformation and "revenue boost" at Tinder. On that day, Kim (who replaced Dubey as MGI CEO) told investors that, in fact, Tinder revenue was below expectations "as a result of disappointing optimization and execution on new product initiatives"—meaning, of course, Explore and Coins. Kim also told investors that "after seeing mixed results from product testing Coins" (these "mixed results" were known since at least August 2021) Tinder would "step back and re-examine" Coins and its ability to be a revenue generator. The next day, during a call with analysts and investors, Kim responded to an analyst's question "what went wrong at Tinder" by pointing to Explore and saying "Tinder did not deliver on its product roadmap [Explore and Coins] for the first half of the year. And execution on a number of initiatives have been delayed that we were counting on for growth . . ." MGI's stock price plunged by 17.5%, or $13.47 per share.

The full truth regarding the product mishaps at Tinder was not revealed until January 31, 2022 when MGI revealed that Tinder's revenue growth declined in 2021 and Swidler attributed the revenue decline, in part, to "not having hit product roadmap and delivered as we expected in the first half of 2021." MGI's stock price fell 5% or $2.71 per share in response.

## NATURE AND STAGE OF THE PROCEEDINGS

On September 18, 2024, Defendants moved to dismiss the SAC, D.I. 63. This answering brief responds to Defendants' arguments in their supporting Opening Brief ("OB"), D.I. 64.

- 4 -

## SUMMARY OF ARGUMENT

The motion to dismiss should be denied because the SAC pleads (1) with particularity that Defendants made materially false and misleading statements about the rollout of Explore and Coins, and (2) a strong inference that Defendants made these statements with reckless disregard for the truth because they knew and had access to information contradicting their statements.[1]

## ARGUMENT

When evaluating a motion to dismiss, the Court accepts factual allegations as true and draws all reasonable inferences in favor of plaintiff to determine whether the complaint states a claim that is facially plausible. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Rule 9(b) and the PSLRA require that securities fraud claims "include particularized allegations of fraud." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.,* 70 F.4th 668, 680 (3d Cir. 2023); *see* 15 U.S.C. §78u-4(b)(1). Defendants contend the SAC fails to allege a false or misleading statement, Defendants' scienter, or a causal link between their misstatements and subsequent corrective disclosures. *Williams v. Globus Med., Inc.*, 869 F.3d 235, 240 (3d Cir. 2017). But the information provided by FEs shows that Dubey and Swidler touted 70% user engagement and adoption of Explore, plans to release Coins globally by Q3 2022, and the importance of both to MGI's 2022 and 2023 revenue growth, were false and misleading when made.

## I.    The Former Employees are Credible and Their Information is Reliable

In the Third Circuit, several factors "guide the determination" of a confidential witness's credibility and reliability: "the dependability of a confidential witness's basis of knowledge; the level of detail provided by the witness; the degree to which other testimony or evidence

---

[1] To assist the court, annexed hereto as Exhibit A is a chart identifying each alleged false and misleading statement, why it was false and misleading and facts supporting a strong inference of scienter.

corroborates the witness's account; and the internal consistency of the information provided." *Prudential*, 70 F.4th at 691.

For each of the FEs, the SAC provides sufficient indicia of reliability and credibility. Plaintiff provides their former positions and dates of employment, who they reported to and communicated with, and how they had access to the information alleged. ¶¶42, 45, 60, 61, 65, 70, 71;[2] *see Avaya*, 564 F.3d at 263 ("Shareholders have adequately described the duration of each CW's employment, the time period during which the CWs acquired the relevant information, and how each CW had access to such information."). Recognizing that the FE allegations readily satisfy the Third Circuit's reliability and credibility requirements,[3] Defendants instead focus their efforts on disputing the substance of the FE's statements.

Defendants assert that various statements made by FEs do not give enough detail to independently prove Defendants made misstatements with scienter, and therefore should be discounted. But Plaintiff's allegations must be taken as true on a motion to dismiss, the analysis of falsity and scienter is holistic, and circumstantial evidence suffices. *See Allegheny Cty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 233 (E.D. Pa. 2021) ("Defendants argue that Plaintiffs have not provided evidence of a single meeting, or document, showing that the Individual Defendants had knowledge of the facts which contradicted their misleading statements. But a strong inference of scienter does not require a 'smoking gun.'"); *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 268 (3d Cir. 2009) (though the shareholders did "not point to any particular document or conversation that would have informed" the defendants, finding scienter based on

---

[2] Citations to ¶_ are to the Second Amended Class Action Complaint for Violations of the Federal Securities Laws ("SAC"), D.I. 56.

[3] As the Court will recall, Defendants did not contest any FE allegations in the FAC, most of which remain unchanged in the SAC, and which the Court credited in its analysis on the first motion to dismiss.

circumstantial evidence).

Defendants contend that FE 2's statements about Explore are "murky" and lack specific language. OB 13.[4] They are wrong. *See infra* 14-15. It does not matter that some of FE 2's statements are paraphrased instead of directly quoted. This does not render their statements "murky" or nonspecific. Indeed, the SAC makes clear the FE's actual statements. *See* ¶¶42-71.[5] FE 2's statements about what Dubey and Swidler knew, had access to, and sought to present to or withhold from the Board, all stem from FE 2's role working directly with them to prepare Board presentations in the run-up to each Board meeting while also gathering and circulating data from MGI's data warehouse. ¶¶45-49; *cf. Prudential*, 70 F.4th at 692 (crediting allegations from an FE's statement that internally, the company understood that a particular segment was "performing poorly" and underlying reasons). FE 2's basis of knowledge is clear.

As in *Prudential*, other allegations in the SAC also corroborate the information from FE 2, and the information "fits within a coherent narrative." 70 F.4th at 692. FE 4 said that users did not engage daily with Explore, and the Match product usage dashboard showed Explore had a negligible impact on user engagement. ¶64. FE 6 acknowledged user engagement of Explore was low, and said, "the actual usage [of Explore] did not change over time." ¶70.[6]

---

[4] Pin cites to the OB are to the ECF pagination.

[5] Unlike in *In re Maxwell Techs., Inc. Sec. Litig.*, 18 F. Supp. 3d 1023, 1034 (S.D. Cal. 2014), on which Defendants rely, the SAC clearly shows which statements are attributable to FE 2 under a separate heading, which does not include any inferences from Plaintiff.

[6] After filing their motion to dismiss, defense counsel claims to have since contacted FE 6, who affirmed that he voluntarily communicated with counsel for Plaintiff, but also claims that there is additional context to his information beyond the SAC's allegations. Post-hac "additional information" by former employees (after intimidating contact from counsel for defendants) is not uncommon, and does not give cause to go beyond the scope of the allegations, which Plaintiff stands behind. *See, e.g.*, *Gorlamari v. Verrica Pharms., Inc.*, 2024 WL 4026176, at *3-4 (E.D. Pa. Sept. 3, 2024).

Defendants cite *OFI Risk Arbitrages v. Cooper Tire & Rubber Co.*, 2015 WL 4036179, at *3 (D. Del. Jul. 1, 2015) and *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004) to argue that FE 5's statements lack detail and corroboration. OB 15-16. But *Chubb* merely requires the basic indicia of credibility and reliability for confidential witness statements restated most recently by the Third Circuit in *Prudential*. 394 F.3d at 148, 155 ("[T]he underlying prerequisite [is] that each source is described sufficiently to support the probability that the source possesses the information alleged.") *Chubb* does not require FE 5 specify who the email about Coins came from, how long Coins would be on hold for, or whether further engineering work was necessary for global release. OB 15. And unlike FE 5, the witness in *OFI Risk Arbitrages* could only speak to the knowledge of an "unknown" company executive and did not specify what the individual defendants knew. That is not the case here. The basis of FE 5's allegations is clear. FE 5 knew that Coins had been placed "on hold" because FE 5 was a member of the Coins engineering team. ¶65. After receiving the email informing the team that Coins was "on hold," FE 5 and the other team members who had been working on Coins had to shift their efforts to Explore, and FE 5 did not perform any additional work related to Coins through the end of 2022. ¶68. Moreover, FE 5's statements are corroborated by the accounts of FE 2, FE 4, and FE 7.

## II.    Dubey and Swidler Misled Investors About Tinder Coins

FE 1, the Chief Product Officer at Tinder through November 2021, said Tinder rolled out a "soft launch" of Coins in some smaller test territories (mainly in Asia where the user base is more familiar with using virtual currency for microtransactions) beginning in August 2021. ¶44. The early data in August 2021, according to FE 1, showed "right from the get-go" that Coins worsened retention; users would get confused or think the feature was too much work to use. ¶44.

FE 5, a product engineer at Tinder on the ten-member team of developers, engineers, and quality assurance staff who worked on Coins and Explore, corroborated FE 1's statements. ¶65. In

late 2021, Coins engineering members, including FE 5, received an email telling them Coins was "not user friendly." ¶66. Users had tested the product, and user feedback was negative: Coins was "not easy to use" and users "did not like it." ¶66. There were no bugs or engineering delays associated with Coins, said FE 5; users just did not like the feature. ¶66. By the end of 2021, said FE 2, the Senior Manager of Corporate Strategy at MGI, it became evident that Coins was not panning out. ¶59.

FE 2 said that the development of Tinder Coins was nearly complete by February 2022. ¶56. The MGI corporate strategy team was tasked with gauging consumer sentiment about Coins before its release and conducted pre-launch research. ¶56. The results were presented to the head of products for Tinder and the MGI corporate strategy team in or around February 2022 in a "readout," which showed "user reaction was baffled to negative." ¶¶56-57. These results were so negative that Coins was "shelved" in February 2022, and FE 2 did not hear about Coins again before departing MGI in October 2022. ¶57. FE 7, a Localization Program Manager at Tinder, similarly said that Tinder Coins had been "scrapped" before FE 7 departed Tinder in March 2022. ¶71. And FE 5 corroborated FE 2 and FE 7, reporting that he and his team received an email in February 2022 informing them that Coins was "on hold." ¶¶67-68. FE 5 said that after receiving this email, FE 5 and the other engineers working on Coins immediately shifted their efforts to Explore, and neither FE 5 nor any other engineers on the team performed additional work related to Coins before FE 5 left Tinder in December 2022. ¶68. And FE 4, a senior marketing manager at Tinder, said Coins was not yet a viable, usable product when he departed Tinder in July 2022. ¶63. FE 5 said Coins was not "on track to launch globally" in the summer of 2022. ¶¶66.[7]

_____

[7] Defendants mistakenly cite *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1194 (9th Cir. 2021) to suggest that Coins could still have been "on track" to launch globally in the summer of 2022 and

FE 2 said that Dubey and Swidler would have needed to sign off on the decision to shelve the development and rollout of Coins because they were typically focused on and involved in all of Tinder product updates in the works (of which there were only a few per year). ¶58. Dubey and Swidler received "ongoing, continuous progress reports throughout the year," said FE 2. ¶58. FE 5 said that in March or April 2022, they attended a MGI-wide "all hands meeting"—also attended by Dubey and Swidler, whose presence was announced during the meeting—during which one of the Company-wide announcements was that Coins had been put on hold. ¶69.[8]

Against this factual backdrop, during an analyst call on February 2, 2022, Dubey responded to an analyst question about the expected contribution of Tinder Coins by stating that "Coins is currently testing in 12 markets" and "we are seeing some increased engagement and retention from [Coins-related] incentives. … The plan is to accelerate the rollout in Q2 and be globally out by Q3." ¶81. Dubey misled investors by saying that "we are seeing some increased engagement and retention" from Coins when early testing data from August 2021 showed "right from the get-go"

---

Defendants could have believed it was still "on track." OB 16. In *Tesla*, allegations from two former employees that a car production goal for the end of 2017 was impossible were found insufficient because the plaintiffs failed to plead any facts showing that an individual defendant ever accepted those employees' views. 985 F.3d at 1194. Here, the testimony from FEs 2, 5, and 7 all show that Coins was actually put "on hold"/"shelved"/"scrapped" in February 2022, ¶¶57, 67-68, 71, and that Dubey and Swidler **would have had to sign off on that decision.** ¶57. And FE 5 confirms that Dubey and Swidler were present for the "all-hands meeting" announcement in March or April 2022 that Coins had been "put on hold." ¶69. That development and rollout of Coins had been indefinitely paused was not a matter of opinion.

[8] FE 5's statements regarding the "all-hands meeting" should not be discredited merely because FE 5 could not recall the exact date or because it was not described by the other FEs. *See* OB 20-21. Defendants rely on *Martin v. GNC Holdings, Inc.*, 2017 WL 3974002, at *14 (W.D. Pa. Sept. 8, 2017), but that case involved issues with the basis of a former employee's knowledge, specifically regarding topics discussed in meetings that the former employee was not alleged to have attended. Here, FE 5 can opine on what occurred in the meeting because FE 5 attended that meeting. FEs 2 and 7 also confirm that Coins was put "on hold"/"shelved" before that meeting. The Coins allegations do not rest solely on "an individual employee's unsupported opinion which otherwise lacks corroboration." *GNC Holdings*, 2017 WL 3974002, at *13. There is no basis to discount FE 5's allegations.

that Coins worsened user retention and, by the end of 2021, testing demonstrated that Coins was "not easy to use" and users "did not like it." ¶44, 66. She touted positive information to the market about testing Coins' effect on user engagement and retention while withholding contemporaneous negative testing results (which proved to be far more important to Coins' prospects).[9] *See Williams*, 869 F.3d at 241 ("Once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading."); *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 186 (D.N.J. 2022) ("Defendants may not describe 'a favorable picture' of material issue 'without including the details that would have presented a complete and less favorable one[.]'"); *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 902 (E.D. Pa. 2018) (finding "it was a material omission" to "emphasize[] the favorable abuse data in support of [defendants'] FDA submissions without disclosing the unfavorable data").

Then, on May 3, 2022, MGI filed a shareholder letter in which Dubey and Swidler said, "Tinder Coins, its in-app virtual currency, is on track to launch globally this summer," and "we expect to begin testing [on use cases for Coins] in the second half of 2022." ¶87. And during the quarterly earnings call the next day, Dubey stated that "by and large, we are on schedule with what we planned to deliver in 2022" (which was "to accelerate the rollout [of Coins in Q2] and be globally out by Q3"). ¶90. These statements are directly contradicted by the allegations that MGI and Tinder executives decided to "shelve" (in the words of FE 2), "put on hold" (in the words of FE 5), and

---

[9] Dubey's statement during a November 2021 earnings call that "the plan for 2022" was to "build all this [Coins] out, test it out, learn it, refine it, [and] work out the kinks in a couple of markets," OB 14 (quoting Ex. B at 11-12), does not render her statements made three months *later* not misleading. In February she offered new and updated information – that MGI was seeing "increased engagement" and that Coins would be out by Q3 2022 – which informed a reasonable investor that Coins was being rolled out in the second and third quarters of 2022, which was not accurate.

"scrap" (in the words of FE 7) further development and testing of Coins in February 2022 after pre-launch research by the MGI corporate strategy team revealed that user sentiment on Coins was "baffled to negative." ¶¶56-57, 67-68, 71. Indeed, FE 2 did not hear anything further about Coins before departing MGI in October 2022, and FE 5's team was immediately reassigned to Explore, with no further work done on Coins before departing Tinder in December 2022. ¶¶57, 68. Coins could not have been "on track to launch globally this summer," MGI did not "expect to begin testing" use cases for Coins, and MGI was not "on schedule with" its plans to accelerate the rollout of Coins in Q2 and be globally out by Q3 **when the development of Coins had been indefinitely halted in February without further progress since**. There was no longer a plan to launch Coins that summer, let alone globally in the next fiscal quarter.[10]

Defendants wrongly contend that statements about initiatives being "on track" are all inactionable puffery and protected forward-looking statements. OB 17. The Third Circuit recognizes that statements must be evaluated in context to determine the mix of present and future representations. *Avaya*, 564 F.3d at 255. Thus, saying sales of products are "still going strong" communicates that *current* sales are strong. *Id.* And stating, "we remain confident with the progress we're making as we execute our plan," is not puffery because it "explicitly" says the company "had a plan it was executing." *In re Advance Auto Parts, Inc. Sec. Litig.*, 2020 WL 599543, at *4 n.2 (D. Del. Feb. 7, 2020).[11] Here, stating that Coins is "on track to launch globally

---

[10] Defendants resort to fighting the facts by baselessly asserting that Coins being "on hold" in early 2022 is not inconsistent with Coins being on track to launch in the summer. OB 15, 20. Plaintiff is entitled to all reasonable inferences in its favor on a motion to dismiss; its allegations demonstrate Defendants' statements are incompatible with the underlying truth.

[11] *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1141-42 (N.D. Cal. 2017), previously relied on by the Court, D.I. 52, at 13, is in agreement. There, the court found actionable statements that "DAU to MAU ratios in the quarter were similar to what they were" at Analyst Day, while dismissing as puffery statements that Twitter was "seeing perhaps the most exciting results" from a new initiative. *Id.* at 1140-42.

- 12 -

this summer" represents, at minimum, a present plan and intent to "launch Coins globally this summer." These statements are not "so vague and of such obvious hyperbole that no reasonable investor would rely upon them." *Id.* at *5.

In any event, the cautionary language Defendants' cite—disclaiming the risk of failing to "keep up with changes in technology and user preferences" "in a timely and cost-effective manner," OB 15—cannot immunize Dubey because (1) that language does not "meaningfully" apprise investors of events that had already come to pass (MGI's decision to cease further development of Coins because of overwhelmingly negative user feedback) and (2) Plaintiff's allegations show the statement was made with actual knowledge of falsehood. *Williams*, 869 F.3d at 245; *cf. McDermid v. Inovio Pharms., Inc.*, 520 F. Supp. 3d 652, 667–68 (E.D. Pa. 2021) (plaintiff pled falsity of executive's "statement that Inovio was on track to meet its goal of producing one million vaccine doses in 2020" by alleging he knew one of Inovio's manufacturing partners lacked large scale manufacturing, another could not produce any doses without the first's intellectual property, and a third could only produce 500,000 doses in 2020).

Finally, during an industry conference hosted by Barclays on December 8, 2022, Swidler said, "[Coins is] on the road map for kind of middle to back half of next year. It was just delayed is the way that I would think about it. It was pushed from 2022 to 2023 to give it more time to be refined." ¶92. This statement was false and misleading because Coins had not been "delayed" "from 2022 to 2023" "to give it more time to be refined."[12] The technical development of Coins had been

---

[12] Defendants' argument that this statement's consistency with "the August 2, 2022 disclosure that MGI was 're-examin[ing]' Coins" somehow undercuts Plaintiff's explanation for falsity makes no sense. OB 14 n.3. Plaintiff agrees that MGI re-examined Coins (and decided against continuing with its rollout) but did so in February 2022—not August 2022—and concealed that decision from investors for months. It is no surprise that Defendants sought to conceal their misrepresentations through "consistent" statements.

nearly complete by February 2022, ¶56, and there were no bugs or engineering delays associated with Coins, ¶66. Instead, testing revealed "baffled to negative" user reaction, ¶¶56-57, which led to all further development of the product being "shelved"/"put on hold"/"scrapped" in February 2022 ¶¶57, 67-68, 71. Indeed, the engineering team that had been working on Coins was reassigned away from Coins in February 2022 and did no further work on Coins before FE 5 departed Tinder in December 2022. ¶68. And FE 2, a senior manager on MGI's corporate strategy team, heard nothing further about Coins before leaving the Company in October 2022. ¶57.

## III.    Dubey and Swidler Misled Investors About Tinder Explore

FE 2 said Explore, which was rolled out in Q3 of 2021, was a "dud" because of the low percentage of users that engaged by going into the Explore tab on Tinder; it had little effect on attracting new users. ¶51. By the end of 2021, said FE 2, it became evident that Explore was not panning out. ¶59. FE 2 said MGI's strategy determined that Explore was a failure by mining the data warehouse for comparative metrics, such as average length of time users spent on the app before Explore was introduced versus after it was launched. ¶52. FE 4, who was responsible for the marketing strategy around Explore (including positioning its launch in the summer/fall of 2021), separately stated that the product usage dashboard circulated by the MGI data analytics team showed that Explore had a negligible effect on user engagement. ¶64. FE 2 said user engagement figures were readily available in a "table in our data warehouse." ¶52. FE 6, a Director of Data Science and Analytics at Tinder and the "lead analyst on Explore," corroborated this, saying there was "pretty widespread transparency in usage" levels related to Explore that was "available" to executives and distributed to reports. ¶70

The terms "engagement" and "adoption"—used by Dubey, Swidler, and MGI interchangeably to publicly describe user interaction with the Explore feature on Tinder—are "deliberately fuzzy," explained FE 2. ¶53. However these terms were defined, user engagement never exceeded single

digit percentages. ¶75. FE 2 said Dubey and Swidler wanted to see double-digit user engagement with Explore so they could share the metrics with the Board. ¶48. But, said FE 2, Board slide decks never included any information about Explore user engagement in 2021 or 2022. ¶48. If user engagement had reached double digits, FE 2 said, Dubey and Swidler would have shared it with the Board. ¶48. FE 2 specifically recalled that user engagement with Explore was only 5% in June 2022—a figure he remembered because Kim requested Explore user engagement metrics after the information was not provided at a weekly meeting, and FE 2 was on the distribution list for these requests. ¶49. FE 6 also said that user engagement of Explore was low and added that "the actual usage [of Explore] did not change over time" before they departed Tinder in May 2022. ¶70.

Against this backdrop, in MGI's 4Q21 shareholder letter dated February 1, 2022, Dubey and Swidler boasted, "To date, the level of adoption of Explore has exceeded our expectations, with approximately two-thirds of active users engaging with Explore." ¶73. And an accompanying graphic titled "% of Active Users Adoption of Explore Since Launch" showed 62%-71% figures across age, gender, and geography demographics. ¶73. During an earnings call the next day, Dubey said Explore has "clearly had a productive start with almost 70% of users adopting this experience," and "we're seeing high levels of engagement and likes, messages and conversations." ¶¶79-80. But based on the FE statements about Explore, the obvious conclusion is that user engagement with and adoption of Explore never exceeded single digit percentages of Tinder users between the end of 2021 and June 2022. ¶75. Defendants either lied about user engagement metrics for Explore or instead reported some positive-sounding but meaningless metric that they represented to be a material representation of the Explore feature's rollout. ¶¶53, 75; *see Shenwick*, 282 F. Supp. 3d at 1143 ("misleading for Defendants to rely on favorable ad engagement trends to describe or predict user engagement when DAU, Twitter's primary metric, was flat or declining.").

Then, during a March 7, 2022 Morgan Stanley industry conference, Swidler said that "getting people to adopt [Explore], go check it out" had "happened really well. Adoption, men, women, by geography has been really strong." ¶84. And finally, in MGI's 1Q22 shareholder letter dated May 3, 2022, Dubey and Swidler said, "Tinder Explore adoption levels continue to be high across active users." ¶87. Both of these statements were false (or at least misleading) because the previously stated "strong" and "high" adoption percentages were themselves false and misleading, and FEs 2, 4, and 6 reported Explore saw low user engagement—which "did not change over time"—and was "a dud" that "had a negligible effect on user engagement." ¶¶51, 64, 70. Defendants' statements about "strong" and "high" adoption percentages "do[] not reconcile easily with these allegations" from the FEs. *Prudential*, 70 F.4th at 690.

## IV.    The SAC Alleges Defendants Acted with Scienter

For scienter, a plaintiff must "allege facts giving rise to a strong inference of either reckless or conscious misbehavior." *Avaya, Inc.*, 564 F.3d at 267. Reckless or conscious misbehavior can be established by alleging "defendants' knowledge of facts or access to information contradicting their public statements." *In re Cambrex Corp. Sec. Litig.*, 2005 WL 2840336, at *11 (D.N.J. Oct. 27, 2005). "A refusal to acknowledge the obvious or to investigate the doubtful may also give rise to an inference of scienter." *Id.* The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre or even the 'most plausible of competing inferences,'" but must merely be "cogent and at least as compelling as any opposing inference of nonfraudulent intent."[13] *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). The question is "whether *all* of the facts alleged,

---

[13] *See e.g., In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at *19 (D.N.J. Aug. 28, 2017) ("That is not to say that plaintiffs' version of events is factually bulletproof; surely it is not. Given the factual particulars alleged, however, the inference of scienter is 'at least as compelling' as an inference non-fraudulent intent, which means that these allegations survive the PSLRA standard, and should go forward to the discovery phase and be subjected to proof or disproof.").

taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323.

Tinder is MGI's largest and most important brand, accounting for over 50% of MGI's revenue. ¶101. According to FE 2, Tinder suffered two years of sequential user decline starting in 2020 with top-of-the-funnel slowdown; Tinder user numbers, revenue, and profitability were declining. ¶106. But Dubey and Swidler sold Explore as "the harbinger for Tinder's new long-term vision"—the solution to their top-of-the-funnel slowdown. ¶¶40, 106. The development and rollout of these new Tinder features was therefore a "core matter of central importance to the company and its high-level executives" that "give[s] rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 246-47 (3d Cir. 2013); *see In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 654 (E.D. Pa. 2015) (business segment comprising 44% of sales was "critical" and "[a]s such, defendants would have been alerted to extensive sales declines and markdowns in UO's North American stores, as alleged by the confidential witnesses").

FE 2 said Dubey met weekly with the CEOs of each brand in the MGI portfolio. ¶46. During these meetings, the focus for Tinder was almost always on growth. ¶46. FE 2 said Dubey and Swidler directed the creation of Board slide presentations by MGI's strategy team and carefully controlled the information going to the Board because they wanted to control the discussion about uncomfortable topics ¶54. Dubey and Swidler emphasized presenting the next initiative to the Board to distract from the current situation with Tinder or why it was not performing well. ¶54. If Dubey and Swidler carefully controlled the flow of information to the Board, the strong inference is that they also carefully controlled the flow of information to the public.

As to Coins, FE 2, 5, and 7 stated that MGI executives decided in February 2022 to

- 17 -

"shelve"/"put on hold"/"scrap" further development of Coins after the MGI corporate strategy team and head of product at Tinder received a print out of user sentiment research showing "baffled to negative" user reaction to Coins. ¶¶56-57, 67-68, 71. FE 2 said that Dubey and Swidler would have needed to sign off on the decision to shelve the development and rollout of Coins because Tinder only has a few product updates being worked on per year, so Dubey and Swidler were typically focused on and involved in all of them; they received "ongoing, continuous progress reports throughout the year." ¶58. And FE 5 said that in March or April 2022, they attended an "all hands meeting"—also attended by Dubey and Swidler, whose presence was announced during the meeting—during which one of the Company-wide announcements was that Coins had been put on hold. ¶69. Dubey and Swidler received ongoing, continuous progress reports about Coins, signed off on the decision to shelve/put on hold/scrap further development of and the planned rollout of Coins, and were present for a meeting in which that decision was announced for others. The SAC alleges Dubey and Swidler knew the information contradicting their statements before they spoke. *Cambrex*, 2005 WL 2840336, at *11.

As for Explore, FE 2 said by the end of 2021, "it became evident that Explore … [was] not panning out…. [T]he 'underlying metrics' showed a 'big red flag' that in 6-12 months Tinder was going to see a hit to the top line and they needed to do something about user retention." ¶59. These metrics were available in MGI's data warehouse, along with user engagement data, which was circulated across MGI through a product usage dashboard and by the data analytics team, and in monthly comparative intel reports sent by FE 2 to every MGI executive (including Dubey and Swidler). ¶¶46, 52, 70. Plaintiff has properly pled what, according to the FEs, MGI's internal data showed and when. *See supra* at 14-15. According to FE 2, and corroborated by FE 4, Dubey and Swidler had access to and received this user engagement data. ¶70. FE 6 also said that Explore

"got a disproportionate share of executive-level attention because it was new." ¶70. *See Advance Auto*, 2020 WL 599543, at \*8 (scienter adequately pled where "'Defendants had access to internal forecasts and the company's financial data' indicating that the company 'could not meet the projected revenues.'"). Moreover, Dubey and Swidler repeatedly touted specific percentage of users adopting and engaging with Explore, confirming their access to and knowledge of the data. *See Endo*, 351 F. Supp. 3d at 906 ("Their public comments regarding the clinical data in press releases and earnings calls confirm they had intimate knowledge of the data."). The strong inference is that Dubey and Swidler affirmatively misrepresented or recklessly disregarded actual user engagement with Explore.

Viewed holistically, the facts alleged in the SAC raise a strong inference that Defendants shelved development of Coins because of terrible user reaction and knew Explore was failing to attract or retain Tinder users, but delayed announcing a pivot away from those initiatives in the hopes that Explores' performance and product execution at Tinder, generally, could be first turned around (which would give Dubey and Swidler better news to share). Defendants gambled and lost. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008).

## V.    The SAC Adequately Pleads Loss Causation

"Adequately alleging loss causation requires only pleading a sufficient causal nexus between the loss and the alleged misrepresentation[.]" *In re Grand Canyon Educ., Inc. Sec. Litig.*, 2023 WL 2072227, at \*30-31 (D. Del. Feb. 17, 2023). Plaintiff points to four corrective disclosures: (1) MGI's August 2, 2022 Letter to Shareholders, (2) Kim and Swidler's statements during the August 3, 2022 earnings call, (3) MGI's January 31, 2023 Letter to Shareholders, and (4) Kim and Swidler's statements during the February 1, 2023 earnings call.

MGI revealed on August 2, 2022 that it expected Tinder's growth to slow in the second half of 2022, blaming "*disappointing execution on … new product initiatives*"—*i.e.*, Explore and

- 19 -

Coins. ¶94. The August 2 press release also quoted Kim stating that "after seeing mixed results from testing Tinder Coins, we've decided to take a step back and re-examine that initiative so that it can more effectively contribute to Tinder's revenue." ¶95. And on August 3, 2022, Kim admitted that "Tinder did not deliver on its product roadmap for the first half of the year," including "Explore." ¶¶97. Kim further revealed that he had replaced Tinder's leadership team, including its CEO, because of their failure to deliver. ¶96. In response to these revelations, MGI's common stock price fell by $13.47 per share on August 3, 2022, or 17.5%. ¶15.

The January 31, 2023 shareholder letter revealed "a significant portion [of the revenue shortfall] resulted from weaker-than-expected product execution at Tinder, the effects of which became more pronounced as the year progressed," that and Tinder was only then (in early 2023) "beginning to execute on its clearly defined product roadmap." ¶98. During the earnings call the next day, Swidler explained why MGI failed to deliver on its guidance: there were "3 areas" that caused the shortfall; one-third of the reason was "FX headwinds;" another "half of the rest or 1/3 comes from what [Kim] just talked about, which is Tinder missed execution and lack of delivery of initiatives, not having hit product roadmap and delivered as we expected in the first half of the year." ¶99. In response to this news, the price of MGI common stock declined $2.71 per share, or 5%, to close at $51.41 per share on February 1, 2023. ¶100.

## CONCLUSION

For all these reasons, Defendants' Motion to Dismiss should be denied.

- 20 -

October 18, 2024

*Of Counsel:*

Jeffrey C. Block (*pro hac vice*)
Jacob A. Walker (*pro hac vice*)
Sarah E. Delaney (*pro hac vice*)
Michael D. Gaines (*pro hac vice*)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
(617) 507-6020 fax
jeff@blockleviton.com
jake@blockleviton.com
sarah@blockleviton.com
michael@blockleviton.com

*Counsel for Lead Plaintiff Northern California
Pipe Trades Trust Funds and Lead Counsel for
the Putative Class*

Jesse L. Jensen (*pro hac vice forthcoming*)
Robert Kravertz (*pro hac vice forthcoming*)
**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
(212) 554-1400 phone
(212) 554-1444 fax
jesse.jensen@blbglaw.com
robert.kravertz@blbglaw.com

*Additional Counsel for Lead Plaintiff
Northern California Pipe Trades Trust
Funds and the Putative Class*

**BLOCK & LEVITON LLP**

/s/  Kimberly A. Evans
Kimberly A. Evans (#5888)
Lindsay K. Faccenda (#5772)
222 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 499-3600 phone
kim@blockleviton.com
lindsay@blockleviton.com

*Counsel for Lead Plaintiff Northern California
Pipe Trades Trust Funds and Lead Counsel for the
Putative Class*